## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| GUSTAVO DIAZ, JOSEPH SANTOS, CHRISTIAN A. GIBSON, GERALD SINCLAIR, MARVIN LEON VEAL, AND DOMENICK SCORZIELLO, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiffs, | |
| v. | CLASS ACTION COMPLAINT |
| FCA US LLC, | |
| Defendant, | JURY TRIAL DEMANDED |

### I. INTRODUCTION

1.      Plaintiffs Gustavo Diaz, Joseph Santos, Christian A. Gibson, Gerald Sinclair, Marvin Leon Veal, and Domenick Scorziello ("Plaintiffs") bring this action individually and on behalf of all persons in the United States, and in the alternative on behalf of all persons in the states of California, Florida, and New York, who purchased or leased 2014-2019 model year Dodge Challengers and Chargers equipped with the V8 engine[1] ("Class Vehicles") against Defendant FCA US LLC ("Defendant" or "FCA").  The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

---

[1] These vehicles include: 2015-2019 Charger Hellcats, 2015-2019 Challenger Hellcats and 2018 Demons models.

2.      This is a consumer class action concerning the misrepresentation of material facts, the failure to disclose material facts, and safety concerns to consumers.

3.      Defendant manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles possessed a defect which materially affects the ability of the vehicles to operate as intended and provide safe, reliable transportation.  Instead, FCA equipped these vehicles with high horsepower engines and marketed the vehicles as track-capable but failed to disclose to consumers that the rear differential was not robust enough for the horsepower and torque loads produced by the engine and transmission.

4.      Plaintiffs allege that the Class Vehicles contain a rear differential that is defective in design, manufacturing, materials, and/or workmanship.  The rear differential in the Class Vehicles all have a common defect, which was latent, but existed at the time that the Class Vehicles left FCA's possession and control and was present at the time of sale or lease of the Class Vehicles. The rear differential in the Class Vehicles is defective in its design, manufacturing, workmanship, and/or materials in that, among other problems, the rear differential is not adequately designed and/or manufactured for the torque loads of the engines and transmissions exerted during acceleration.  Accordingly, the high torque loads degrade the differential, causing the rear differential and its internal components including, but not limited to, the ring gear, pinion gear differential housing and/or axles to fail (the "Differential Defect" or "Defect").

5.      Discovery will show the Defect is the result of: defective design; sub-standard, inconsistent and improper procedures in manufacturing the rear differential; and/or poor quality-control procedures to ensure such defective rear differentials do not reach consumers.  The Defect causes unsafe driving conditions because the Class Vehicles have a significantly greater chance of failing while being driven.

6.      The Differential Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member.

7.      The Differential Defect does not merely result in an uncomfortable and unsafe driving condition. The damage to the differential imposes escalating repairs and repair costs on consumers, including having to replace the defective differential with a new differential. Further, when the differential fails, it often explodes, sending shrapnel into the undercarriage of the vehicle and damaging ancillary parts that also require repair or replacement.  Based on FCA's inability to resolve the Differential Defect, it appears all consumers will need a replacement of the rear differential before the end of the useful life of the differential and are at risk for significant damage to their vehicles if the differential explodes as a result of the premature failure.

8.      Due to the Differential Defect, the Class Vehicles are prone to exhibit premature differential failures at rates and in a manner that do not conform to industry standards. The Differential Defect substantially decreases the value of the Class Vehicles, forcing owners/lessees of the vehicles to potentially spend significant money – or to hope that FCA will cover the cost – to have the differential repaired or replaced. Even then, repairing or replacing the defective parts with currently available FCA replacement parts does not resolve the Differential Defect, because the customer is left with inherently defective parts or receives another defective part in its place. For the same reason, repairing the Class Vehicles does not cure the Differential Defect, but merely leaves the vehicles with the same defective parts that permanently decrease the Vehicle's value. As such, the Differential Defect endangers the drivers and passengers of the vehicles. It creates uncertainty for the drivers of the Class Vehicles, who cannot rely on their vehicles to operate consistently, reliably, or safely. FCA's deliberate non-disclosure and omission of these defects artificially inflated the purchase and lease price for these vehicles.  Had FCA disclosed the

3

Differential Defect, Plaintiffs and the Class members would not have purchased their vehicles or would have paid less for them.

9.      Despite knowing that the Class Vehicles contain a defect in design, manufacturing, materials, and/or workmanship that causes the rear differential and/or axle to suddenly and prematurely fail well before its useful life, FCA failed to disclose such information about the Differential Defect to the public or remedy the Defect.  Rather, FCA represented that the rear differential installed in the Class Vehicles was sufficient to withstand the intended use of the vehicle – both ordinary and high-performance driving.

10.      **"GO DOWN THAT QUARTER MILE FASTER THAN ANYONE ELSE CAN**." "When you have the guts to give drivers 707 horsepower, 605lb-ft of torque and a **staggering quarter-mile time,…" "Both Challenger SRT Hellcat and Charger SRT Hellcat house a Supercharged 6.2-liter SRT Hellcat HEMI V8 engine with upgraded components to withstand the brutal performance."**  This is what FCA told potential track-enthusiast customers to entice them to buy its 2015-2019 Charger Hellcats, 2015-2019 Challenger Hellcats and 2018 Demons. But these vehicles were far from the "upgraded component[] to withstand the brutal performance" that FCA promised.  FCA chose to equip the Class Vehicles with inadequate and defective rear differentials. These defects manifest not only in the rear differential's inability to withstand the high-performance demands of racetrack use, but also by creating dangerous driving conditions when drivers are operating the Class Vehicles on public roadways.

11.      The Class Vehicles all bear FCA's Street & Racing Technology ("SRT") badge, indicating these are high-performance vehicles designed to be driven on both ordinary public roads and for speedways, dragstrips, and other track use.

12.     When a carmaker sells a car, it has duty to ensure that the car functions properly and safely for its advertised use and is free from defects. When a carmaker discovers a defect, it must disclose the defect and make it right or cease selling the car. When a carmaker provides a warranty, it must stand by that warranty. This case arises from Defendant's breach of these rules. FCA deceived its customers when it sold Class Vehicles with the promise that they were equipped with upgraded components to withstand the brutal performance standards for track racing; they were, in fact, unusable and unsafe even for regular driving, much less for track racing.

13.     As FCA intended, consumers, through FCA's marketing, came to associate the Class Vehicles with high performance use, including racetrack and drag racing.  Moreover, these Class Vehicles came at a premium price. The Class Vehicles were sold at thousands of dollars above the list price and/or double or triple the price of the base model Charger and Challengers because muscle car/performance car enthusiasts were willing to pay the premium to own such a high-performance vehicle.

14.     As FCA intended, Plaintiffs purchased Class Vehicles, in part, for track use. However, these vehicles are not ready for track use due to the inadequate and defective rear differential. These inadequate and defective differentials pose a safety risk on a racetrack and on public roads due the horsepower and torque loads placed upon the defective rear differential for which it is incapable of withstanding. Moreover, the high speeds the Class vehicles can rapidly attain due to their high-performance engines causes the defective differential to be much a greater safety risk. As a result, the Class Vehicles for which FCA promised superior performance and quality are defective.

15.     Plaintiffs and members of the Classes relied on FCA's representations that the Class Vehicles were properly engineered and equipped to handle high performance driving, including track and drag racing use, as well as ordinary, public road driving.

16.     Defendant concealed and failed to disclose to Plaintiffs and members of the Classes that the Differential Defect exists in the Class Vehicles, poses a significant safety risk when the Class Vehicles suddenly become inoperable when the differential fails. Moreover, defendants concealed that, as a result of said defect, the Class Vehicles will require a replacement differential as well as other ancillary parts which are damaged during said failure, at a significant cost.

17.     Based on pre-production testing and design failure mode analysis, warranty claims, replacement part orders, and consumer complaints, including complaints to NHTSA, as well as other sources of internal data not available to consumers, Defendant was aware of the Differential Defect in the Class Vehicles but concealed the Defect from Plaintiffs and members of the Classes. Indeed, despite being aware of the Defect and numerous complaints, FCA knowingly, actively and affirmative omitted and/or concealed the existence of the Defect to increase profits by selling additional Class Vehicles and by unlawfully transferring the cost of repair and replacement of the rear differential and other damaged associated parts to Plaintiffs and members of the Classes.

18.     FCA has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Differential Defect, which was material to Plaintiffs and Class Members, who could not reasonably know of the Defect. FCA has not disclosed the Differential Defect to the purchasers or lessees like Plaintiffs at the point of purchase or through advertisements or marketing materials. Such disclosures would have influenced Class Members' purchase decisions and the purchase price they paid. Under all circumstances, FCA had a duty to disclose the latent Differential Defect at the point of sale of the Class Vehicles. Instead, FCA failed and

refused—and continues to refuse—to disclose the Defect and provide a meaningful remedy to those who have suffered economic harm as a result of the Differential Defect. Worse, FCA has denied warranty coverage to consumers with vehicles that are still covered by warranty for this defect.

19.     The Differential Defect is a latent defect that presents a safety risk to drivers and passengers, causes damages to driveline and ancillary components over time, and makes vehicles equipped with the defective differential dangerous. It makes the Class Vehicles unfit for the ordinary and advertised use of providing safe and reliable transportation. As such, the Differential Defect presents a breach of the implied warranty of merchantability.

20.     Additionally, because FCA concealed and failed to disclose the Differential Defect, owners have suffered and continue to suffer substantial damages and should be entitled to the benefits of all tolling and estoppel doctrines.

21.     As a direct and proximate result of FCA's concealment of, and failure to disclose, the Differential Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles  because the Defect significantly diminishes the value of the Vehicles; (2) have Vehicles that suffer premature differential failures;  (3) have and/or must expend significant money to have their Vehicles (inadequately) repaired; and (4) are not able to use their Vehicles for their intended purpose and in the manner FCA advertised

22.     In the United States, FCA provides warranty coverage for Class Vehicles under one or more warranties.  For illustrative purposes, FCA currently offers a 3-year/36,000 mile basic limited warranty and a 5-year/60,000 mile powertrain limited warranty for every Dodge branded vehicle, including the Class Vehicles.[2]

---

[2]  *See e.g.,* 2019 Dodge Challenger Quick Reference Guide*,*

23.     FCA breached its express and implied warranties through which FCA promised to, *inter alia*, (1) provide Class Vehicles fit for the ordinary and advertised purpose for which they were sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts they supplied, including the rear differential.  Because the Differential Defect was present at the time of sale or lease of the Class Vehicles and concealed from Plaintiffs and members of the Classes, FCA, was required to repair or replace the rear differential resulting from the Defect under the terms of the warranties.  Yet, discovery will show that FCA has failed to repair or replace the defective and damaged parts free of charge under FCA's warranties.

24.     FCA's decision to sell the Class Vehicles without disclosing its specialized knowledge of the Differential Defect violates consumer state laws.

25.     Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Differential Defect at the point of sale.  Plaintiff and Class members have consequently suffered ascertainable losses and actual damages. Moreover, Plaintiff seek equitable remedies, including inter alia, an order that the Class Vehicles are defective and injunctive relief preventing FCA from continuing its wrongful conduct as alleged herein.

## II.  PARTIES

### Plaintiffs

### Gustavo Diaz

26.     Plaintiff Gustavo Diaz is a citizen of California, residing in Long Beach, California.

---

https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Dodge/2019/Challenger/10011.pdf (last visited June 24, 2021)

27.     Plaintiff Diaz purchased a new 2015 Dodge SRT Challenger Hellcat (for the purpose of this section, the "Class Vehicle") on or about October 27, 2015, at Hooman Chrysler Dodge Jeep Ram of Los Angeles, an FCA authorized dealership in Inglewood, California.

28.     Plaintiff Diaz purchased his Class Vehicle primarily for personal, family, or household use.

29.     Plaintiff Diaz still owns his Class Vehicle.

30.     Unknown to Plaintiff Diaz at the time he purchased the Class Vehicle, the Class Vehicle was equipped with a rear differential that was defective and not robust enough for the horsepower and torque loads of the driveline.

31.     The defective rear differential will cause Plaintiff Diaz damages in the form of diminished value of the Class Vehicle and, with respect to future attempted repairs, time lost associated with the repairs of his vehicle, the loss of use of the vehicle during the repairs, and the expense of obtaining alternative transportation during the repairs.

32.     FCA knew about the Defect at the time of purchase but did not disclose the Defect to Plaintiff Diaz. So, Plaintiff Diaz purchased his Class Vehicle on the reasonable but mistaken belief that his Class vehicle would be safe and reliable on public roadways, which it was not, and capable of track use, which it was not.

33.     Passenger safety and reliability were important factors in Plaintiff Diaz's decision to purchase his vehicle.  Before making his purchase, Plaintiff Diaz reviewed several vehicle advertisements and test drove two other Dodge SRT vehicles before deciding on his Class Vehicle. Plaintiff Diaz selected and ultimately purchased his Class Vehicle, in part, because the Class Vehicle was represented to be and was marketed as a high-performance vehicle.

34.     FCA also produced and distributed uniform marketing materials about the Class Vehicles to dealerships with the expectation that this information would be passed onto the consumer through dealer interactions.

35.     None of the information provided to Plaintiff Diaz disclosed any defects in the rear differential or drivetrain system or that the Class Vehicles were not capable of safe driving on public roadways and track use. FCA's omissions were material to Plaintiff Diaz.  Had FCA disclosed its knowledge of the Differential Defect before he purchased his Class Vehicle, Plaintiff Diaz would have seen or been aware of the disclosure.  If FCA had disclosed to Plaintiff Diaz that his Class Vehicle suffered from defects that would prevent the full use of his Class vehicle and pose safety risks, then he would not have purchased his Class Vehicle or would have paid less.

36.     Plaintiff Diaz first experienced the Defect in his Class Vehicle almost immediately after purchase and at or around 1000 miles on the vehicle's odometer.  Plaintiff Diaz experienced the driveshaft rattling and would feel the differential click while driving.

37.     On or around April 26, 2016, Plaintiff Diaz brought his Class Vehicle to Hooman Chrysler Dodge Jeep Ram of Los Angeles and complained about the issues with the driveshaft and rear differential, but the dealership told him nothing was wrong with the vehicle.

38.     FCA's authorized dealership failed to adequately repair Plaintiff Diaz's vehicle, and it continues to exhibit the Differential Defect.

39.     To date, Plaintiff Diaz has received no notification from FCA about any potential repair or aftermarket modification that would repair the Drivetrain or the Differential Defect and render the Class Vehicle safe to drive on public roadways, or during occasional track use, that would also be compliant with FCA's express warranties.

40.     While Plaintiff Diaz was aware at the time of purchase that his class vehicle came with express warranties, he was not aware that executing aftermarket repairs could void the express warranties for the entire Class Vehicle.

41.     The Differential Defect can cause unexpected failures that significantly impair the safety, reliability, and operability of the Class Vehicles to such an extent that they are rendered unfit for the ordinary purpose of driving on public roadways.

42.     As a result of the Differential Defect, Plaintiff Diaz has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.

43.     Plaintiff Diaz will be unable to rely on the Class Vehicle's advertising or labeling in the future, and so will not purchase a Class Vehicle although he would like to.

44.     At all times, Plaintiff Diaz, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Joseph Santos**

45.     Plaintiff Joseph Santos is a citizen of California, residing in El Sobrante California.

46.      Plaintiff Santos purchased a new 2016 Dodge Charger Hellcat (for the purpose of the section, the "Class Vehicle") on or about August 27, 2016, at Hilltop Chrysler Jeep Dodge Ram, an FCA authorized dealership in Richmond, California.

47.     Plaintiff Santos purchased his Class Vehicle primarily for personal, family, or household use.

48.     Plaintiff Santos still owns his Class Vehicle.

11

49.     Unknown to Plaintiff Santos at the time he purchased the Class Vehicle, the Class Vehicle was equipped with a rear differential that was defective and not robust enough for the horsepower and torque loads of the driveline.

50.     The defective rear differential has caused Plaintiff Santos damages in the form of diminished value of the Class Vehicle and time lost associated with the repairs of his vehicle, the loss of use of the vehicle during the repairs, and the expense of obtaining alternative transportation during the repairs (and will cause him all of these damages associated with future attempted repairs).

51.     FCA knew about the Defect at the time of purchase but did not disclose the Defect to Plaintiff Santos. So, Plaintiff Santos purchased his Class Vehicle on the reasonable but mistaken belief that his Class vehicle would be safe and reliable on public roadways and that the Class Vehicle was capable of track use.

52.     Passenger safety and reliability were important factors in Plaintiff Santos's decision to purchase his vehicle.  Before making his purchase, Plaintiff Santos conducted online research, including visiting the FCA website.  He also reviewed the window sticker (the "Monroney" sticker) and test drove a similar vehicle before purchase.  Plaintiff Santos selected and ultimately purchased his Class Vehicle, in part, because the Class Vehicle was represented to be and was marketed as a high-performance vehicle.

53.     FCA also produced and distributed uniform marketing materials for Class Vehicles to dealerships with the expectation that this information would be passed onto the consumer through dealer interactions.

54.     None of the information provided to Plaintiff Santos disclosed any defects in the rear differential or drivetrain system or that not all models of the Class Vehicles were capable of

safe driving on public roadways and track use. FCA's omissions were material to Plaintiff Santos. Had FCA disclosed its knowledge of the Differential Defect before he purchased his Class Vehicle, Plaintiff Santos would have seen or been aware of the disclosure.  If FCA had disclosed to Plaintiff Santos that his Class Vehicle suffered from defects that would prevent the full use of his Class vehicle and pose safety risks, including the Defect, then he would not have purchased his Class Vehicle or would have paid less.

55.     In or around August 2017 with approximately 7,000 miles on the odometer, Plaintiff Santos first experienced the defect in his Class Vehicle when he was driving, and the vehicle made a loud clunking noise.  When Plaintiff Santos shifted the vehicle, it made a loud noise that sounded like metal was grinding.

56.     On or about August 28, 2017 with approximately 7,125 miles on the odometer, Plaintiff Santos brought his vehicle to Hilltop Chrysler Jeep Dodge Ram with concerns his rear end was making clunking noises. The technician reported, "verified rotational rubbing type noise coming from rear of vehicle when turning at slow speed's [sic] in either direction had assistant get out and listen and found noise is coming from inside rear engine. Diff is sealed unit, red replace." The technician reported the repair as, "removed exhaust and drive line to access rear differential removed old differential and installed new differential."

57.     Shortly after the differential repair on or about August 28, 2017, Plaintiff Santos noticed excessive gear lube / oil on exhaust and rear end.  On or about September 11, 2017 with approximately 7, 270 miles on the odometer Plaintiff Santos brought his vehicle back to Hilltop Chrysler Jeep Dodge Ram due the excessive amount of gear lube and oil on his exhaust and rear end after the previous repair. The technician reported, "verified customer's complaint found R/side rear drive axle boot is leaking grease from underneath vehicle 9/14/17." The technician also

reported an additional repair as, "removed exhaust system and driveline removed rear differential removed r/side rear drive axle cleaned grease off of rear sub frame and body installed new r/side rear drive axle installed new axle nut and reassembled."

58.     Shortly after the two (2) previous repair attempts, on or about November 28, 2017 with approximately 8,564 miles on the odometer Plaintiff Santos brought his vehicle back to Hilltop Chrysler Jeep Dodge Ram with concerns that his vehicle was not properly repaired, and his exhaust tips were not properly aligned. The technician reported, "verified customer complaint exhaust tipe's [sic] are not alighed woth [sic] rear facia [sic] cut outs need to adjust exhaust tip's [sic]."

59.     On or about April 26, 2018 with approximately 10,142 miles on the odometer, Plaintiff Santos delivered his vehicle to Hilltop Chrysler Jeep Dodge Ram with concerns that he was hearing metal to metal noises coming from his rear end. The technician verified the concern and reported, "Found noise coming from the differential. Checked differential fluid. Checked differential fluid and found metal shavings." The technician reported the repair as, "replace rear differential and recheck. Removed rear drive shaft and exhaust. Removed rear differential and replaced with new. Installed exhaust and driveshaft."

60.     After the previous repair attempts to the rear differential, Plaintiff Santos noticed that his exhaust tips are again not straight. On or about June 5, 2019 with approximately 17, 515 miles on the odometer, Plaintiff Santos returned his vehicle to Hilltop Chrysler Jeep Dodge Ram. The technician confirmed Mr. Santos' complaint that his exhaust tips were not straight. The technician reported that they straightened the exhaust tips and tightened the "Bango" clamps.

61.     On or about August 27, 2019 with approximately 20,856 miles on the odometer, Plaintiff Santos brought his vehicle to Hilltop Chrysler Jeep Dodge Ram with concerns that his

exhaust rattles and that there is a clicking sounds coming from the right rear wheel area. The technician verified that there was a metallic popping type noise from the right rear wheel area. The technician reported the repair as, "replace rear cross member assembly due to rear cross member busing not serviceable."

62.     A few days after an attempted repair to Plaintiff's drivetrain components, Plaintiff Santos brought his vehicle back to Hilltop Chrysler Jeep Dodge Ram on or about September 4, 2019 with approximately 21,563 miles on the odometer with concerns of a clicking noise coming from the rear wheel area of his vehicle. The technician reported, "Removed parking break cable, differential, axles and sub frame. Reinstalled rear differential and refilled with fluid found metal in rear differential recommend replace." The technician also reported the repair as, "Removed exhaust and driveshaft. Removed differential and replaced with new. Installed new differential."

63.     On or about July 16, 2020 with approximately 26,657 miles on the odometer, Plaintiff Santos brought his vehicle to Hilltop Chrysler Jeep Dodge Ram with concerns that axle grease is leaking from the rear axle and that he heard noises coming from the rear end. The technician verified the rear cv axle boot was leaking grease and recommended replacement. The technician also reported, "no abnormal diff noise present."

64.     On or about August 24, 2020 with only approximately 1,000 additional miles after the previous repair attempt, Plaintiff Santos returned his vehicle to Hilltop Chrysler Jeep Dodge Ram where the technician inspected the vehicle and found driver rear cv axle boot ripped and leaking. The technician reported the repair as, "removed driver rear wheel, un mounted differential and driveline, lowered differential, removed and replaced leaking cv axle with new axle nut."

65.     With only approximately 250 additional miles after the previous repair, Plaintiff Santos brought his vehicle back to Hilltop Chrysler Jeep Dodge Ram with concerns of fluid leaking

from his rear axle and banging noises when he shifts. The technician reported finding metal in the differential gear oil that required a rear differential replacement.

66.     Despite these attempted repairs, FCA's authorized dealerships failed to adequately repair Plaintiff Santos's vehicle, and it continues to exhibit the Differential Defect.

67.     To date, Plaintiff Santos has received no notification from FCA about any potential repair or aftermarket modification that would repair the Drivetrain and render the Class Vehicle safe to drive on public roadways, or during occasional track use, that would also be compliant with FCA's express warranties.

68.     While Plaintiff Santos was aware at the time of purchase that his class vehicle came with express warranties, he was not aware that executing aftermarket repairs to repair a safety defect that FCA refused to repair could void the express warranties for the entire Class Vehicle.

69.     The Differential Defect can cause unexpected failures that significantly impair the safety, reliability, and operability of the Class Vehicle to such an extent that they are rendered unfit for the ordinary purpose of driving on public roadways.

70.     As a result of the Differential Defect, Plaintiff Santos has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.

71.     Plaintiff Santos will be unable to rely on the Class Vehicle's advertising or labeling in the future, and so will not purchase a Class Vehicle although he would like to.

72.     At all times, Plaintiff Santos, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Christian Gibson**

73.     Plaintiff Christian Gibson is a citizen of Florida, residing in Jupiter, Florida.

16

74.     Plaintiff Gibson purchased a New 2018 Dodge Demon (for the purpose of the section, the "Class Vehicle") on October 20, 2017, at Arrigo Dodge Chrysler Jeep, an FCA authorized dealership in West Palm Beach, Florida.

75.     Plaintiff Gibson purchased his Class Vehicle primarily for personal, family, or household use.

76.     Plaintiff Gibson still owns his Class Vehicle.

77.     Unknown to Plaintiff Gibson at the time he purchased the Class Vehicle, the Class Vehicle was equipped with a rear differential that was defective and not robust enough for the horsepower and torque loads of the driveline.

78.     The defective rear differential has caused Plaintiff Gibson damages in the form of diminished value of the Class Vehicle and time lost associated with the repairs of his vehicle, the loss of use of the vehicle during the repairs, and the expense of obtaining alternative transportation during the repairs (and will cause him all of these damages associated with future attempted repairs).

79.     FCA knew about the Defect at the time of purchase but did not disclose the Defect to Plaintiff Gibson. Therefore, Plaintiff Gibson purchased his Class Vehicle on the reasonable but mistaken belief that his Class vehicle would be safe and reliable on public roadways and that the Class Vehicle was capable of track use.

80.     Passenger safety and reliability were important factors in Plaintiff Gibson's decision to purchase his vehicle.  Before making his purchase, Plaintiff Gibson reviewed marketing materials regarding the safety and reliability of the Class Vehicle, including FCA's brochures and online advertising, and spoke with FCA sales representative concerning the vehicle's features. Plaintiff Gibson selected and ultimately purchased his Class Vehicle, in part, because the Class

Vehicle was represented to be and was marketed as a high-performance vehicle. Plaintiff Gibson purchased his Class Vehicle for purpose of track use and high-spirited driving but has not driven his vehicle for its intended purpose because of the Differential Defect and the risk of differential failure.

81.     FCA also produced and distributed uniform marketing materials for Class Vehicles to dealerships with the expectation that this information would be passed onto the consumer through dealer interactions.

82.     None of the information provided to Plaintiff Gibson disclosed any defects in the rear differential or drivetrain system or that not all models of the Class Vehicles were capable of safe driving on public roadways and track use. FCA's omissions were material to Plaintiff Gibson. Had FCA disclosed its knowledge of the Differential Defect before he purchased his Class Vehicle, Plaintiff Gibson would have seen or been aware of the disclosure.  If FCA had disclosed to Plaintiff Gibson that his Class Vehicle suffered from defects that would prevent the full use of his Class vehicle and pose safety risks, then he would not have purchased his Class Vehicle or would have paid less.

83.     To date, Plaintiff Gibson has received no notification from FCA about any potential repair or aftermarket modification that would repair the Drivetrain or the Defect and render the Class Vehicle safe to drive on public roadways, or during occasional track use, that would also be compliant with FCA's express warranties.

84.     While Plaintiff Gibson was aware at the time of purchase that his Class Vehicle came with express warranties, he was not aware that executing aftermarket repairs could void the express warranties for the entire class vehicle.

85.     The Differential Defect can cause unexpected failures that significantly impair the safety, reliability, and operability of the Class Vehicle to such an extent that they are rendered unfit for ordinary purpose of driving on public roadways.

86.     As a result of the Differential Defect, Plaintiff Gibson has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.

87.     Plaintiff Gibson will be unable to rely on the Class Vehicle's advertising or labeling in the future, and so will not purchase a Class Vehicle although he would like to.

88.     At all times, Plaintiff Gibson, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Gerald Sinclair**

89.     Plaintiff Gerald Sinclair is a citizen of Florida, residing in Melbourne, Florida.

90.     Plaintiff Sinclair purchased a used 2016 Dodge Charger Hellcat (for the purpose of the section, the "Class Vehicle") on or about July 28, 2018, at Boniface-Hiers Chrysler Dodge ("Boniface-Hiers"), an FCA authorized dealership in Merritt Island, Florida.

91.     Plaintiff Sinclair purchased his Class Vehicle primarily for personal, family, or household use.

92.     Plaintiff Sinclair still owns his Class Vehicle.

93.     Unknown to Plaintiff Sinclair at the time he purchased the Class Vehicle, the Class Vehicle was equipped with a rear differential that was defective and not robust enough for the horsepower and torque loads of the driveline.

94.     The defective rear differential has caused Plaintiff Sinclair damages in the form of diminished value of the Class Vehicle and time lost associated with the repairs of his vehicle, the

loss of use of the vehicle during the repairs, and the expense of obtaining alternative transportation during the repairs (and will cause him all of these damages associated with future attempted repairs).

95.     FCA knew about the Defect at the time of purchase but did not disclose the Defect to Plaintiff Sinclair. So, Plaintiff Sinclair purchased his Class Vehicle on the reasonable but mistaken belief that his Class vehicle would be safe and reliable on public roadways and that the Class Vehicle was capable of track use.

96.     Passenger safety and reliability were important factors in Plaintiff Sinclair's decision to purchase his vehicle.  Before making his purchase, Plaintiff Sinclair viewed FCA marketing materials regarding the safety and reliability of the Class Vehicle, including FCA's online advertising.  Plaintiff Sinclair selected and ultimately purchased his Class Vehicle, in part, because the Class Vehicle was represented to be and was marketed as a high-performance vehicle.

97.     FCA also produced and distributed uniform marketing materials for Class Vehicles to dealerships with the expectation that this information would be passed onto the consumer through dealer interactions.

98.     None of the information provided to Plaintiff Sinclair disclosed any defects in the rear differential or drivetrain system or that not all models of the Class Vehicles were capable of safe driving on public roadways and track use. FCA's omissions were material to Plaintiff Sinclair. Had FCA disclosed its knowledge of the Differential Defect before he purchased his Class Vehicle, Plaintiff Sinclair would have seen or been aware of the disclosure.  If FCA had disclosed to Plaintiff Sinclair that his Class Vehicle suffered from defects that would prevent the full use of his Class vehicle and pose safety risks, including the Defect, then he would not have purchased his Class Vehicle or would have paid less.

99.     On or around January 23, 2019 with approximately 15,922 miles on the odometer, Plaintiff Sinclair brought his Class Vehicle to Boniface-Hiers Chrysler Dodge Jeep Ram and complained that the rear end of the vehicle was noisy, and the vehicle would not move.  The technician reported, "found that left side axel[sic] does not move and right side moves remove diff found left axel [sic] snapped off and right side axel [sic] spline twisted diff has damaged inside and metal contamination."  As a result, the dealership replaced rear differential.

100.    Despite this attempted repairs, FCA's authorized dealerships failed to adequately repair Plaintiff Sinclair's vehicle, and it continued to exhibit the Differential Defect.

101.    On or about April 12, 2021, Plaintiff Sinclair brought his Class Vehicle to Fairway Auto Center and complained about a clicking noise coming from the rear differential. The technician was unable to diagnosis the vehicle and no repairs were made.

102.    To date, Plaintiff Sinclair has received no notification from FCA about any potential repair or aftermarket modification that would repair the Drivetrain and render the Class Vehicle safe to drive on public roadways, or during occasional track use, that would also be compliant with FCA's express warranties.

103.    While Plaintiff Sinclair was aware at the time of purchase that his class vehicle came with express warranties, he was not aware that executing aftermarket repairs could void the express warranties for the entire Class Vehicle.

104.    The Differential Defect can cause unexpected failures that significantly impair the safety, reliability, and operability of the Class Vehicle to such an extent that they are rendered unfit for the ordinary purpose of driving on public roadways.

105.     As a result of the Differential Defect, Plaintiff Sinclair has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.

106.     Plaintiff Sinclair will be unable to rely on the Class Vehicle's advertising or labeling in the future, and so will not purchase a Class Vehicle although he would like to.

107.     At all times, Plaintiff Sinclair, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Marvin Leon Veal**

108.     Plaintiff Marvin Leon Veal is a citizen of Florida, residing in Daytona Beach, Florida.

109.      Plaintiff Veal purchased a new 2019 Dodge Charger Hellcat (for the purpose of the section, the "Class Vehicle") on or about October 28, 2018, at Daytona Dodge Chrysler Jeep Ram, an FCA authorized dealership in Daytona Beach, Florida.

110.     Plaintiff Veal purchased his Class Vehicle primarily for personal, family, or household use.

111.     Plaintiff Veal still owns his Class Vehicle.

112.     Unknown to Plaintiff Veal at the time he purchased the Class Vehicle, the Class Vehicle was equipped with a rear differential that was defective and not robust enough for the horsepower and torque loads of the driveline.

113.     The defective rear differential has caused Plaintiff Veal damages in the form of diminished value of the Class Vehicle and time lost associated with the repairs of his vehicle, the loss of use of the vehicle during the repairs, and the expense of obtaining alternative transportation

during the repairs (and will cause him all of these damages associated with future attempted repairs).

114.    FCA knew about the Defect at the time of purchase but did not disclose the Defect to Plaintiff Veal. So, Plaintiff Veal purchased his Class Vehicle on the reasonable but mistaken belief that his Class vehicle would be safe and reliable on public roadways and that the Class Vehicle was capable of track use.

115.    Passenger safety and reliability were important factors in Plaintiff Veal's decision to purchase his vehicle.  Before making his purchase, Plaintiff Veal viewed FCA marketing materials regarding the safety and reliability of the Class Vehicle, including FCA's window sticker and spoke with a FCA sales representative regarding the vehicles features.  Plaintiff Veal selected and ultimately purchased his Class Vehicle, in part, because the Class Vehicle was represented to be and was marketed as a high-performance vehicle.

116.    FCA also produced and distributed uniform marketing materials for Class Vehicles to dealerships with the expectation that this information would be passed onto the consumer through dealer interactions.

117.    None of the information provided to Plaintiff Veal disclosed any defects in the rear differential or drivetrain system or that not all models of the Class Vehicles were capable of safe driving on public roadways and track use. FCA's omissions were material to Plaintiff Veal.  Had FCA disclosed its knowledge of the Differential Defect before he purchased his Class Vehicle, Plaintiff Veal would have seen or been aware of the disclosure.  If FCA had disclosed to Plaintiff Veal that his Class Vehicle suffered from defects that would prevent the full use of his Class vehicle and pose safety risks, including the Defect, then he would not have purchased his Class Vehicle or would have paid less.

118.     Shortly after purchase, Plaintiff Veal experienced the defect in his Class Vehicle when the differential started to make a loud noise.

119.     On or about November 23, 2018 with approximately 1,177 miles on the odometer, Plaintiff Veal brought his Class Vehicle to Daytona Dodge Chrysler Jeep Ram and complained that the rear end of his vehicle was making a terrible noise.  The dealership inspected his vehicle and discovered an internal failure in the rear differential.  The dealership removed and replaced the rear differential.

120.     On or around January 16, 2019 with approximately 3,677 miles on the odometer, Plaintiff Veal brought his Class Vehicle to Athens Dodge Chrysler Jeep, located in Athens, Georgia, and complained of a whining noise coming from the rear differential.  The dealership inspected his vehicle and replaced the rear differential.  The dealership test drove the vehicle after replacing the rear differential, and while not as loud, the differential continued to make the whining noise.  The dealership explained the noise was the result of the gear mesh.

121.     On or around October 21, 2019 with approximately 11,150 miles on the odometer, Plaintiff Veal brought his Class Vehicle to Athens Dodge Chrysler Jeep, located in Athens Georgia, and complained that the rear end of his vehicle was making a loud roaring noise.  The dealership inspected his vehicle and replaced the rear axle in the differential system and added fluid to the differential.

122.     Despite these attempted repairs, FCA's authorized dealerships failed to adequately repair Plaintiff Veal's vehicle, and it continues to exhibit the Differential Defect.

123.     To date, Plaintiff Veal has received no notification from FCA about any potential repair or aftermarket modification that would repair the Drivetrain and render the Class Vehicle

24

safe to drive on public roadways, or during occasional track use, that would also be compliant with FCA's express warranties.

124.    While Plaintiff Veal was aware at the time of purchase that his class vehicle came with express warranties, he was not aware that executing aftermarket repairs could void the express warranties for the entire Class Vehicle.

125.    The Differential Defect can cause unexpected failures that significantly impair the safety, reliability, and operability of the Class Vehicle to such an extent that they are rendered unfit for the ordinary purpose of driving on public roadways.

126.    As a result of the Differential Defect, Plaintiff Veal has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.

127.    Plaintiff Veal will be unable to rely on the Class Vehicle's advertising or labeling in the future, and so will not purchase a Class Vehicle although he would like to.

128.    At all times, Plaintiff Veal, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Domenick Scorziello**

129.    Plaintiff Domenick Scorziello is a citizen of New York, residing in Thornwood, New York.

130.     Plaintiff Scorziello purchased a new 2018 Dodge Demon (for the purpose of the section, the "Class Vehicle") on December 22, 2018, at Eastchester Chrysler Jeep Dodge, an FCA authorized dealership in Bronx, New York.

131.    Plaintiff Scorziello purchased his Class Vehicle primarily for personal, family, or household use.

132.    Plaintiff Scorziello still owns his Class Vehicle.

133.    Unknown to Plaintiff Scorziello at the time he purchased the Class Vehicle, the Class Vehicle was equipped with a rear differential that was defective and not robust enough for the horsepower and torque loads of the driveline

134.    The defective rear differential has caused Plaintiff Scorziello damages in the form of diminished value of the Class Vehicle and time lost associated with the repairs of his vehicle, the loss of use of the vehicle during the repairs, and the expense of obtaining alternative transportation during the repairs (and will cause him all of these damages associated with future attempted repairs).

135.    FCA knew about the Defect at the time of purchase but did not disclose the Defect to Plaintiff Scorziello. So, Plaintiff Scorziello purchased his Class Vehicle on the reasonable but mistaken belief that his Class vehicle would be safe and reliable on public roadways and that the Class Vehicle was capable of track use.

136.    Passenger safety and reliability were important factors in Plaintiff Scorziello's decision to purchase his vehicle.  Before making his purchase, Plaintiff Scorziello reviewed marketing materials regarding the safety and reliability of the Class Vehicle, including FCA's brochures and online advertising, and spoke with FCA sales representative concerning the vehicle's features.  Plaintiff Scorziello selected and ultimately purchased his Class Vehicle, in part, because the Class Vehicle was represented to be and was marketed as a high-performance vehicle. Plaintiff Scorziello purchased his Class Vehicle for the purpose of track use but has not yet driven his vehicle on a track because of the Differential Defect and risk of differential failure.

137.    FCA also produced and distributed uniform marketing materials for Class Vehicles to dealerships with the expectation that this information would be passed onto the consumer through dealer interactions.

138.    None of the information provided to Plaintiff Scorziello disclosed any defects in the rear differential or drivetrain system or that not all models of the Class Vehicles were capable of safe driving on public roadways and track use. FCA's omissions were material to Plaintiff Scorziello.  Had FCA disclosed its knowledge of the Differential Defect before he purchased his Class Vehicle, Plaintiff Scorziello would have seen or been aware of the disclosure.  If FCA had disclosed to Plaintiff Scorziello that his Class Vehicle suffered from defects that would prevent the full use of his Class vehicle and pose safety risks, then he would not have purchased his Class Vehicle or would have paid less.

139.    To date, Plaintiff Scorziello has received no notification from FCA about any potential repair or aftermarket modification that would repair the Drivetrain or the Defect and render the Class Vehicle safe to drive on public roadways, or during occasional track use, that would also be compliant with FCA's express warranties.

140.    While Plaintiff Scorziello was aware at the time of purchase that his Class Vehicle came with express warranties, he was not aware that executing aftermarket repairs could void the express warranties for the entire class vehicle.

141.    The Differential Defect can cause unexpected failures that significantly impair the safety, reliability, and operability of the Class Vehicle to such an extent that they are rendered unfit for the ordinary purpose of driving on public roadways.

142.     As a result of the Differential Defect, Plaintiff Scorziello has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.

143.     Plaintiff Scorziello will be unable to rely on the Class Vehicle's advertising or labeling in the future, and so will not purchase a Class Vehicle although he would like to.

144.     At all times, Plaintiff Scorziello, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

### Defendant

145.     Defendant FCA US LLC is a limited liability company organized and in existence under the laws of the State of Delaware. FCA US LLC's Corporate Headquarters are located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide. FCA is the warrantor and distributor of the Class Vehicles in the United States. FCA's sole member is FCA North America Holdings LLC, a Delaware limited liability company, with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA North America Holdings LLC's sole member is Fiat Chrysler Automobiles N.V., which was incorporated as a public limited liability company (a "naamloze vennootschap") under the laws of the Netherlands. Its principal office is located at 25 St. James's Street, London SW1A 1HA, United Kingdom.

146.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles. FCA (like its predecessor, Chrysler) is one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat

brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

147.    FCA has designed, manufactured, imported, distributed, offered for sale, sold, and leased the Challenger SRT Hellcat®, Charger SRT Hellcat®, and Demon® options with the knowledge and intent to market, sell, and lease them in all 50 states, including in California. Moreover, FCA and its agents designed, manufactured, marketed, distributed, warranted, sold and leased the Class Vehicles in California and throughout the United States. Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler name and disseminating vehicle information provided by Fiat Chrysler to customers.

148.    FCA has a nationwide dealership network and operates offices and facilities throughout the United States.  In order to sell vehicles to the general public, FCA enters into agreements with dealerships who are then authorized to sell the brands of vehicles owned by FCA, including Dodge, to consumers such as Plaintiffs.  In return for the exclusive right to sell new FCA-brand vehicles in a geographic area, authorized dealerships are also permitted to service and repairs these vehicles under the warranties FCA provides directly to consumers.  These contracts give FCA a significant amount of control over the actions of the dealerships, including sale and marketing over the vehicles and parts and accessories for those vehicles.  All service and repairs at an authorized dealership are also completed according to FCA's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents.  Per the agreements between FCA and the authorized dealers, consumers such as Plaintiffs can receive services under FCA's issued warranties at dealer locations that are convenient to them.

149.    FCA also develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotion materials

relating to Class Vehicles through the dealership network. FCA is also responsible for the production and content of the information on the Monroney Stickers.

150.     FCA warrants the Class Vehicles and is the drafter of those warranties, the terms of which unreasonably favor FCA. The warranties given by FCA to Plaintiffs and consumers are presented on a "take it or leave it" basis, and Plaintiffs and consumers are not given a meaningful choice in the terms of the warranties provided by FCA.

### III. JURISDICTION AND VENUE

151.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than Ford, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

152.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

153.     This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as FCA is "at home" in Delaware.

154.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue FCA in this District, FCA's state of incorporation.

## IV. FACTUAL ALLEGATIONS

### A.    FCA Marketed the Class Vehicles as Designed for High-Performance Environments

155.    Certain consumers purchase vehicles with the intention of using them in high-performance environments, including drag racing and closed racetracks.  These muscle car and track enthusiasts often purchase their performance vehicle specifically to drive for ordinary purposes as well as these high-performance environments.

156.    FCA specifically marketed the Challenger SRT Hellcat®, Charger SRT Hellcat®, and Demon® options as having a "Staggering Quarter Mile Time," as "Track-Proven Performer[s]" and "street-legal production drag car[s]"[3] because it knew these features were materials to track enthusiasts and other prospective customers.

157.    Indeed, the Class Vehicles were advertised to "withstand the brutal performance" associated with the aggressive driving found in high-performance driving environments.[4]  FCA's marketing incited customers by bragging to "have the guts to give drivers 707 horsepower, 650 lb-ft of torque and a staggering quarter-mile time."[5]

158.    For example, the 2018 Dodge Challenger/Charger brochure included the following:[6]

---

[3] https://www.dodge.ca/en_dir/pdf/2018/brochures/charger.pdf (last visited June 24, 2021)
[4] *See,* 2018 Dodge Challenger / Charger brochure, *http://autotrends.org/brochures/2018-dodge-challenger-brochure.pdf.*  (last visited June 24, 2021)
[5] *Id.*
[6] 2018 Dodge Challenger / Charger brochure, available at http://autotrends.org/brochures/2018-



159.    FCA also boasts about a "Track-Proven Tuned Chassis" in the 2019 Dodge

Challenger / Charger brochure that included the following:[7]



160.    In the 2020 Dodge Challenger brochure included the following:[8]

---

dodge-challenger-brochure.pdf (last visited June 24, 2021), at p. 8

[7]    2019 Dodge Challenger / Charger brochure, available at
https://cdn.dealereprocess.org/cdn/brochures/dodge/2019-challenger.pdf (last visited June 24, 2021), at p. 15

[8]    2020 Dodge Challenger Brochure available at http://digimag.rrd.com/Chrysler/DNL/2020-Dodge-Challenger-Catalog.pdf (last visited June 24, 2021), at p. 3



161.    FCA also published videos on of the 2015 Dodge Challenger SRT Hellcat engaging in drag racing and burnouts:[9]




**B.     The Differential Defect**

[9] *2015 Dodge Challenger SRT Hellcat performance* FCA North America, Youtube (July 11, 2014) https://youtu.be/iYol7m3WjGQ (last visited June 24, 2021) *2015 Dodge Challenger SRT Hellcat Burn Out* (Jul 15, 2014), https://youtu.be/5hTY-xfFD6k (last visited June 24, 2021)

162.    A rear differential is a component on the rear axle in all vehicles designed to compensate for the difference in distance between the inner and outer rear wheels when the vehicle is turning.  Specifically, the rear differential allows the rear tires to move in the same direction while rotating at different speeds. The rear differential is a critical driveline component that transfers the vehicle's engine's power (horsepower and torque) to the rear wheels. This transfer of engine power to the rear differential enables the Class Vehicles to operate in a forward or reverse direction. The power of the engine in the Class Vehicles is routed through the transmission, then transferred to the rear differential by the driveshaft. Once the engine's power is transmitted to the rear differential, the engine's power (horsepower and torque) is subsequently transferred to the drive tires through axle shafts.

163.    The rear differential operates by connecting the vehicle's transmission to the axle shaft, and then the axle shaft, in turn, connects to the wheels, allowing the engine power to transfer to the vehicle's rear wheels.  Through this transfer of power, the gears in the differential direct the vehicle to move forward or backward as well as to turn and change direction.

164.    The differential accomplishes this by distributing the engine's horsepower and torque to the drive wheels. .

165.    Robust and properly engineered Rear differentials are especially important in vehicles like the high-performance Class Vehicles which are equipped with high performance engines and intended to be used on racetracks or used in a high-performance manner.

166.    Gear oil with a higher viscosity than that of engine oil is used to lubricate the internal components of the rear differential.  This viscous gear oil is necessary to manage heat within the differential as well as to help the internal components of the differential  withstand the high mechanical stress that differential components experience during use, especially during

acceleration and high speeds. Said gear oil is also used to lubricate and coat areas of metal-on-metal contact within the differential. Insufficient gear oil, by volume or viscosity, increases direct the metal-on-metal within the differential can damage gears and other internal components. Rear differential oil is generally recommended to be replaced at 50,000-mile interval for high use vehicles,[10] because over time it can degrade and become filled with small particulates from the internal components which can damage the rear differential and/or the axle.

167.    The Class Vehicles are equipped with a rear differential that contains the Differential Defect, which is the result of defects in design, manufacturing, materials, and/or workmanship. By designing, manufacturing, assembling, inspecting, distributing, selling and leasing the Class Vehicles with the Differential Defect, FCA rendered the Class Vehicles defective and unsafe for their intended use and purpose.

168.    The rear differential in the Class Vehicles is designed, engineered, and/or manufactured in a manner that causes the differential to prematurely fail. This often results in immediate catastrophic failure, causing the vehicle to lose the ability to transfer the engine power to the rear wheels and may cause the driver to lose control of the vehicle without any prior notice of the problem.

169.    Specifically, discovery will show the rear differentials (pictured below) in the Class Vehicles are not properly designed, engineered or manufactured to handle the horsepower and torque loads produced by the Class Vehicle's engines during acceleration or high-performance use. The high horsepower and torque loads damage and/or degrade the components of the differential as well as the entire drivetrain system. The Defective Differential is unable to handle

---

[10] *See e.g.*, (2020 Charger Owner's Manual)
https://cdn.dealereprocess.org/cdn/servicemanuals/dodge/2020-charger.pdf (last visited June 24, 2021)

the mechanical (horsepower and torque) loads of the Class vehicle's engines which will ultimately result in the catastrophic failure of the rear differential including the differential housing and its internal components. Moreover, prior to catastrophic failure, the Defect causes metal shavings and other metal particulates to contaminate the differential oil, increasing friction and heat which result in differential damage.  The degradation of the internal components of the defective differential ultimately causes the rear differential and/or axles to fail.



170.    Discovery will further show the Differential Defect is the result of substandard, inconsistent and improper procedures in the materials used or the manufacturing of the rear differential and its components, and/or poor quality-control procedures to ensure such defective rear differentials do not reach consumers.

171.    Discovery will show the Differential Defect is also the result of substandard materials, specifically including the rear differential housing, the housing mounting points and mounting hardware as well as the differential gears and bearings, which degrade at a much faster rate than normal and lead to premature and catastrophic failure .  The rear differential in Class

Vehicles includes several components, including the housing, ring gear, pinion gear, pinion bearing and side bearings and gears, as well as the gear oil, and all of these components contribute to a higher risk of differential failure due to the Differential Defect.   In particular, the rear differential manufactured and assembled by FCA is sold as a singular unit and the internal components cannot be repaired except by replacing the entire rear differential.

172.   As a result of the substandard design, materials, manufacturing, and workmanship, the differential components are not of an appropriate design or quality of material to withstand of the force of the torque – or power – being transferred from the engine to the wheels.  Because these parts were poorly designed, manufactured, and/or assembled by FCA using both inferior materials and workmanship, the differential and entire driveline system degrades prematurely.

173.   This is of greater concern in the Class Vehicles because they are specifically advertised for drag racing and track use.  The substandard rear differential will degrade faster and ultimately fail based on the substantial mechanical loads and force exerted upon the rear differential during intended high performance use, despite the fact that Class Members have paid a premium for vehicles were supposed to be designed, manufactured and assembled for the purchase of high performance use.

174.   Because of the Differential Defect, Class Vehicles also experience rear differential failure during acceleration or when driven on surfaces treated for maximum traction, like drag strips as FCA intended and advertised.

175.   Initial symptoms of the Differential Defect – that the rear differential is failing – include a noisy differential, such as whining, howling or whirling sounds, and vibrations in the rear of the vehicle. Said noise and vibration, which emanates from the rear differential due to the Defect, enter the passenger compartment in the area of the rear seat since the rear seat is located

slightly above the rear differential.  This noise and vibration may increase when the vehicle is accelerating and/or turning as well as at high speeds. Moreover, the differential failure which results in the housing exploding may pose a risk to rear seat passengers (let discuss).

176.    If the differential fails while driving, the vehicle may experience a complete loss of power which may result in the driver losing control of the vehicle.

177.    For Plaintiffs and members of the Classes, the rear differential does not live up to expectations to provide safe, reliable transportation for a normal vehicle, much less the quality necessary for a performance vehicle.

178.    The Differential Defect presents a safety hazard that renders the Class Vehicles unreliable, unpredictable, and more likely to be involved in a collision or other serious accident.

179.    When the rear differential and/or axle fail, the vehicle becomes undrivable and the differential housing commonly explodes, sending shrapnel into the undercarriage of the car.  This is especially hazardous given the high speeds during which the failure commonly occurs.

180.    Costs to repair or replace a rear differential in the Class Vehicles often run thousands of dollars, excluding any other repairs necessary to the other vehicle components that may have been damaged by the defective rear differential.

181.    Discovery will show the rear differentials in the Class Vehicles are not fully serviceable with replacement parts; as such, when the rear differential experiences the symptoms of the Defect - whether complete failure resulting in the differential exploding or the initial phases of the defect which result in excessive noise due to gear wear – the only  viable option is to replace the entire differential.

182.    For Plaintiffs and members of the Classes, the rear differential does not live up to expectations – not only are the Class Vehicles unable to provide the superior track experience advertised by FCA, they are unable to provide safe, reliable transportation in ordinary driving.

### C.    FCA Had Superior and Exclusive Knowledge of the Differential Defect

183.    Defendant fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Classes the Defect in the Class Vehicles even though Defendant knew or should have known of design and/or manufacturing defects in Class Vehicles.

184.    Knowledge and information regarding the Differential Defect were in the exclusive and superior possession of FCA, and its dealers, and that information was not provided to Plaintiffs and members of the Classes. Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, knowledge of alternative designs for rear differentials, quality control audits of the rear differential and related components, early consumer complaints made to Defendant's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, auto parts stores, and/or consumers, consumer complaints to dealers and NHTSA and testing performed in response to consumer complaints, *inter alia*, Defendant was aware (or should have been aware) of the Differential Defect in the Class Vehicles and fraudulently concealed the defect and safety risk from Plaintiffs and members of the Classes.

185.    Defendant knew, or should have known, that the Differential Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles or within the applicable warranty periods.

186.    Notwithstanding Defendant's exclusive and superior knowledge of the Differential Defect, Defendant failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continues to sell Class Vehicles containing the Defect. Defendant intentionally concealed that the Differential Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

187.    Discovery will show, as a result of their exclusive and superior knowledge regarding the Differential Defect, Defendant released several service bulletins describing the issues related to the Defect to their exclusive network of dealerships beginning in or around May 2015.   The service bulletins FCA released all attempted to address symptoms related to the Differential Defect and not the underlying Defect.   As such, the service bulletins do not acknowledge the Differential Defect, but instead attempt to provide instructions to dealerships on what repairs to perform to Class Vehicles to merely alleviate the symptoms of the Defect.

188.    On or around May 30, 2015, Defendant released Service Bulletin number 03-001-15 describing issues in 2015 model year vehicles for Chrysler 300, Dodge Charger, and Dodge Challenger vehicles.  The service bulletin described the issues as "a slight noise of vibration from the rear of the vehicle" and recommended replacing both rear halfshafts.  Exhibit A.

189.    On or around July 18, 2015, Defendant released a revised service bulletin, Service Bulletin number 03-001-15 REV. A.  The revised service bulletin updated the description of the issue as "a slight shake/vibration felt in the seat and/or floor, generated from the rear of the vehicle" and that it was "most noticeable on very smooth roads, at steady-state cruising speeds 50-80 mph." The revised service bulletin continued to recommend replacing both rear halfshafts.  Exhibit B.

190.    On or around June 24, 2016, Defendant released a second bulletin, Service Bulletin number 03-004-16, involving the same vehicles but expanding the model years to include 2016.

This service bulletin recommended inspecting and replacing the propeller shaft due to a whining noise coming from the real axle area at high speeds.  Exhibit C.

191.    On or around December 23, 2016, Defendant released Service Bulletin number 03-008-16, again concerning rear axle noise in the following 2015-2017 model year vehicles, including the Chrysler 200, Dodge Charger, and Dodge Challenger.  The service bulletin involves replacing the axle oil on limited slip differentials.  Exhibit D.

192.    On or around March 15, 2017, Defendant released TSB number 9003655, addressing issues with noise from rear axle while the vehicle is performing tight turning maneuvers for model years 2015 sand 2016 Chrysler 300, Dodge Charger, and Dodge Challenger vehicles and 2017 Dodge Charger vehicles.  The bulletin recommended draining and refilling the oil. Exhibit E.

193.    None of the service bulletins issues fully repaired or remedied the Differential Defect.  Rather, the service bulletins were geared towards addressing symptoms of the Defect, including noise coming from the rear axle.  Defendant intentionally failed to disclose to Plaintiffs and members of the Classes that the service bulletins failed to cure the Differential Defect. Indeed, many members of the Classes who had these repair attempts performed on their Class Vehicles later had to pay for costly rear differential and/or axle replacements.

194.    Plaintiffs and members of the Classes were never provided with copies of or information about the service bulletins described above.  Further, the service bulletin information was not directly communicated to consumers.  Despite the safety risk associated with the Differential Defect, Defendant failed to disclose the Defect to owners of the Class Vehicles, including Plaintiffs and members of the Classes, and instead, intentionally concealed the Defect.

195.    Defendant continued to use the same or substantially similar differentials in the Class Vehicles despite knowledge of the Differential Defect from the issuance of the service bulletins, as well as from warranty claims and customer complaints.

196.    The service bulletins, along with pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, quality control audits of the rear differential and related components early consumer complaints made to Defendant's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair order and parts data received from the dealers, auto parts stores, and consumers, and testing performed in response to consumer complaints, evidence that since as early as 2015, Defendant has had exclusive and superior knowledge regarding the Differential Defect. Further, Defendant gained its knowledge of the Defect through sources not available to Plaintiffs and members of the Classes.

197.    Consumers who purchased or leased Class Vehicles have filed numerous complaints with NHTSA reporting the Differential Defect, reporting the need to pay exorbitant amounts to repair or replace the rear differential and associated damaged parts and detailing their experiences of catastrophic differential failure, which put the safety of drivers and their passengers at risk.

198.    FCA monitors customers' complaints made on third party websites and made to the National Highway Traffic Safety Administration ("NHTSA.") Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

199.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Reporting Requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id*. Thus, FCA knew or should have known of the many complaints about the Differential Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, FCA to the Starter Defect.

200.    The following are a small sample of complaints concerning the Differential Defect, available through NHTSA's website, www.safercar.gov, which reveal that FCA, through its network of dealers and repair technicians, was made aware of the many failed differentials in Class Vehicles:

- **2018 Dodge Challenger SRT- NHTSA ID Number: 11255061**[11] Incident Date August 24, 2019
  Consumer Location STATEN ISLAND, NY
  TL* THE CONTACT OWNS A 2018 DODGE CHALLENGER. WHILE THE CONTACT'S SON WAS DRIVING AT AN UNKNOWN SPEED, THE VEHICLE SUDDENLY STALLED. THE VEHICLE WAS UNABLE TO RESTART AND WAS TOWED TO ISLAND CHRYSLER DODGE RAM (LOCATED AT 1239 HYLAND BLVD, STATEN ISLAND, NY 10305, 718-667-8989). THE DEALER DIAGNOSED THAT THE TRANSMISSION AND REAR DIFFERENTIAL NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. AFTER LEAVING THE DEALER, WHILE DRIVING, SEVERAL WARNING INDICATORS ILLUMINATED ON THE INSTRUMENT PANEL. THE CONTACT RETURNED THE VEHICLE TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE AXLE, IGNITION COIL, SPARK PLUGS, ANTI-LOCK BRAKES, AND STABILIZER BAR NEEDED TO BE REPLACED. THE DEALER REPAIRED THE VEHICLE, BUT THE FAILURE CONTINUED. THE MANUFACTURER WAS CONTACTED AND ADVISED THE CONTACT TO CALL THE NATIONAL CENTER FOR DISPUTE SETTLEMENT FOR FURTHER ASSISTANCE. THE CONTACT CALLED

---

[11] 2018 Dodge Challenger SRT Demon, National Highway Traffic Safety Administration, https://www.nhtsa.gov/vehicle/2018/DODGE/CHALLENGER%252520SRT%252520DEMON/2%252520DR/RWD#complaints390 (last visited June 24, 2021)

THE NATIONAL CENTER FOR DISPUTE SETTLEMENT AND WAS PROVIDED CASE NUMBER: 32195089NY. THE APPROXIMATE FAILURE MILEAGE WAS 24,000. *TT *AS

- **2017 Dodge Charger NHTSA ID Number: 11088904**[12] Incident Date October 9, 2017
  Consumer Location WACO, TX Vehicle Identification Number 2C3CDXGJXHH****
  NOISE FROM THE REAR DIFFERENTIAL AREA. WHEN GOING SPEEDS OF 65+ MPH THERE IS A HOWLING/WHINING NOISE THAT IS CONSTANT. WHEN I LET OFF THE GAS IT GOES AWAY. WHEN I GET BACK ON THE GAS IT COMES BACK. I HAVE HAD THE REAR DIFF REPLACED AND HAVE HAD IT IN MULTIPLE TIMES FOR DIAGNOSTICS/FLUID CHANGES WITH NO FIX IN SITE. FCA TOLD ME, TO BAD, THAT IS A NORMAL NOISE AND THERE IS NOTHING ELSE WE CAN DO TO FIX THE ISSUE. A BRAND NEW CAR WITH AN OLD CAR NOISE? UNACCEPTABLE. I HAVE VIDEOS, REPAIR DOCUMENTATION SHOWING THE NOISE. *TT *TR

- **2016 Dodge Challenger SRT NHTSA ID Number: 11222628**[13] Incident Date June 26, 2019
  Consumer Location ATLANTA, GA Vehicle Identification Number 2C3CDZBT0GH****
  REAR DIFFERENTIAL MAKES A GRINDING NOISE WHEN I MAKE TURNS. DODGE ISSUED A STAR NUMBER AND FIXED IT BEFORE

- **2016 Dodge Challenger SRT NHTSA ID Number: 10885201**[14] Incident Date July 15, 2016 Consumer Location PRATTVILLE, AL Vehicle Identification Number 2C3CDZAG2GH****
  DRIVELINE CLUNK NOISE IN REAR OF VEHICLE WHEN COMING TO A STOP BETWEEN 3 TO 6 MPH DOWNSHIFTING. THIS HAPPENS NO MATTER WHAT THE ROAD SURFACE YOUR ON. THIS IS A NEW VEHICLE WITH LESS THAN 500 MILES, AFTER I WENT TO MY COUNTY PROBATE OFFICE TO GET MY LICENCE TAG, THIS OCCURRED EVERY TIME I CAME TO A FULL STOP AT A SIGN, LIGHT OR BEHIND A VEHICLE IN FRONT OF ME. TOOK VEHICLE TO DEALERSHIP, SERVICE

---

[12] 2017 Dodge Charger, National Highway Traffic Safety Administration, https://www.nhtsa.gov/vehicle/2017/DODGE/CHARGER/4%252520DR/RWD (last visited June 24, 2021)
[13] 2016 Dodge Challenger SRT, National Highway Traffic Safety Administration, https://www.nhtsa.gov/vehicle/2016/DODGE/CHALLENGER%252520SRT/2%252520DR/RWD (last visited June 24, 2021)
[14] Id.

MANAGER CAME OUT TO SEE IF ANYTHING WAS LOOSE IN TRUNK, SPARE TIRE,ETC. NO PROBLEM FOUND, I WAS TOLD TO BRING CAR BACK MONDAY MORNING FOR FURTHER DIAGNOSIS WHERE TECHS CAN FIND PROBLEM. I HAVE HEARD OTHERS COMPLAIN OF THIS ISSUE WITH THEIR CHALLENGERS BUT NO AVAIL, OR THEY WOULD TELL THE OWNERS THAT THIS WAS NORMAL. NO THIS IS NOT NORMAL IN THE DRIVELINE, PLEASE INVESTIGATE THIS ISSUE SO IT CAN BE RESOLVED WITH CHRYSLER WETHER A RECALL OR TSB NEEDS TO BE ENFORCED TO SOLVE THIS DRIVELINE ISSUE. THANKS FOR YOUR TIME IN THIS MATTER.

201.    FCA is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, FCA conducts tests, including pre-sale durability testing, on incoming components, including differentials, to verify the parts are free from defect and align with FCA's specifications.[15]

202.    FCA has robust durability testing for pre-production vehicles. As described by FCA, "powertrains go through a battery of tests meant to ensure customers get maximum performance and durability."[16]

203.    Vehicles bearing the SRT badge, like the Class Vehicles, undergo the standard durability testing as well as additional track evaluations that simulate actual driving conditions.[17]

204.    The SRT testing includes a simulated road course or dragstrip, which pushes the engine to peak torque and peak power and tests different types of driveline loads.

205.    Thus, FCA knew or should have known that the rear differential was defective and

---

[15]    Akweli    Parker,    *How    Car    Testing    Works*,    HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited June 24, 2021).

[16] *Powertrain Testing Shows the Lengths FCA US LLC Goes to Exceed Customer Expectations,* Put to the Test (2019 Issue Number 5) https://www.moparmagazine.com/2019/10/put-to-the-test/ (last visited June 24, 2021)

[17] *Id.*

poses a significant safety risk due to the inherent risk of the Differential Defect.

### D.    FCA Actively Concealed the Defect

206.    Despite their knowledge of the Defect in the Class Vehicles, Defendant actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, Defendant failed to disclose to or actively concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair, and thereafter:

   a.  any and all known material defects or material nonconformities of the Class Vehicles, including the Differential Defect;

   b.  that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

   c.  that the Class Vehicles were defective, even though FCA learned of the Differential Defect before it placed the Class Vehicles in the stream of commerce.

207.    As reported by The Drive, an online automotive news company, FCA conducted an internal investigation into the failure of rear differentials after two such failures were recorded on video at a private event at the Houston Raceway Park in 2019.[18]

208.    The event, held in early 2019, hosted members of the Legions of Demons car club and provided an opportunity to attempt to beat the Dodge Demon quarter-mile record in a safe environment.  Notably, the event was produced by the same drag strip surface company that supervised track maintenance during development of Demon vehicles.

209.    Yet, of the 42 stock Demons that raced, four suffered catastrophic rear-end failures

---

[18] Kyle Cheromcha, *Dodge Investigating Video Showing Pair of Dodge Demons Exploding on Drag Strip: Does this signal a larger problem for Dodge's production drag racer?* (Feb. 13, 2019) https://www.thedrive.com/news/26448/dodge-investigating-video-showing-pair-of-dodge-demons-exploding-on-drag-strip (last visited June 24, 2021)

at launch.  Another Demon vehicle, containing modifications, also suffered a rear-end failure.  Two of the failures were recorded in slow motion video.[19]

210.    As a result of the video showing the failures, it is reported that FCA conducted an investigation, but shortly thereafter, provided a response, ignoring the Defect and instead, focused on warranty concerns and modifications: "There is nothing to investigate. Warranty concerns are a non-issue for Demon owners with unmodified vehicles. Modifications using non-OEM parts should not raise questions about the durability of the stock Demon or its performance."[20]

211.    Despite the fact that four of the failures involved unmodified, or stock vehicles, FCA contained to deny the existence of the Differential Defect.

212.    Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at their dealerships and/or be unable to drive their vehicles for long stretches of time while they are being constantly repaired.

213.    Moreover, when vehicles are brought to Defendant's dealers for repair, including under the recall, Class Members are provided with ineffective repairs in which one defective differential is replaced with another defective differential, as experienced by Plaintiffs.

214.    As a result, Class Members continue to experience the Differential Defect despite having repairs, as shown by the experiences of Plaintiffs. Because many Class Members, like Plaintiffs, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs, related expenses (e.g. towing), and diminution in value is not sufficient. A remedial

---

[19] *Id.*

[20] Brad Anderson, *Demon Differentials Are Exploding but Dodge Says There's Nothing To Investigate,* (Feb. 14, 2019), https://www.carscoops.com/2019/02/demon-differentials-exploding-dodge-wants-find (last visited June 24, 2021)

scheme which also makes available a fix and/or warranty extension is necessary to make Class Members whole.

215.    Defendant has not recalled all the Class Vehicles to repair the Differential Defect, has not offered to its customers a free suitable repair or free replacement of parts related to the Differential Defect, under the recall or otherwise, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Differential Defect.

216.    Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

217.    As a result of the Differential Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

218.    The existence of the Differential Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Whether a vehicle's rear differential can operate and withstand the advertised and ordinary torque loads of the driveline are material safety concerns. Had Plaintiffs and other Class Members known of the Differential Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

219.    Reasonable consumers, like Plaintiffs, expect that a vehicle is safe, will function in a manner that will not pose a safety risk, is free from defects, and will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class Members further expect and assume that FCA will not sell or lease vehicles with known safety defects, such as the Differential Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

220.    The Class Vehicles do not function as FCA intended; no manufacturer intends for a vehicle shudder, whine, hesitate, or loss power while being driven.

**E.      FCA has Unjustly Retained a Substantial Benefit**

221.    Plaintiffs allege that Defendant unlawfully failed to disclose the alleged Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

222.    Plaintiffs further allege that Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

223.    As discussed above therefore, Plaintiffs allege that Defendant unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.

224.    Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

**F.  The Agency Relationship Between FCA US, LLC and its Network of Authorized Dealerships**

225.    In order to sell vehicles to the general public, Defendant enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Defendant-branded vehicles, the authorized dealerships are also permitted under these agreements with Defendant to service and repair these vehicles under the warranties Defendant provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, Defendant's authorized dealerships are Defendant's agents, and the consumers who purchase or lease Defendant vehicles

are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Defendant vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

226.   Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

227.   Defendant issued the express warranty to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Monroney Stickers on Defendant-branded vehicles. Because Defendant issues the express warranty directly to the consumers, the consumers are in direct privity with Defendant with respect to the warranties.

228.   In promoting, selling, and repairing its defective vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive

Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

a. The authorized FCA US LLC dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, service bulletins, technical service bulletins ("TSBs") and other documents;

b. Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

c. The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d. Defendant dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

e. Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

f. Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public; and

g.  Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

229.  Indeed, FCA's warranty booklets make it abundantly clear that FCA's authorized dealerships are FCA's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "authorized dealerships." For example, at the outset, FCA notifies Plaintiffs and class members in the warranty booklet that "**Warranty service must be done by an authorized Chrysler, Dodge, Jeep or Ram dealer**" and that "**They know you and your vehicle best, and are most concerned that you get prompt and high quality service**." Further, the booklet states that "warranty problems came be resolved by your dealer's sales or service departments."  The booklets direct Plaintiffs and class members, should they have a problem or concern, to "always talk to your dealer's service manager or sales manager first."  FCA than directs Plaintiffs and class members to first, "[d]iscuss your problem with the owner or general manager of the dealership," and if that is unsatisfactory, to second, "contact the FCA US Customer Assistance Center."[21]

230.  Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Defendant or its agent dealerships to establish privity of contract between Defendant, on one hand, and Plaintiffs and each of the members of the Class, on the other hand.

---

[21] *See e.g.*, 2018 Dodge Warranty Information – All Vehicles,
https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Dodge/2018/Challenger_SRT/8727.pdf. (last visited June 24, 2021)

This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendant.

### G.    Tolling of the Statute of Limitations

231.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect.  Defendant and its agents continue to deny the existence and true extent of the Defect, even when questioned by Plaintiffs and members of the Classes.

232.    Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Defect and the associated safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the Defect or that Defendant was concealing the Defect.

233.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Defect in Class Vehicles.

234.    Defendant knowingly, actively and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Classes reasonably relied on Defendant's knowing, active, and affirmative concealment.

235.    For these reasons, all applicable statutes of limitation have been tolled based on the

discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

**H.     Class Allegations**

236.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).[22] This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

237.    The Class and Sub-Classes are defined as:

> **Nationwide Class:** All individuals in the United States who purchased or leased Dodge branded vehicle, 2015-2019 Charger Hellcats, 2015-2019 Challenger Hellcats and 2018 Demons.

> **California Sub-Class:** All residents of the State of California who purchased or leased Dodge branded vehicle, 2015-2019 Charger Hellcats, 2015-2019 Challenger Hellcats and 2018 Demons.

> **CLRA Sub-Class:**  All members of the State of California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

> **Florida Class:** All residents of the State of Florida who purchased or leased Dodge branded vehicle, 2015-2019 Charger Hellcats, 2015-2019 Challenger Hellcats and 2018 Demons.

> **New York Class:** All residents of the State of New York who purchased or leased Dodge branded vehicle, 2015-2019 Charger Hellcats, 2015-2019 Challenger

---

[22] Collectively, the "Class," unless otherwise noted.

Hellcats and 2018 Demons.

238.     Excluded from the class and Sub-Classes are: (1) Defendant, and entity or division in which the Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) all Judges to whom this case is assigned and the Judges' staff; (3) any Judge sitting in the presiding court system who may hear an appeal of any judgement entered; and (4) those person who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

239.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

240.     There is a well-defined community of interest in the litigation and each Sub-Class is readily ascertainable.

241.     Numerosity. Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough, well over a hundred thousand, such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

242.     Typicality. Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by FCA. The representative Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing of replacing

defective Drivetrain parts. Furthermore, the factual bases of FCA's misconduct are common to all Class Members and represent a common thread resulting in injury to all Class Members.

243.    <u>Commonality.</u> There are numerous questions of law and fact common to Plaintiff and the Class that predominate over any question affecting only individual Class Members. These common legal and factual issues include the following:

    **a.**  Whether Class Vehicles contain defects relating to the rear differential;

    **b.**  Whether the defects relating to the rear differential constitute an unreasonable safety risk;

    **c.**  Whether Defendant know about the defects relating to the rear differential and, if so, how long Defendant has known of the defect;

    **d.**  Whether the defective nature of the rear differential constitutes a material fact;

    **e.**  Whether Defendant has a duty to disclose the defective nature of the rear differential to Plaintiffs and Class Members;

    **f.**  Whether Plaintiff and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

    **g.**  Whether Defendant knew or reasonably should have known of the defects relating to the rear differential before it sold and leased Class Vehicles to Plaintiff and Class Members;

    **h.**  Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the Defective Drivetrain parts;

    **i.**  Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective

differential parts;

**j.**   Whether Defendant breached the implied warranty of merchantability pursuant to state law and/or the UCC;

**k.**   Whether Defendant breached its express warranties under state law and/or the UCC

**l.**   Whether Defendant's conduct violates consumer protection statutes;

**m.**   Whether Defendant is liable for fraudulent omission;

**n.**   Whether Defendant was unjustly enriched; and

**o.**   Whether Plaintiffs and the other Class Members are entitled to damages and other monetary relief and, if so, in what amount.

244.   <u>Adequate Representation</u>. Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

245.   <u>Predominance and Superiority.</u> Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior

method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

246.    In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or (b)(2) because:

> a.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for FCA;
>
> b.   The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dipositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and
>
> c.   FCA has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

247.    Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## V.  COUNTS

### COUNT I
### Fraud by Omission or Fraudulent Concealment
### (On behalf of the Class, or in the Alternative,
### on Behalf of all Sub-Classes against Defendant)

248.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein.

249.    Plaintiffs bring this cause of action on behalf of themselves and the nationwide Class, or in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

250.    FCA knew that the Class Vehicles suffered from an inherent Differential Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

251.    Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

252.    Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

 a.  Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

 b.  The omitted facts were material because they directly impact the safety of the Class Vehicles;

 c.  Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

 d.  Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e.   Defendant actively concealed the defective nature of the Class Vehicles from

Plaintiffs and Class Members.

253.   The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class

Members are material in that a reasonable person would have considered them to be important in

deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them.

Whether a vehicle becomes inoperable when the differential fails is a material safety concern. Had

Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would

not have purchased or leased the Class Vehicles or would have paid less for them.

254.   Defendant concealed or failed to disclose the true nature of the design and/or

manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to

act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to

their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of

Defendant's defective Class Vehicles.

255.   Defendant continued to conceal the defective nature of the Class Vehicles even

after Class Members began to report the problems. Indeed, Defendant continues to cover up and

conceal the true nature of the problem today.

256.   As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class

Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve

their right to elect either to (a) rescind their purchase or lease of the Defective Vehicles and obtain

restitution or (b) affirm their purchase or lease of the Defective Vehicles and recover damages.

257.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich

Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II
### Unjust Enrichment
### (On Behalf of the Class, or, in the Alternative, on Behalf of all Sub-Classes against Defendant)

258.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein.

259.    Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

260.    FCA has received and retained a benefit from Plaintiffs and all Class Members and inequity has resulted.

261.    FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the Differential Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

262.    As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, FCA charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to FCA's authorized distributors and dealers, which are in FCA's control.

263.    All Class members conferred a benefit on FCA.

264.    It is inequitable for FCA to retain these benefits.

265.    Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

266.    FCA knowingly accepted the benefits of its unjust conduct.

267.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

268.    Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

269.    Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT III
### Violation of the Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301)
### (On behalf of the Class, or in the Alternative,
### on Behalf of all Sub-Classes against Defendant)

270.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein.

271.    This claim is brought on behalf of Plaintiffs and the Class, or alternatively, on behalf of all Sub-Classes, against Defendant.

272.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

273.    FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

274.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

275.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

276.    Defendant's implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

277.    Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

278.    Defendant breached the implied warranty and the express warranty by virtue of the above-described acts.

279.    Plaintiffs and the other Class Members notified Defendant of the breach within a reasonable time and/or were not required to do so. FCA was also on notice of the Defect from, among other sources, the complaints and service requests it received from Class Members and its dealers.

280.    Defendant's breach of the implied warranty and express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

281.    Plaintiffs and the Class Members have had sufficient direct dealings with either FCA or its agents (dealerships and technical support) to establish privity of contract between FCA, on one hand, and Plaintiffs and each of the other Class Members on the other hand. Nonetheless,

privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

282.   FCA breached these warranties, as described in more detail above. Without limitation, the Class Vehicles contain a Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are manufactured with defective materials and/or with poor workmanship. Contrary to FCA's representations about its vehicles, the Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect.

283.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, FCA has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the defect.

284.   At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

64

285.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

286.     Plaintiffs provided notice to FCA of their intent to pursue class claims under the MMWA via letters dated May 18, 2021 and June 14, 2021.

287.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

288.     Plaintiffs, individually and on behalf of all members of the Class, seek all damages permitted by law, in an amount to be proven at trial.

**Claims on Behalf of the California Sub-Class**

<u>**COUNT IV**</u>
**Breach of Express Warranty**
**CAL. COM. CODE §§ 2313 AND 10210**
**(On Behalf of the California Sub-Class against FCA)**

289.     Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 235 as if fully set forth herein.

290.     Plaintiffs Diaz and Santos bring this count on behalf of themselves and the California Sub-Class against FCA.

291.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under §

2103(1)(d).

292.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

293.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

294.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under California state law.

295.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"

296.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

297.    The Warranty formed the basis of the bargain that was reached when Plaintiffs Diaz and Santos and other members of the California Sub-Class purchased or leased their Class Vehicles.

298.    FCA breached the express warranty through the acts and omissions described above.

299.    Plaintiffs Diaz and Santos and members of the California Sub-Class have had sufficient direct dealing with either FCA or its agents (i.e., dealerships and technical support) to establish privity of contract between FCA, on one hand, and Plaintiffs Diaz and Santos and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs Diaz and Santos and each of the other Class Members are the intended third-party

beneficiaries of contracts between FCA and its distributors and dealers, and specifically, of FCA's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

300.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Plaintiffs Diaz and Santos and the members of the California Sub-Class.  Among other things, Plaintiffs Diaz and Santos and members of the California Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

301.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiffs Diaz and Santos and the members of the California Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

302.    Plaintiffs Diaz and Santos were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received

from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

303.    Nonetheless, Plaintiffs Diaz and Santos provided notice to FCA of the breach of express warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.  Further, Plaintiffs Diaz and Santos provided written notice by letters dated May 18, 2021 and June 14, 2021.

304.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs Diaz and Santos and California Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

305.    As a result of FCA's breach of the express warranty, Plaintiffs Diaz and Santos and California Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

<u>**COUNT V**</u>
**Breach of the Implied Warranty Pursuant to the Song-Beverly**
**Consumer Warranty Act**
**CAL. CIV. CODE §§ 1792 AND 1791.1, ET SEQ.**
**(On Behalf of the California Sub-Class against Defendant)**

306.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 as if fully set forth herein.

307.    Plaintiffs Diaz and Santos bring this count on behalf of themselves and the California Sub-Class against Defendant.

308.    Plaintiffs Diaz and Santos and the California Sub-Class members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

309.    FCA is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

310.    The Class Vehicles are and were at all relevant times "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

311.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

312.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiffs Diaz and Santos and members of the California Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs Diaz and Santos and members of the California Sub-Class, with no modification to the defective Class Vehicles.

313.    FCA provided Plaintiffs Diaz and Santos and members of the California Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

314.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

69

315.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

316.    As a result of FCA's breach of the applicable implied warranties, Plaintiffs Diaz and Santos and members of the California Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs Diaz and Santos and members of the California Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

317.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

318.    Plaintiffs Diaz and Santos and members of the California Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

319.    Plaintiffs Diaz and Santos and members of the California Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Plaintiffs Diaz and Santos and the Class Members and through other internal sources.

320.     Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.  Further, Plaintiffs Diaz and Santos provided written notice by letters dated May 18, 2021 and June 14, 2021.

321.     As a direct and proximate cause of FCA's breach, Plaintiffs Diaz and Santos and members of the California Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Diaz and Santos and members of the California Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

322.     As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs Diaz and Santos and members of the California Sub-Class have been damaged in an amount to be proven at trial.

**COUNT VI**
**Violation of the California Consumer Legal Remedies Act**
**CAL. CIV. CODE § 1750, *ET SEQ***
**(On Behalf of the California Sub-Class against Defendant)**

323.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein.

324.     Plaintiffs Diaz and Santos bring this cause of action on behalf of themselves and on behalf of the members of the CLRA Sub-Class.

325.     Plaintiffs Diaz and Santos and the CLRA Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

326.    FCA is a "person" as defined by California Code § 1761(c).

327.    By failing to disclose and concealing the defective nature of the rear differential from Plaintiffs Diaz and Santos and CLRA Sub-Class members, FCA violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their rear differentials had characteristics and benefits that they do not have and represented that the Class Vehicles and their rear differentials were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

328.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

329.    FCA knew that the Class Vehicles and their rear differential suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

330.    Because of their reliance on FCA's omissions, owners and/or lessees of the Class Vehicles, including Plaintiffs Diaz and Santos, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Differential Defect, Plaintiffs Diaz and Santos and CLRA Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' rear differentials are defective.

331.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

332.    Defendant was under a duty to Plaintiffs Diaz and Santos and the CLRA Sub-Class Members to disclose the defective nature of the Class Vehicles because:

        a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs Diaz and Santos and the California Sub-Class Members at the time of sale and thereafter.

333.   By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

334.   The facts concealed or not disclosed by Defendant to Plaintiffs Diaz and Santos and the CLRA Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle becomes inoperable when the differential fails is a material safety concern. Had Plaintiffs Diaz and Santos and the CLRA Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

335.   Plaintiffs Diaz and Santos and the CLRA Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Differential Defect. That is the reasonable and objective consumer expectation for vehicles.

336.   As a result of Defendant's misconduct, Plaintiffs Diaz and Santos and the CLRA Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

337.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs Diaz and Santos and the CLRA Sub-Class Members have suffered and will continue to suffer actual damages.

338.    FCA's violations present a continuing risk to Plaintiffs Diaz and Santos and the CLRA Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

339.    Plaintiffs Diaz and Santos provided FCA with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) by letters date May 18, 2021 and June 14, 2021. Throughout the course of this litigation and continuing at present, FCA has failed to provide appropriate relief for its violations, including its violations of the CLRA. Therefore, Plaintiffs Diaz and Santos seeks monetary, compensatory, and punitive damages.

**COUNT VII**
**Violation of the California Bus. & Prof. Code § 17200, *ET SEQ***
**(On Behalf of the California Sub-Class against Defendant)**

340.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein.

341.    Plaintiffs Diaz and Santos bring this cause of action on behalf of themselves and on behalf of the members of the California Sub-Class.

342.    As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Differential Defect, Plaintiffs Diaz and Santos and Class Members were harmed and suffered actual damages in that the Class Vehicles' differential components are substantially certain to fail before their expected useful life has run.

343.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

344.     Plaintiffs Diaz and Santos and the California Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Differential Defect.

345.     Defendant knew the Class Vehicles and their rear differentials suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

346.     In failing to disclose the defects with the rear differential, Defendant has knowingly concealed materials facts and breached its duty not to do so.

347.     Defendant was under a duty to Plaintiffs Diaz and Santos and the California Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs Diaz and Santos and the California Sub-Class Members at the time of sale and thereafter.

348.     The facts concealed or not disclosed by Defendant to Plaintiffs Diaz and Santos and the California Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle becomes inoperable when the differential fails is a material safety concern. Had Plaintiffs Diaz and Santos and the California Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

349.    Defendant continued to conceal the defective nature of the Class Vehicles and their rear differentials even after Class Members began to report problems.  Indeed, Defendant continues to cover up and conceal the true nature of the problem.

350.    Defendant's conduct was and is likely to deceive consumers.

351.    Defendant's acts, conduct and practices was unlawful, in that they constituted:

      (a)    Violations of the California Consumers Legal Remedies Act;

      (b)    Violations of the Song-Beverly Consumer Warranty Act;

      (c)    Breach of Express Warranty

352.    By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

353.    Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

354.    As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiffs Diaz and Santos and the California Sub-Class members have suffered and will continue to suffer actual damages.

355.    Defendant has been unjustly enriched and should be required to make restitution to Plaintiffs Diaz and Santos and the California Sub-Class pursuant to §§ 17203 and 17204 of the Business & Professions Code.

**Claims on Behalf of the Florida Sub-Class**

## COUNT VIII
### Breach of Express Warranty
### F.S.A. §§ 672.313 AND 680.21
### (On Behalf of the Florida Sub-Class against FCA)

356.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 235 as if fully set forth herein.

357.    Plaintiffs Gibson, Sinclair, and Veal bring this count on behalf of themselves and the Florida Sub-Class against FCA.

358.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

359.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

360.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

361.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Florida state law.

362.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

363.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

364.   The Warranty formed the basis of the bargain that was reached when Plaintiffs Gibson, Sinclair, and Veal and other members of the Florida Sub-Class purchased or leased their Class Vehicles.

365.   FCA breached the express warranty through the acts and omissions described above.

366.   Plaintiffs Gibson, Sinclair, and Veal and members of the Class have had sufficient direct dealing with either FCA or its agents (i.e., dealerships and technical support) to establish privity of contract between FCA, on one hand, and Plaintiffs Gibson, Sinclair, and Veal and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs Gibson, Sinclair, and Veal and each of the other Class Members are the intended third-party beneficiaries of contracts between FCA and its distributors and dealers, and specifically, of FCA's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

367.   Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Plaintiffs Gibson, Sinclair, and Veal and the members of the Florida Sub-Class.  Among other things, Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross

78

disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

368.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiffs Gibson, Sinclair, and Veal and the members of the Florida Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

369.    Plaintiffs Gibson, Sinclair, and Veal were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

370.    Nonetheless, Plaintiffs Gibson, Sinclair, and Veal provided notice to FCA of the breach of express warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.  Further, Plaintiffs Gibson, Sinclair, and Veal provided written notice by letter dated May 18, 2021.

371.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs Gibson, Sinclair, and Veal and Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

372.    As a result of FCA's breach of the express warranty, Plaintiffs Gibson, Sinclair, and Veal and Florida Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT IX**
**Breach of the Implied Warranty of Merchantability**
**F.S.A. §§ 672.314 AND 680.212**
**(On Behalf of the Florida Sub-Class against Defendant)**

373.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 as if fully set forth herein.

374.    Plaintiffs Gibson, Sinclair, and Veal bring this count on behalf of themselves and the Florida Sub-Class against Defendant.

375.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

376.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

377.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

378.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

379.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through

authorized dealers, like those from whom Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class, with no modification to the defective Class Vehicles.

380.    FCA provided Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

381.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

382.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

383.    As a result of FCA's breach of the applicable implied warranties, Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

384.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

385.    Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

386.    Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Plaintiffs Gibson, Sinclair, and Veal and the Class Members and through other internal sources.

387.    Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.  Further, Plaintiffs Gibson, Sinclair, and Veal provided written notice by letter dated May 18, 2021.

388.    As a direct and proximate cause of FCA's breach, Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

389.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs Gibson, Sinclair, and Veal and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

**COUNT X**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**F.S.A. §§ 501.201-.213**
**(On Behalf of the Florida Sub-Class against Defendant)**

390.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein.

391.    Plaintiffs Gibson, Sinclair, and Veal bring this cause of action on behalf of themselves and on behalf of the members of the Florida Sub-Class.

392.    Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class members are "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

393.     FCA's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq.*, Florida Statutes ("FDUTPA").  FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FDUTPA.

394.    FCA's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

395.    FCA participated in unfair or deceptive trade practices that violated the FDUTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally

misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

396.    FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

397.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

398.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

399.    FCA knew or should have known that its conduct violated the FDUTPA.

400.    Defendant was under a duty to Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members to disclose the defective nature of the Class Vehicles because:

  a.  Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

  b.  Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

  c.  Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members at the time of sale and thereafter.

401.     By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

402.     The facts concealed or not disclosed by Defendant to Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle becomes inoperable when the differential fails is a material safety concern. Had Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

403.     Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Differential Defect. That is the reasonable and objective consumer expectation for vehicles.

404.     As a result of Defendant's misconduct, Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

405.     As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members have suffered and will continue to suffer actual damages.

406.     FCA's violations present a continuing risk to Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

407.     The foregoing acts, omissions, and practices proximately caused Plaintiffs Gibson, Sinclair, and Veal and the Florida Sub-Class Members to suffer real damages in the form of, *inter*

*alia*, overpaying for the vehicles, as well as diminution of value of the vehicles, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

**Claims on Behalf of the New York Sub-Class**

**COUNT** XI
**Breach of Express Warranty**
**N.Y. U.C.C. §§ 20314 and 2A-210**
**(On Behalf of the New York Sub-Class against FCA)**

408.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 235 as if fully set forth herein.

409.    Plaintiff Scorziello brings this count on behalf of himself and the New York Sub-Class against FCA.

410.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

411.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

412.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-15(1) and 2A-103(1)(h).

413.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under New York state law.

414.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

415.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

416.    The warranty formed the basis of the bargain that was reached when Plaintiff Scorziello and other members of the New York Sub-Class purchased or leased their Class Vehicles.

417.    FCA breached the express warranty through the acts and omissions described above.

418.    Plaintiff Scorziello and members of the Class have had sufficient direct dealing with either FCA or its agents (i.e., dealerships and technical support) to establish privity of contract between FCA, on one hand, and Plaintiff Scorziello and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiff Scorziello and each of the other Class Members are the intended third-party beneficiaries of contracts between FCA and its distributors and dealers, and specifically, of FCA's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

419.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Plaintiff

Scorziello and the members of the New York Sub-Class.  Among other things, Plaintiff Scorziello and members of the New York Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

420.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiff Scorziello and the members of the New York Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

421.    Plaintiff Scorziello were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

422.    Nonetheless, Plaintiff Scorziello provided notice to FCA of the breach of express warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.  Further, Plaintiff Scorziello provided written notice by letter dated May 18, 2021.

423.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiff

Scorziello and New York Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

424.    As a result of FCA's breach of the express warranty, Plaintiff Scorziello and New York Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT XII**
**Breach of the Implied Warranty of Merchantability**
**N.Y. U.C.C. §§ 2-314 and 2A-212**
**(On Behalf of the New York Sub-Class against Defendant)**

425.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 as if fully set forth herein.

426.    Plaintiff Scorziello brings this count on behalf of himself and the New York Sub-Class against Defendant.

427.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

428.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

429.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-15(1) and 2A-103(1)(h).

430.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. UCC Law §§ 2-314 and 2A-212.

431.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through

authorized dealers, like those from whom Plaintiff Scorziello and members of the New York Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff Scorziello and members of the New York Sub-Class, with no modification to the defective Class Vehicles.

432.   FCA provided Plaintiff Scorziello and members of the New York Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

433.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

434.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

435.   As a result of FCA's breach of the applicable implied warranties, Plaintiff Scorziello and members of the New York Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiff Scorziello and members of the New York Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

436.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

437.    Plaintiff Scorziello and members of the New York Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

438.    Plaintiff Scorziello and members of the New York Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Plaintiff Scorziello and the Class Members and through other internal sources.

439.    Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.  Further, Plaintiff Scorziello provided written notice by letter dated May 18, 2021.

440.    As a direct and proximate cause of FCA's breach, Plaintiff Scorziello and members of the New York Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Scorziello and members of the New York Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

441.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff Scorziello and members of the New York Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XIII**
**Violation of the New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York Sub-Class against Defendant)**

442.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein.

443.    Plaintiff Scorziello brings this cause of action on behalf of himself and on behalf of the members of the New York Sub-Class.

444.    FCA is a "person," "firm," "corporation," or "association" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349.

445.    Plaintiff Scorziello and the New York Sub-Class members are "persons" within the meaning of N.Y. Gen Bus. Law § 349.

446.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. FCA's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of FCA's deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing Class Vehicles, constitute conduct directed at consumers and "consumer-oriented." Further, Plaintiff Scorziello and the New York Sub-Class Members suffered injury as a result of the deceptive acts or practice. FCA engaged in unlawful deceptive act and/or practices that violated the New York GBL.

447.    FCA's actions, as set forth above, occurred in the conduct of business, trade or commerce.

448.    FCA participated in unfair or deceptive practices that violated the New York GBL. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by

concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

449.    FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

450.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

451.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

452.    FCA knew or should have known that its conduct violated the New York CFA.

453.    Defendant was under a duty to Plaintiff Scorziello and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

93

c.   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff Scorziello and the New York Sub-Class Members at the time of sale and thereafter.

454.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

455.    The facts concealed or not disclosed by Defendant to Plaintiff Scorziello and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle becomes inoperable when the differential fails is a material safety concern. Had Plaintiff Scorziello and the New York Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

456.    Plaintiff Scorziello and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Differential Defect. That is the reasonable and objective consumer expectation for vehicles.

457.    As a result of Defendant's misconduct, Plaintiff Scorziello and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

458.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff Scorziello and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

459.    FCA's violations present a continuing risk to Plaintiff Scorziello and the New York Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices

complained of herein affect the public interest.  Specifically: (1) the number of consumers affected by FCA's deceptive practices are in the hundreds of thousands nation-wide; (2) FCA has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective differentials, the likelihood of continued impact on other consumers is significant.

460.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff Scorziello and each New York Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining FCA's deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT XIV
### Violation of the New York General Business Law § 350
### N.Y. Gen. Bus. Law § 350
### (On Behalf of the New York Sub-Class against Defendant)

461.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein.

462.    Plaintiff Scorziello brings this cause of action on behalf of himself and the New York Sub-Class against Defendant.

463.    New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the

advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

464.    FCA caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiff Scorziello and the New York Sub-Class Members.

465.    FCA violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, FCA's failure to disclose the Differential Defect, by concealing the Differential Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Differential Defect in the course of its business.

466.    In purchasing or leasing the Class Vehicles, Plaintiff Scorziello and the New York Sub-Class Members were deceived by FCA's failure to disclose the Differential Defect.

467.    Plaintiff Scorziello and the New York Sub-Class Members had no way of knowing that FCA's representations and omissions were false and misleading, that an internal component part of the Class Vehicles is defective and causes a safety hazard, that the differentials will fail under normal and intended use of the Class Vehicles, or that FCA would refuse to repair, replace,

or compensate Plaintiff Scorziello and the New York Sub-Class Members for the failure of the defective differentials and the known consequences of that failure to the Class Vehicles.

468.   FCA's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

469.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Scorziello and the New York Sub-Class Members.

470.   FCA knew or should have known that its conduct violated the NY FAA.

471.   Plaintiff Scorziello and the New York Sub-Class Members reasonably relied on FCA's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

472.   Had Plaintiff Scorziello and the New York Sub-Class Members known that the Class Vehicles would exhibit the Differential Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of FCA's misconduct.

473.   Defendant was under a duty to Plaintiff Scorziello and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff Scorziello and the New York Sub-Class Members at the time of sale and thereafter.

474.    Plaintiff Scorziello and the New York Sub-Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that they overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations, fraud, deceptive practices, and omissions.

475.    Plaintiff Scorziello and the New York Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because FCA acted willfully or knowingly, Plaintiff Scorziello and the New York Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendant and in favor of Plaintiffs, the Class and all Sub-Classes, and award the following relief:

A.  A declaration that FCA is financially responsible for notifying all Class Members of the Differential Defect;

B.  An order enjoining FCA from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling FCA to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling FCA to repair and eliminate the Differential Defect from every Class Vehicle; enjoining FCA from selling the Class Vehicles with the misleading information; and/or compelling FCA to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

C.  Damages and restitution in an amount to be proven at trial;

D.  An order certifying the proposed Class and Sub-Classes, designating Plaintiffs named representatives of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

E.  A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

F.  Any and all remedies provided pursuant to the express and implied warranty laws, common law fraud by concealment laws, and consumer protection statutes alleged herein;

G.  An award to Plaintiffs and the Class and Sub-Classes of compensatory, exemplary, and statutory damages as applicable, including interest, in an amount to be proven at trial;

H.  A declaration that Defendant must disgorge, for the benefit of the Class and Sub-Classes, all or part of the ill-gotten profits it received from the sale or lease of Class Vehicles, and/or make full restitution to Plaintiffs and Class Members;

I.  An award of attorneys' fees and costs, as allowed by law;

J.  An award of pre-judgment and post-judgment interest, as provided by law;

K.  Leave to amend the Complaint to conform to the evidence produced at trial; and

L.  Such other relief as may be appropriate under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated:  June 24, 2021                    Respectfully submitted,

                                         Attorneys for Plaintiff,

                                         By: /s/ *Russell D. Paul*
                                         Russell D. Paul (Bar No. 4647)
                                         Abigail Gertner (PHV app. forthcoming)
                                         Amey J. Park (PHV app. forthcoming)
                                         Natalie Lesser (PHV app. forthcoming)
                                         **BERGER MONTAGUE PC**
                                         1818 Market Street, Suite 3600
                                         Philadelphia, PA 19103
                                         Tel.:    (215) 875-3000
                                         Fax:     (215) 875-4604
                                         Email:  rpaul@bm.net
                                                 agertner@bm.net
                                                 apark@bm.net
                                                 nlesser@bm.net

                                         Tarek H. Zohdy (PHV app. forthcoming)
                                         Cody R. Padgett (PHV app. forthcoming)
                                         **CAPSTONE LAW APC**
                                         1875 Century Park East, Suite 1000
                                         Los Angeles, California 90067
                                         Telephone:     (310) 556-4811
                                         Facsimile:     (310) 943-0396
                                         Tarek.Zohdy@capstonelawyers.com
                                         Cody.Padgett@capstonelawyers.com

                                         Steven Calamusa (PHV app. forthcoming)
                                         **GORDON & PARTNERS, P.A.**
                                         4114 Northlake Blvd.,
                                         Palm Beach Gardens, FL 33410
                                         Telephone: (561) 799-5070
                                         Facsimile: (561) 799-4050
                                         scalamusa@fortheinjured.com

100