## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| _____ ) | |
| GUSTAVO DIAZ, *et al.* individually and on ) | |
| behalf of all others similarly situated, ) | Civil Action No.  21-cv-00906-EJW |
| ) | |
| Plaintiffs, ) | **JURY TRIAL DEMANDED** |
| ) | |
| v. ) | |
| ) | |
| FCA US LLC, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM OPINION AND ORDER

Russell D. Paul, Abigail J. Gertner, Amey J. Park, BERGER MONTAGUE PC, Philadelphia, PA; Cody R. Padgett, Laura E. Goolsby, Tarek H. Zohdy, CAPSTONE LAW APC, Los Angeles, CA; Steven Calamusa, Geoff Stahl, GORDON & PARTNERS, Palm Beach Gardens, FL – Attorneys for Plaintiffs

Patrick Brannigan, ECKERT SEAMANS CHERIN & MELLOTT LLC, Wilmington, DE; Stephen A. D'Aunoy, Thomas L. Azar, Scott H. Morgan, THOMPSON COBURN LLP, St. Louis, MO – Attorneys for Defendant

September 2, 2022
Wilmington, Delaware

**WALLACH, CIRCUIT JUDGE:**

Plaintiffs are residents of California, Florida, and New York, and bring a putative consumer class action on behalf of themselves, a proposed class (the "Class") comprised of "all persons in the United States . . . who purchased or leased 2014-2019 model year Dodge Challengers and Chargers equipped with the V8 engine" (a "Class Vehicle"),[1] and, in the alternative, a number of proposed sub-classes comprised of residents of California, Florida, and New York who purchased or leased a Class Vehicle.[2]  Complaint ¶ 1 (D.I. 1).  Before the court is Defendant FCA US LLC's ("FCA" or "Defendant") Motion to Dismiss Plaintiffs' Complaint in its entirety under Federal Rule of Civil Procedure ("Rule") 12(b)(6), for failure to state a claim on which relief can be granted. Motion to Dismiss (D.I. 15, 16).

Plaintiffs' Complaint contains fourteen counts under federal and state law, alleging misconduct by FCA relating to a defective aspect of the Class Vehicles.[3]  Specifically, Plaintiffs allege that every Class Vehicle has a "rear differential[4] that is defective in design, manufacturing,

---

[1]	Plaintiffs further identify the Class Vehicle definition as including "2015-2019 Charger Hellcats, 2015-2019 Challenger Hellcats and 2018 Demons models."  Complaint ¶ 1 n.1.

[2]	Each state-based sub-class is defined as "[a]ll residents of the State of [California, Florida, or New York] who purchased or leased [a Class Vehicle]."  Complaint ¶ 237.  In addition, Plaintiffs seek to define a California-specific sub-class, the "CLRA Sub-Class," comprised of "[a]ll members of the California Sub-Class who are 'consumers' within the meaning of California Civil Code § 1761(d)."  *Id.*  As will be discussed *infra*, California Plaintiffs Diaz and Santos bring Count VI, "Violation of the California Consumer Legal Remedies Act" under California Civil Code § 1750 *et seq.*, on behalf of the CLRA Sub-Class.  *Id.* at 71.  For ease of reference, each proposed state-defined sub-class is referred to as the "[State] Sub-Class."

[3]	At the motion to dismiss stage, the court "must 'accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff].'"  *Kedra v. Schroeter*, 876 F.3d 424, 434 (3d Cir. 2017) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008)).

[4]	Plaintiffs allege the following definition of "rear differential":

materials, and/or workmanship." Complaint ¶ 4. According to Plaintiffs, this defect (the "Differential Defect" or the "Defect") "was latent, but existed at the time that the Class Vehicles left FCA's possession and control and was present at the time of sale or lease of the Class Vehicles." *Id.* Further, Plaintiffs assert that the Defect exists because

> the rear differential is not adequately designed and/or manufactured for the torque loads of the engines and transmissions exerted during acceleration. Accordingly, the high torque loads degrade the differential, causing the rear differential and its internal components including, but not limited to, the ring gear, pinion gear[,] differential housing and/or axles to fail.

*Id.*

For the reasons that follow, Defendant's Motion to Dismiss is granted, and Plaintiffs' Complaint is dismissed in its entirety without prejudice.

---

> [A] component on the rear axle in all vehicles designed to compensate for the difference in distance between the inner and outer rear wheels when the vehicle is turning. Specifically, the rear differential allows the rear tires to move in the same direction while rotating at different speeds. The rear differential is a critical driveline component that transfers the vehicle's engine's power (horsepower and torque) to the rear wheels. This transfer of engine power to the rear differential enables the Class Vehicles to operate in a forward or reverse direction. The power of the engine in the Class Vehicles is routed through the transmission, then transferred to the rear differential by the driveshaft. Once the engine's power is transmitted to the rear differential, the engine's power (horsepower and torque) is subsequently transferred to the drive tires through axle shafts.

Complaint ¶ 162.

## BACKGROUND

I.   **Parties**

A.   **Named Plaintiffs**

The named Plaintiffs in this action are Gustavo Diaz, a citizen of California who purchased a new Class Vehicle; Joseph Santos, a citizen of California who purchased a new Class Vehicle; Christian Gibson, a citizen of Florida who purchased a new Class Vehicle; Gerald Sinclair, a citizen of Florida who purchased a used Class Vehicle; Marvin Leon Veal, a citizen of Florida who purchased a new Class Vehicle; and Domenick Scorziello, a citizen of New York who purchased a new Class Vehicle.  Complaint ¶¶ 26, 27, 45, 46, 73, 74, 89, 90, 108, 109, 129, 130.  All named Plaintiffs purchased their Class Vehicles from FCA-authorized dealerships in the state in which they reside.  *Id.* ¶¶ 27, 46, 74, 90, 109, 130.

B.   **Defendant**

Defendant FCA is a Delaware limited liability company with its principal place of business in Michigan.[5]  *Id.* ¶ 145.  It "designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide."  *Id.*  FCA has a "performance automobile division" called SRT, through which it "designed, manufactured, imported, distributed, offered for sale, sold, and leased" the Class Vehicles.  *Id.* ¶¶ 146–47.

According to Plaintiffs, "FCA has a nationwide dealership network and operates offices and facilities throughout the United States," from which Plaintiffs purchased their Class Vehicles.  *Id.* ¶ 148.  FCA governs services and repairs at its authorized dealerships "through service manuals,

---

[5]       As a limited liability company, FCA's citizenship "is determined by the citizenship of each of its members."  *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 348 (3d Cir. 2013) (citation omitted).  FCA's sole member is another Delaware limited liability company with its principal place of business in Michigan, and that company's sole member is a Netherlands and United Kingdom company.  Complaint ¶ 145.

technical service bulletins ('TSBs'), and other documents. . . . FCA also develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotion materials relating to Class Vehicles through the dealership network [including Monroney Stickers]." *Id.* ¶¶ 148–49.

The only written (express) warranty at issue here[6] is FCA's three-year/36,000 mile "Basic Limited Warranty" that came with each Class Vehicle, covering "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." Complaint ¶¶ 295–96; *see also, e.g.*, Motion to Dismiss Ex. A at 5.

## II.    General Allegations Regarding Plaintiffs' Purchases of Class Vehicles

Plaintiffs allege that they purchased their Class Vehicles as performance vehicles, and have been harmed by the Differential Defect, which causes the Class Vehicles to "not live up to expectations to provide safe, reliable transportation for a normal vehicle, much less the quality necessary for a performance vehicle." *See, e.g.*, Complaint ¶ 177; *see also id.* ¶ 15 ("Plaintiffs and members of the Classes relied on FCA's representations that the Class Vehicles were properly engineered and equipped to handle high performance driving, including track and drag racing use, as well as ordinary, public road driving.").

There are a number of allegations common to the named Plaintiffs, who reside in California, Florida, and New York.  Specifically, all named Plaintiffs allege that they purchased their Class Vehicles "primarily for personal, family, or household use," and that they still own their (allegedly defective) Class Vehicles. *Id.* ¶¶ 28, 29, 47, 48, 75, 76, 91, 92, 110, 111, 131, 132.

---

[6]    At Oral Argument, Plaintiffs' Counsel conceded that the Basic Limited Warranty was the only express warranty at issue in this case.  Oral Argument at 31:57, Diaz et al. v. FCA US LLC (No. 21-cv-00906-EJW).

"Passenger safety and reliability were important factors" in all named Plaintiffs' purchase decisions.  *Id.* ¶¶ 33, 52, 80, 96, 115, 136.

Unbeknownst to Plaintiffs at the time of purchase, however, each "Class Vehicle was equipped with a rear differential that was defective and not robust enough for the horsepower and torque loads of the driveline."[7]  *Id.* ¶¶ 30, 49, 77, 93, 112, 133.

According to Plaintiffs, FCA knew of the Differential Defect at the time of Plaintiffs' purchases, but did not disclose it to any of them, which resulted in Plaintiffs making purchases "on the reasonable but mistaken belief that [their Class Vehicles] would be safe and reliable on public roadways, . . . and capable of track use," which they were not.  *Id.* ¶¶ 32, 51, 79, 95, 114, 135.

In addition to information about the Class Vehicles' capabilities that each Plaintiff alleges he obtained or reviewed during the purchase process, Plaintiffs allege that "FCA also produced and distributed uniform marketing materials about the Class Vehicles to dealerships with the expectation that this information would be passed [on to] the consumer through dealer interactions."  *Id.* ¶¶ 33, 34, 52, 53, 80, 81, 96, 97, 115, 116, 136, 137.  "None of the information provided," however, "disclosed any defects in the rear differential or drivetrain system or that the Class Vehicles were not capable of safe driving on public roadways and track use."  *See, e.g.*, *id.* ¶ 35.  If Plaintiffs had been aware of the Differential Defect, each alleges that "he would not have purchased his Class Vehicle or would have paid less."  *Id.* ¶¶ 35, 54, 82, 98, 117, 138.  Plaintiffs claim that, as of the time of their filing this action, they have "received no notification from FCA

---

[7]        Plaintiffs explain that the Defect causes "high horsepower and torque loads," to "damage and/or degrade" the rear differential along with "the entire drivetrain system."  Complaint ¶ 169.  Plaintiffs allege that this leads to eventual "catastrophic failure" of the rear differential, but prior to that, "the Defect causes metal shavings and other metal particulates to contaminate the differential oil, increasing friction and heat," which causes degradation of the differential's internal components and potential failure of the axles of the vehicle.  *Id.*

about any potential repair or aftermarket modification that would repair the Drivetrain or the Differential Defect and render the Class Vehicle[s] safe to drive on public roadways, or during occasional track use, that would also be compliant with FCA's express warranties."[8]  *Id.* ¶¶ 39, 67, 83, 102, 123, 139.

Accordingly, because Plaintiffs aver that "[t]he Differential Defect can cause unexpected failures that significantly impair the safety, reliability, and operability of the Class Vehicles to such an extent that they are rendered unfit for the ordinary purpose of driving on public roadways," they have "lost confidence" in their Class Vehicles, consider themselves "unable to rely on [Defendant's] advertising or labeling in the future," and do not plan to purchase Class Vehicles again although they "would like to."  *Id.* ¶¶ 41–43, 69–71, 85–87, 104–06, 125–27, 141–43.

## III.   Injury Allegations Specific to Named Plaintiffs

Plaintiffs summarize the injuries suffered by themselves and other putative Class members as follows:

> As a direct and proximate result of FCA's concealment of, and failure to disclose, the Differential Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles because the Defect significantly diminishes the value of the Vehicles; (2) have Vehicles that suffer premature differential failures; (3) have and/or must expend significant money to have their Vehicles (inadequately) repaired; and (4) are not able to use their Vehicles for their intended purpose and in the manner FCA advertised[.]

Complaint ¶ 21.

---

[8]     Plaintiffs further allege that, while they were "aware at the time of purchase that [their Class Vehicles] came with express warranties, [they were] not aware that executing aftermarket repairs could void the express warranties for the entire Class Vehicle[s]."  *See, e.g.*, Complaint ¶ 40.  Since Defendant does not bring its Motion to Dismiss on this ground—that is, that the warranties are inapplicable on account of having been voided—these allegations appear to be irrelevant to the resolution of FCA's Motion to Dismiss.  Likewise, Plaintiffs' allegations that they "attempted to drive [their] Class Vehicle[s] in a foreseeable manner and in a manner in which [they were] intended to be used" is not at issue in the context of this Motion, as Defendant does not argue that Plaintiffs used their Class Vehicles in an unforeseeable manner.  *See, e.g.*, *id.* ¶ 44.

Plaintiffs Diaz, Santos, Sinclair, and Veal allege facts—detailed below—purporting to show the damages they allegedly suffered due to having to repair, or attempt to repair, their Class Vehicles.   Plaintiffs Gibson (Florida) and Scorziello (New York)[9] do not allege that they experienced any actual issues driving their Class Vehicles, and do not allege that they sought or obtained any repairs on account of the alleged Defect.  *See id.* ¶¶ 80–83; 136–139; Oral Argument at 19:23, Diaz et al. v. FCA US LLC (No. 21-cv-00906-EJW) (Plaintiffs' Counsel acknowledging that Plaintiffs Gibson and Scorziello have not experienced manifestation of the Defect).  Plaintiffs do not allege that they paid FCA's authorized dealerships for the repairs they obtained.  *See id.* ¶¶ 26–44, 45–72, 89–107, 108–28; *cf. also id.* ¶ 303 (emphasis added) ("Plaintiffs Diaz and Santos . . . repeatedly took their vehicle[s] to an authorized FCA dealership and requested *warranty repairs*.").  Indeed, at Oral Argument, Plaintiffs' Counsel conceded that Plaintiffs did not pay for the repairs.  Oral Argument at 44:02.

As a general matter, Plaintiffs allege that "[c]osts to repair or replace a rear differential in the Class Vehicles often run thousands of dollars, excluding any other repairs necessary to the other vehicle components that may have been damaged by the defective rear differential."  *Id.* ¶ 180.  According to Plaintiffs, "Defendant has not recalled all the Class Vehicles to repair the

---

[9]        Because Plaintiffs structure their Complaint so as to frequently repeat allegations in form while changing the specific party referenced, there are several conflicting allegations concerning Plaintiff Scorziello.  *See* Complaint ¶ 422 ("Plaintiff Scorziello provided notice to FCA of the breach of express warranties when they [sic] repeatedly took their [sic] vehicle to an authorized FCA dealership and requested warranty repairs.").  *But see id.* ¶ 423 (stating that "Plaintiff Scorziello and New York Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run" but not indicating that the alleged Defect has manifested in Plaintiff Scorziello's Class Vehicle).  It is apparent from the section of the Complaint addressing Plaintiff Scorziello's actual purchase history that he makes no allegations that the Defect manifested in his Class Vehicle.  This absence of facts alleged is in contrast to the recitations of some of the other named Plaintiffs, and accordingly, the court cannot conclude that Plaintiff Scorziello has in fact sought repairs for his Class Vehicle based on the Differential Defect.

Differential Defect, has not offered to its customers a free suitable repair or free replacement of parts . . . and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Differential Defect."  *Id.* ¶ 215.

### A.    Plaintiff Diaz (California)

Plaintiff Diaz alleges that, "[b]efore making his purchase," in October 2015, he "reviewed several vehicle advertisements and test drove two other Dodge SRT vehicles before deciding on his Class Vehicle."  Complaint ¶¶ 27, 33.  "[A]lmost immediately after purchase," and "at or around 1000 miles on the vehicle's odometer," Plaintiff Diaz alleges that he "experienced" the Differential Defect because "the driveshaft [was] rattling and [he] would feel the differential click while driving."  *Id.* ¶ 36.  In April 2016, Plaintiff Diaz brought his Class Vehicle to an FCA-authorized dealership, "complain[ing] about the issues with the driveshaft and the rear differential, but the dealership told him nothing was wrong with the vehicle."  *Id.* ¶¶ 36–37.  Thus, the dealership "failed to adequately repair Plaintiff Diaz's vehicle, and it continues to exhibit the Differential Defect."  *Id.* ¶ 38.

### B.    Plaintiff Santos (California)

Plaintiff Santos alleges that, prior to his August 2016 purchase of his Class Vehicle, he "conducted online research, including visiting the FCA website. He also reviewed the window sticker (the 'Monroney' sticker) and test drove a similar vehicle before purchase."  Complaint ¶¶ 46, 52.  Plaintiff Santos alleges that he first experienced the Differential Defect in August 2017, a year after purchasing his Class Vehicle, with about "7,000 miles on the odometer."  *Id.* ¶ 55.  Specifically, "the vehicle made a loud clunking noise," and when the shift was engaged, "it made a loud noise that sounded like metal was grinding."  *Id.*  That same month, Plaintiff Santos brought his Class Vehicle to an FCA-authorized dealership, which performed a repair that "removed

exhaust and drive line to access rear differential[,] removed old differential and installed new differential." *Id.* ¶¶ 55, 56. Plaintiff Santos alleges, however, that he continued to experience problems with his Class Vehicle, such that he brought his Class Vehicle back to the dealership at least eight more times between September 2017 and August 2020 for numerous repairs, which included at least three replacements of the rear differential and numerous references, by the repairing technician, to potential issues with the rear differential. *Id.* ¶¶ 56–66. According to Plaintiff Santos, "[d]espite these attempted repairs, FCA's authorized dealerships failed to adequately repair [his] vehicle, and it continues to exhibit the Differential Defect." *Id.* ¶ 66.

### C.     Plaintiff Sinclair (Florida)

Plaintiff Sinclair[10] alleges that he "viewed FCA marketing materials regarding the safety and reliability of the Class Vehicle, including FCA's online advertising," before purchasing his Class Vehicle in July 2018. Complaint ¶¶ 90, 96. Plaintiff Sinclair first brought his Class Vehicle to an FCA-authorized dealership in January 2019, when the Vehicle had "approximately 15,922 miles on the odometer," because "the rear end of the vehicle was noisy, and the vehicle would not move." *Id.* ¶ 99. The dealership found that the axles were damaged, and replaced the rear differential. *Id.* Nevertheless, Plaintiff Sinclair alleges, that despite the repairs, the dealership "failed to adequately repair [his] vehicle, and it continued to exhibit the Differential Defect." *Id.* ¶ 100. Because of "a clicking noise coming from the rear differential," Plaintiff Sinclair brought his Class Vehicle back to the dealership in April 2021, but the dealership's "technician was unable to diagnosis [sic] the vehicle and no repairs were made." *Id.* ¶ 101.

---

[10]     Plaintiff Sinclair purchased a used Class Vehicle, the only named Plaintiff to do so. Complaint ¶ 90.

### D.    Plaintiff Veal (Florida)

Before purchasing his Class Vehicle in October 2018, Plaintiff Veal looked at "FCA marketing materials regarding the safety and reliability of the Class Vehicle, including FCA's window sticker and spoke with a FCA sales representative regarding the vehicle[']s features." Complaint ¶¶ 109, 115.  Plaintiff Veal alleges that he experienced the Differential Defect "when the differential started to make a loud noise," which led him to bring his Class Vehicle to an FCA-authorized dealership in November 2018, "with approximately 1,177 miles on the odometer."  *Id.* ¶¶ 118–19.  The dealership "discovered an internal failure in the rear differential . . . [and] removed and replaced the rear differential."  *Id.* ¶ 119.  Plaintiff Veal brought his Class Vehicle to the dealership again in January 2019 and October 2019, "complain[ing] of a whining noise coming from the rear differential," and later of "a loud roaring noise" from the rear of the Vehicle.  *Id.* ¶¶ 120–21.  On the first occasion, the dealership replaced the rear differential, but the whining noise continued, at which time "[t]he dealership explained the noise was the result of the gear mesh."  *Id.* ¶ 120.  On the second occasion, "[t]he dealership inspected [Plaintiff Veal's] vehicle and replaced the rear axle in the differential system and added fluid to the differential."  *Id.* ¶ 121. Like the other named Plaintiffs, Plaintiff Veal alleges that, despite the "attempted repairs, FCA's authorized dealerships failed to adequately repair [his] vehicle, and it continues to exhibit the Differential Defect."  *Id.* ¶ 122.

## IV.   FCA's Conduct

### A.    Features and Defects of the Class Vehicles

Plaintiffs allege that FCA consistently "marketed the Class Vehicles as designed for high-performance environments," and rely on various Class Vehicle brochures for the proposition that the Class Vehicles should have, among other things, been able to "'withstand the brutal

10

performance' associated with the aggressive driving found in high-performance driving environments. . . . [including] drag racing and burnouts."   Complaint at 31 (capitalization normalized); *id.* ¶¶ 155–57, 161.

In light of the Class Vehicles' intended purpose, Plaintiffs allege that "properly engineered Rear differentials are especially important to vehicles like the high-performance Class Vehicles which are equipped with high performance engines and intended to be used on racetracks or . . . in a high-performance manner." *Id.* ¶ 165.  Plaintiffs allege, however, that "discovery will show the rear differentials . . . in the Class Vehicles are not properly designed, engineered or manufactured to handle the horsepower and torque loads produced by the Class Vehicle's [sic] engines during acceleration or high-performance use." *Id.* ¶ 169.  In sum, Plaintiffs allege that the Defect arises from faulty "design, materials, manufacturing, and workmanship," resulting in "the differential components [not being] of an appropriate design or quality of material to withstand . . . the force of the torque – or power – being transferred from the engine to the wheels." *Id.* ¶ 172.  "Because these parts were poorly designed, manufactured, and/or assembled by FCA using both inferior materials and workmanship, the differential and entire driveline system degrades prematurely." *Id.*  In other words,

> [t]he Defective Differential is unable to handle the mechanical (horsepower and torque) loads of the Class vehicle's engines which will ultimately result in the catastrophic failure of the rear differential including the differential housing and its internal components. Moreover, prior to catastrophic failure, the Defect causes metal shavings and other metal particulates to contaminate the differential oil, increasing friction and heat which result in differential damage. The degradation of the internal components of the defective differential ultimately causes the rear differential and/or axles to fail.

*Id.* ¶ 169.  Plaintiffs further allege that the Defect "is the result of substandard, inconsistent and improper procedures in the material used or the manufacturing of the rear differential and its components, and/or poor quality-control procedures" as well as "the result of substandard

materials, specifically including the rear differential housing, the housing mounting points and mounting hardware as well as the differential gears and bearings, which degrade at a much faster rate than normal and lead to premature and catastrophic failure." *Id.* ¶¶ 170–71. "Because of the Differential Defect, Class Vehicles also experience rear differential failure during acceleration or when driven on surfaces treated for maximum traction, like drag strips as FCA intended and advertised." *Id.* ¶ 174.

When the Defect begins to manifest, the differential allegedly makes "whining, howling or whirling sounds," along with vibrations that can be felt in the passenger compartment, and "a risk to rear seat passengers" due to the possibility of the differential's housing exploding. *Id.* ¶ 175. "If the differential fails while driving, the vehicle may experience a complete loss of power." *Id.* ¶ 176. Thus, because the Defect causes failures that render Class Vehicles "undrivable" in "hazardous" ways, "[f]or Plaintiffs and members of the Classes, the rear differential does not live up to expectations to provide safe, reliable transportation for a normal vehicle, much less the quality necessary for a performance vehicle." *Id.* ¶¶ 177, 179. Finally, Plaintiffs allege that repairs require complete replacement of the rear differential because "rear differentials in the Class Vehicles are not fully serviceable with replacement parts; as such, when the rear differential experiences the symptoms of the Defect . . . the only viable option is to replace the entire differential." *Id.* ¶ 181.

**B.      FCA's Knowledge**

In addition to their recitations of FCA's advertising regarding the Class Vehicles, Plaintiffs endeavor to show first that "FCA had superior and exclusive knowledge of the Differential Defect," and second, that "FCA actively concealed the Defect." Complaint at 39, 46 (capitalization normalized).

To support these conclusions, Plaintiffs allege that FCA "was aware (or should have been aware) of the Differential Defect in the Class Vehicles,"

> [b]ased on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, knowledge of alternative designs for rear differentials, quality control audits of the rear differential and related components, early consumer complaints made to Defendant's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, auto parts stores, and/or consumers, consumer complaints to dealers and [the National Highway Traffic Safety Administration] and testing performed in response to consumer complaints[.]

*Id.* ¶ 184. In sum, Plaintiffs claim that FCA "continued to use the same or substantially similar differentials in the Class Vehicles despite knowledge of the Differential Defect from the issuance of the service bulletins, as well as from warranty claims and customer complaints." *Id.* ¶ 195; *see also id.* ¶ 186 ("Notwithstanding Defendant's exclusive and superior knowledge of the Differential Defect, Defendant failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continues to sell Class Vehicles containing the Defect.").

Plaintiffs quote a number of service bulletins that FCA issued to its dealership network to address the "symptoms" caused by the Differential Defect, but not the Defect itself—thus, according to Plaintiffs, "attempt[ing] to provide instructions to dealerships on what repairs to perform . . . to merely alleviate the symptoms of the Defect." *Id.* ¶ 187. "Plaintiffs and members of the Classes were never provided with copies of or information about the service bulletins," and thus, Plaintiffs allege that FCA "failed to disclose the Defect to owners of the Class Vehicles, including Plaintiffs and members of the Classes, . . . intentionally conceal[ing] the Defect" and resulting in Class members paying for repairs related to the Defect. *Id.* ¶¶ 193–94.

Plaintiffs also allege that consumer complaints, filed with the National Highway Traffic Safety Administration ("NHTSA"), "report[] the need to pay exorbitant amounts to repair or

replace the rear differential and associated damaged parts and detailing their experiences of catastrophic differential failure, which put the safety of drivers and their passengers at risk." *Id.* ¶¶ 197, 200.  Plaintiffs reproduce four NHTSA complaints. *Id.* ¶ 200.  Since "automakers monitor NHTSA databases for consumer complaints regarding their automobiles . . . to identify potential defects in their vehicles, . . . FCA knew or should have known of the many complaints about the Differential Defect[.]" *Id.* ¶ 199.

Finally, with regard to testing, Plaintiffs cite to news articles that discuss pre-production testing conducted by major manufacturers generally, as well as a news article showing that FCA does advanced durability testing for its high-performance (SRT) vehicles, such as Class Vehicles. *Id.* ¶¶ 201–05.  "As described by FCA, 'powertrains go through a battery of tests meant to ensure customers get maximum performance and durability,'" and "[v]ehicles bearing the SRT badge . . . undergo . . . standard durability testing as well as additional track evaluations that simulate actual driving conditions."[11] *Id.* ¶¶ 202–03.  Plaintiffs contend that the track evaluations specifically "simulate[] road course or dragstrip, which pushes the engine [of a Class Vehicle] to peak torque and peak power and tests different types of driveline loads," such that FCA should have discovered—and thus been on notice—of the Defect. *Id.* ¶¶ 204–05.

As to active concealment, Plaintiffs contend that FCA "failed to disclose to *or* actively concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair, and thereafter" material defects "including the Differential Defect"—specifically "that the Class Vehicles were not in good working order, were defective, and were not fit for their intended

---

[11]      "The Class Vehicles all bear FCA's Street & Racing Technology ('SRT') badge, indicating these are high-performance vehicles designed to be driven on both ordinary public roads and for speedways, dragstrips, and other track use."  Complaint ¶ 11.

purpose," despite "FCA learn[ing] of the Differential Defect before it placed the Class Vehicles in the stream of commerce." *Id.* ¶ 206 (emphasis added).

Plaintiffs allege that FCA was on notice of the Differential Defect due to evidence from a privately hosted event in 2019 at which four unmodified Class Vehicles had rear-end failures while driving on a track. *Id.* ¶¶ 207, 209. After video from the event was released, FCA conducted an investigation. *Id.* ¶¶ 207–11. Plaintiffs contend that the investigation put FCA on notice of the Defect, but that FCA continued to deny that the Defect existed, thus actively concealing it from Plaintiffs. *Id.* ¶ 210 ("As a result of . . . video showing the failures, it is reported that FCA conducted an investigation, but shortly thereafter, provided a response, ignoring the Defect and instead, focused on warranty concerns and modifications: 'There is nothing to investigate. Warranty concerns are a non-issue for Demon owners with unmodified vehicles. Modifications using non-OEM [original equipment manufacturer] parts should not raise questions about the durability of the stock Demon or its performance.'").

Plaintiffs also allege that the repair process—replacing one defective rear differential with another, similarly defective part—further demonstrates FCA's active concealment. *Id.* ¶ 213. Thus, FCA "has not offered to its customers a free suitable repair or free replacement of parts related to the Differential Defect . . . [or] reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Differential Defect." *Id.* ¶ 215.

Plaintiffs believe that a recall of all Class Vehicles is appropriate.[12] *Id.* at 98. Until such time as FCA remedies its alleged failures through recall, repair, and/or reimbursement, Plaintiffs

---

[12]    Plaintiffs make several references in their Complaint to a "recall" of the Class Vehicles as if it has already occurred in part, but they fail to allege any facts about the nature and extent of this recall. *See, e.g.*, Complaint ¶ 213 (emphasis added) ("[W]hen vehicles are brought to Defendant's dealers for repair, *including under the recall*, Class Members are provided with

contend that "Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles," and, "[a]s a result of the Differential Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles." *Id.* ¶¶ 216–17.

## V.   Procedural History

Plaintiffs filed their putative Class Action Complaint and Jury Demand on June 24, 2021. *See* Complaint at 100.  Plaintiffs primarily seek declaratory relief, injunctive relief, monetary damages, and restitution.  Complaint at 98–99.  Plaintiffs also make allegations in support of class certification,[13] and seek to equitably toll various statutes of limitations on their California state law claims that would otherwise apply.  *Id.* ¶¶ 231–47.

Plaintiffs' Complaint contains fourteen counts.  Counts I, II, and III are brought by all Plaintiffs "on behalf of the Class, or in the alternative, on behalf of all Sub-Classes against Defendant."  Complaint at 59, 61, 62 (capitalization normalized).  Count I is a common law claim for "fraud by omission or fraudulent concealment."  *Id.* at 59 (capitalization normalized).  Count

---

ineffective repairs in which one defective differential is replaced with another defective differential, as experienced by Plaintiffs.").

[13]     28 U.S.C. § 1332(d) sets forth the altered requirements of diversity jurisdiction for class actions under the Class Action Fairness Act of 2005:

> The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant . . . .

*Id.* § 1332(d)(2).  Here, Plaintiffs have alleged that they meet the requirements of § 1332.  *See* Complaint ¶ 151.

The court notes that Plaintiffs have made a typographical error in ¶ 151 by referring to Defendant as "Ford."  It appears that Plaintiffs may have taken paragraphs from a complaint in a different case.

II is a common law claim for unjust enrichment. *Id.* at 61. Count III is a federal claim for violation of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 *et seq. Id.* at 62.

Counts IV, V, and VII are California state law claims brought by California Plaintiffs Diaz and Santos on behalf of themselves and the California Sub-Class, alleging breach of express warranty (Count IV), implied warranty of merchantability under California's Song-Berverly Consumer Warranty Act (Count V), and violations of California's Unfair Competition Law ("UCL") provisions prohibiting "unfair competition" including fraudulent acts and misleading advertising (Count VII). *Id.* at 65, 68, 74 & ¶ 343. Relatedly, Plaintiffs Diaz and Santos bring Count VI on behalf of the "CLRA Sub-Class," alleging violations of the California Consumers Legal Remedies Act ("CLRA"). *Id.* at 71.

Counts VIII, IX, and X are Florida state law claims brought by Florida Plaintiffs Gibson, Sinclair, and Veal on behalf of themselves and the Florida Sub-Class, alleging breach of express warranty (Count VIII), implied warranty of merchantability (Count IX), and violations of the Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). *Id.* at 77, 80, 83.

Finally, Counts XI, XII, XIII, and XIV are New York state law claims brought by New York Plaintiff Scorziello on behalf of himself and the New York Sub-Class, alleging breach of express warranty (Count XI), implied warranty of merchantability (Count XII), and violations of New York General Business Law ("NYGBL") provisions aimed at protecting against deceptive consumer-oriented practices (Count XIII) and false advertising (Count XIV). *Id.* at 86, 89, 92, 95 & ¶¶ 446, 463.

By its Motion to Dismiss, Defendant challenges all of the pleaded counts on the basis that Plaintiffs have "fail[ed] to adequately allege cognizable damages." Motion to Dismiss 1. Defendant further seeks to dismiss as time-barred the Counts brought on behalf of California

17

Plaintiffs (Counts I-VII). *Id.* In addition to its Count-specific arguments that Plaintiffs have failed to allege facts sufficient to obtain relief on any of their claims, Defendant further argues that the claims brought on behalf of the putative nationwide Class (Counts I, II, and III) must be dismissed (or stricken) because Plaintiffs lack standing to sue on behalf of residents of states of which they themselves are not residents. *Id.* at 2. Finally, Defendant argues that Plaintiffs cannot obtain injunctive relief in the form of a recall of the Class Vehicles because it is preempted by the exclusive jurisdiction of NHTSA. *Id.*

For the reasons that follow, Defendant's Motion to Dismiss is granted without prejudice.

## DISCUSSION

### I.    Jurisdiction

Before ruling on Defendant's Motion to Dismiss under Rule 12(b)(6), the court is required to satisfy itself of its subject matter jurisdiction, including standing under Article III of the Constitution. *See, e.g.*, *Finkelman v. NFL*, 810 F.3d 187, 193 (3d Cir. 2016) ("[E]ven when [parties] do not address standing, we must determine on our own whether standing exists."); *see also* U.S. CONST. art. III, § 2.[14]   "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). These are:

---

[14]    It is worth noting that FCA's opening argument in its brief, directed at all Counts of Plaintiffs' Complaint, contends that Plaintiffs have failed to sufficiently allege damages such that *any* of their claims can survive a motion to dismiss. Plaintiffs characterize this as a challenge to standing. *See* Motion to Dismiss 7 ("[I]t is beyond debate that injury/damages are an essential element of each of the claims that Plaintiffs plead. Yet, the pleaded facts show: (1) Plaintiffs Gibson and Scorziello never had any problem with their vehicles, at all; and, (2) no Plaintiff has ever paid for a repair relating to the rear differential in their vehicle."); Opposition to Motion to Dismiss 3–4 (D.I. 18) (citations omitted) ("Plaintiffs Diaz, Santos, Sinclair, and Veal have all alleged concrete instances of the defect manifesting in their vehicles, and Plaintiffs Gibson and Scorziello allege legitimate fear of the dangerous defect manifesting. . . . Therefore, their

> (1) the invasion of a concrete and particularized legally protected interest and resulting injury in fact that is actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (citing *Lujan*, 504 U.S. at 560).

Plaintiffs have the burden of establishing their standing in federal court. *Blunt*, 767 F.3d at 278 (citing *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005)) ("It is well established that plaintiffs bear the burden of demonstrating that they have standing in the action that they have brought."). When plaintiffs seek different kinds of relief, they also must establish "Article III standing for each type of relief sought." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d

---

allegations of injury-in-fact and cognizable damages for diminished value and overpayment are not speculative.").

Damages as an element of a claim is a merits question, distinct from the standing analysis that a court must undertake to satisfy its "bedrock obligation to examine [its] own subject matter jurisdiction." *Finkelman*, 810 F.3d at 193 (citation omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998) ("[T]he Article III requirement of remediable injury in fact, . . . (except with regard to entirely frivolous claims) has nothing to do with the text of the statute relied upon.").

When deciding a motion to dismiss, the court must distinguish between "allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth,'" and those that are "well-pleaded," such that the "court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Certainly, the court has considered FCA's argument that "there is not a single factual assertion showing any Plaintiff (or anyone at all) paid for a repair, sold their vehicle at a loss or that the market generally reflects a loss of value for Plaintiffs' vehicles." Motion to Dismiss 7–8.

While FCA attempts to distinguish between a challenge to injury and to the sufficiency of alleged damages, however, all of the authority it relies on in its brief in support of its Motion to Dismiss concerns Article III standing, not damages as an element of a claim. *See id.* at 7 (collecting cases). As will be addressed, the court concludes that Plaintiffs have sufficiently alleged injury in fact to establish their standing to seek damages. Accordingly, the court rejects FCA's opening "damages" argument as one essentially attacking Plaintiffs' Article III standing, albeit not in the context of a motion to dismiss under Rule 12(b)(1) (dismissal for lack of standing).

254, 301 (3d Cir. 2012) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). Essentially the same standard of proof applies when evaluating standing on the basis of the plaintiff's complaint, and when ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6). That is, the court "must 'accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff].'" *Kedra v. Schroeter*, 876 F.3d 424, 434 (3d Cir. 2017) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008)); *see Finkelman*, 810 F.3d at 194.

In the context of a class action, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494, (1974); *see also Finkelman*, 810 F.3d at 195. Further, because the court "do[es] not exercise jurisdiction over one claim simply because it arose 'from the same "nucleus of operative fact"' as another claim," a plaintiff representing class members must "demonstrate standing for each claim he seeks to press" on their behalf. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

The court determines that Plaintiffs have sufficiently alleged that diversity jurisdiction exists under the Class Action Fairness Act of 2005. *See* 28 U.S.C. § 1332(d)(2). Accordingly, the court's assessment of its own jurisdiction primarily concerns Plaintiffs' Article III standing for the various claims they bring, and the types of relief they seek.

The court concludes that Plaintiffs have established Article III standing as to all their claims that seek (1) damages, (2) injunctive relief, and (3) declaratory relief arising under two theories of economic injury. The court concludes, however, that Plaintiffs do not have standing to seek restitution, and thus their potential recovery under Counts I and II (common law claims for fraud

and unjust enrichment) is limited in that regard, while Count VII (seeking restitution under California's UCL, which does not allow for other types of monetary recovery) is dismissed in its entirety, without prejudice, for lack of standing.

The court further determines that Plaintiffs' established standing permits them to bring claims on behalf of the proposed state-based sub-classes, as well as the California-specific CLRA Sub-Class. Plaintiffs lack standing, however, to bring claims under the laws of states in which they do not reside, and in which none of their injuries are alleged to have taken place. Therefore, Counts I, II, and III (common law claims and a federal claim that depends on the viability of accompanying state law warranty claims) are dismissed, without prejudice, as to the proposed "nationwide" Class.

### A. Plaintiffs Have Standing to Seek Damages, Injunctive Relief, and Declaratory Relief on Behalf of Themselves and the California, Florida, New York, and CLRA Sub-Classes

#### 1. Legal Standard

The first element of standing, injury in fact, "is often determinative." *Toll Bros. Inc. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009). The injury must be both "concrete," meaning that it is "real," *i.e.*, "distinct and palpable, as opposed to merely abstract." *N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 238 (3d Cir. 2011) (citations omitted). It must also be "particularized," meaning that it "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "The injury must also be 'an invasion of a legally protected interest.'"[15] *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235,

---

[15]     Relevant to the dispute here, "whether a plaintiff has alleged an invasion of a 'legally protected interest' does not hinge on whether the conduct alleged to violate a statute does, as a matter of law, violate the statute." *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 164 (3d Cir. 2017). To set such a standard "would effectively collapse [the court's] evaluation under [Rule] 12(b)(6) . . . into an Article III standing evaluation." *Id.*; *see also id.* at 170 ("[T]he merits of

245 (3d Cir. 2012) (quoting *Lujan*, 504 U.S. at 560).  Finally, the injury must be "actual or imminent, not conjectural or hypothetical."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

The standard is modified when plaintiffs seek injunctive relief, such that they must establish that they are "'likely to suffer future injury' from the defendant's conduct."  *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 292 (3d Cir. 2018) (quoting *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)).  Similarly, to seek declaratory relief, plaintiffs "must possess constitutional standing but need not have suffered 'the full harm expected.'"  *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 193 (3d Cir. 2004) (quoting *St. Thomas–St. John Hotel & Tourism Ass'n v. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000)).

As to the remedies of disgorgement or restitution, a plaintiff must allege sufficient facts to show injury based on a defendant's unlawful profits.  *See Johnson & Johnson*, 903 F.3d at 291; *see also Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 895 (3d Cir. 2020) ("[S]tanding doesn't flow from mere suspicion that a defendant made more money by allegedly shirking a legal obligation.").

> ## 2.   Plaintiffs Have Adequately Alleged Two Theories of Economic Injury for Purposes of Seeking Damages, Injunctive Relief, and Declaratory Relief

"[T]he Supreme Court has repeatedly recognized that financial or economic interests are 'legally protected interests' for purposes of the standing doctrine."  *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 164 (3d Cir. 2017) (citations omitted).  However, if plaintiffs allege "an economic injury as a result of a purchasing decision," they "must do more than simply characterize that

---

Plaintiffs' claims under the law . . . should be tested through Defendants' motion to dismiss for failure to state a claim pursuant to [Rule] 12(b)(6).").

purchasing decision as an economic injury [and] must instead allege facts that would permit a factfinder to determine, without relying on mere conjecture, that . . . plaintiff[s] failed to receive the economic benefit of [their] bargain[s]." *Johnson & Johnson*, 903 F.3d at 281.  In other words, to "successfully plead an economic injury" based on the benefit of the bargain theory, plaintiffs must demonstrate that they "bargained for a product worth a given value but received a product worth less than that value." *Id.* at 283.  Relatedly, the Third Circuit has recognized "the premium price theory," under which plaintiffs "may plead an economic injury by alleging that the defendant unlawfully advertised its product as being 'superior' to others." *Id.*  To succeed under this theory, plaintiffs must at least allege that the defendant "advertised [their product] as superior to other products," or that plaintiffs "'would not have paid a premium . . . ' but for such advertisements"— that is, plaintiffs must identify an "'unlawful' premium." *Id.*

The court holds that named Plaintiffs have established individual standing to bring claims for damages, injunctive, and declaratory relief against FCA based on their allegations of economic injury, under both the "benefit of the bargain" and "premium price" theories.[16]  Plaintiffs have sufficiently alleged that they have suffered or will imminently suffer economic injury caused by FCA's actions, and that such injury is likely to recur in future.[17]  Because each of their claims—

---

[16]     Because the court concludes that Plaintiffs have established injury in fact on the basis of the two theories discussed above, it declines to reach the issue of whether a third theory they posit—loss of use—is sufficiently supported by well-pleaded facts to establish standing in this case.  In sum, Plaintiffs allege "loss of use" of their Class Vehicles during the time that the Vehicles were being repaired.  *See, e.g.*, Complaint ¶ 31.  Not all Plaintiffs sought or obtained repairs of their Class Vehicles, however, and thus this theory would potentially fail on the grounds that it is overly speculative or "conjectural" as to at least some of Plaintiffs' claims.  *See, e.g.*, *Finkelman*, 810 F.3d at 195.

[17]     The court notes that neither of the two other requirements of Article III standing— causation or redressability—are in question here, and thus primarily discusses injury in fact.

23

with the exception of Counts I and II (in part) and Count VII—seek those types of relief and are linked to one or both of the two established theories, the court proceeds to evaluate the merits of those claims.   The court determines, however, that Plaintiffs lack standing to seek restitution because they relied on conclusory statements rather than well-pleaded facts.[18]   Accordingly, Plaintiffs cannot seek restitution under Counts I and II, and the court dismisses Count VII in its entirety without prejudice.

> ### a.   Plaintiffs Have Adequately Alleged Actual, Imminent, Economic Injury and Future Injury

Under the "benefit of the bargain" theory, Plaintiffs allege that they all purchased Class Vehicles that were "equipped with a rear differential that was defective and not robust enough for

---

The causation requirement is "akin to 'but for' causation" and "requires the alleged injury to be 'fairly traceable to the challenged action of the defendant, . . . not the result of the independent action of some third party not before the court.'"   *Finkelman*, 810 F.3d at 193 (citations omitted). Here, it is clear from the face of the Complaint that Plaintiffs allege their injuries were caused by FCA's failure to "adequately design[] and/or manufacture[]" the Class Vehicles' rear differentials, and its failure to disclose the Differential Defect.   Complaint ¶¶ 4, 32, 51, 79, 95, 114, 135.   Thus, the challenged actions in this case, on which Plaintiffs premise all their claims, are those that resulted in the alleged economic injuries they suffered.   To the extent that the success of certain of Plaintiffs' claims whose elements include *contractual* privity between themselves and FCA, these are merits questions which "should be tested through Defendants' motion to dismiss for failure to state a claim pursuant to [Rule] 12(b)(6)," rather than causation questions to be resolved with regard to standing.   *Cottrell*, 874 F.3d at 170.

As to redressability, plaintiffs must "show that it is 'likely, as opposed to merely speculative,' that the alleged injury will be redressed by a favorable decision."   *Finkelman*, 810 F.3d at 194 (citation omitted).   Here, Plaintiffs seek damages to make them whole for the harms they have allegedly already incurred, and injunctive relief to prevent further injury of a like nature. *See* Complaint at 98–99.   Once again, their entitlement to the requested relief remains to be determined, but their requests do not fall facially short of the constitutional requirement that the relief sought must "remedy the injury suffered."   *Steel Co.*, 523 U.S. at 107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

[18]      "[A]ll aspects of a complaint must rest on 'well-pleaded factual allegations' and not 'mere conclusory statements.'"   *Finkelman*, 810 F.3d at 194 (quoting *Iqbal*, 556 U.S. at 678– 79).

the horsepower and torque loads of the driveline."  Complaint ¶¶ 30, 49, 77, 93, 112, 133.  Plaintiffs further describe the nature of the alleged defect, and its effects: the rear differential requires repairs sooner than expected, cannot function when Plaintiffs accelerate to high speeds, and sometimes fails altogether.  *See, e.g.*, *id.* ¶¶ 169–71, 175.  In sum, "the rear differential does not live up to expectations to provide safe, reliable transportation for a normal vehicle, much less the quality necessary for a performance vehicle."  *Id.* ¶ 177.  Specifically, though each named Plaintiff considered "[p]assenger safety and reliability" to be "important factors" in their purchase decision, and "ultimately purchased his Class Vehicle, in part, because the Class Vehicle was represented to be and was marketed as a high-performance vehicle," what each Plaintiff received was a vehicle that was neither "safe and reliable on public roadways," nor "capable of track use."  *See id.*  ¶¶ 32, 33, 51, 52, 79, 80, 95, 96, 114, 115, 135, 136.  The facts as alleged here, therefore, are distinguishable from those in *Johnson & Johnson*, where the plaintiff failed to establish standing because she "fail[ed] to allege even that the [purportedly defective product] provided her with an economic benefit worth one penny less than what she paid."  903 F.3d at 288.  Here, Plaintiffs uniformly allege that the Class Vehicles they purchased fell short of the expectations they specifically bargained for.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Blunt*, 767 F.3d at 279 (quoting *Lujan*, 504 U.S. at 561).

Alternatively, Plaintiffs have established injury in fact under the "premium price" theory of economic injury, under which "a plaintiff may plead an economic injury by alleging that the defendant unlawfully advertised its product as being 'superior' to others."  *Johnson & Johnson*, 903 F.3d at 283.  Here, Plaintiffs allege that "the Class Vehicles . . . are specifically advertised for

drag racing and track use."  Complaint ¶ 173; *see also id.* ¶ 11 ("The Class Vehicles all bear FCA's Street & Racing Technology ('SRT') badge, indicating these are high-performance vehicles designed to be driven on both ordinary public roads and for speedways, dragstrips, and other track use."), ¶¶ 156–61 (referencing specific advertisements to this effect).  Indeed, these differences are allegedly reflected in the prices of Class Vehicles, which are "sold at thousands of dollars above the list price and/or double or triple the price of the base model Charger and Challengers," which Plaintiffs contend was "because muscle car/performance car enthusiasts were willing to pay the premium to own such a high-performance vehicle."  *Id.* ¶ 13.

Plaintiffs further allege, however, that their Class Vehicles' "substandard rear differential[s] will degrade faster and ultimately fail based on the substantial mechanical loads and force exerted upon the rear differential during intended high performance use."  *Id.* ¶ 173.  Accordingly, Plaintiffs claim that they have been harmed because they "paid a premium for vehicles [that] were supposed to be designed, manufactured and assembled for the purchase of high performance use."  *Id.*  Further, each Plaintiff individually alleges that he "purchased his Class Vehicle on the reasonable but mistaken belief that his Class vehicle . . . [was] capable of track use, which it was not."  *See, e.g.*, *id.* ¶ 32; *see also, e.g.*, *id.* ¶ 33 ("Plaintiff . . . selected and ultimately purchased his Class Vehicle, in part, because the Class Vehicle was represented to be and was marketed as a high-performance vehicle.").

Again, these facts are distinguishable from those that led the *Johnson & Johnson* Court to conclude that the plaintiff "identified no unlawful 'premium'" because she "did not claim that Johnson & Johnson 'advertised Baby Powder as superior to other products,' nor did she allege that 'she would not have paid a premium for Baby Powder' but for such advertisements."  903 F.3d at 283 (citation omitted).  Here, as the court has already noted, Plaintiffs all allege that, had they

known that their Class Vehicles were defective, they "would not have purchased [each] Class Vehicle or would have paid less." Complaint ¶¶ 35, 54, 82, 98, 117, 138. "The injury-in-fact requirement is 'very generous' to claimants, demanding only that the claimant 'allege[] some specific, "identifiable trifle" of injury.'" *Cottrell*, 874 F.3d at 162 (quoting *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)). Thus, the court is satisfied that Plaintiffs here have established standing to seek damages against FCA under two theories of economic injury.[19]

---

[19]    The concreteness, particularity, and imminence of the alleged injuries is easily established here, as it often is in cases where plaintiffs allege economic harms. *See Cottrell*, 874 F.3d at 163 (quoting *Danvers*, 432 F.3d at 291, 293) ("Typically, a plaintiff's allegations of financial harm will easily satisfy each of [the standing] components, as financial harm is a 'classic' and 'paradigmatic form[]' of injury in fact.").

Plaintiffs' injuries are sufficiently concrete because they are "real" rather than "[b]are procedural or technical violations of a statute[.]" *Cottrell*, 874 F.3d at 167 (citations omitted). That is, Plaintiffs allege that they suffered economic injury when they purchased vehicles that fell short of their bargained-for expectations, and when they paid a premium price for a specially marketed product that was defective. Therefore, Plaintiffs "allege that [FCA's] violations caused each of them tangible, economic harm." *Id.*

Likewise, the injuries Plaintiffs allege are particularized, for they "affect [Plaintiffs] in a personal and individual way." *Spokeo*, 578 U.S. at 339. Here, like the plaintiffs in *Cottrell*, "each Plaintiff alleges financial harm that he . . . has personally incurred in purchasing [a product] that was impossible for him . . . to use" in the manner intended. 874 F.3d at 167; *see also Spokeo*, 578 U.S. at 339 n.7 ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance.").

Finally, the imminence of the injury in fact is not at issue where "Plaintiffs' claimed financial harm has *already* occurred," such that "it is not merely possible, or even probable." *Cottrell*, 874 F.3d at 168. Here, Plaintiffs' injuries for which they seek damages—the loss of the benefit of their bargain and their purchase of a product advertised as "premium" that was actually not able to perform as expected or advertised—occurred when they purchased their Class Vehicles. In addition, to the extent that Plaintiffs allege imminent future harm for purposes of obtaining injunctive relief, the court determines that they have satisfied the test for standing for that type of relief, as discussed *infra*. *See, e.g.*, *Johnson & Johnson*, 903 F.3d at 292 (citation omitted) (requiring plaintiffs seeking injunctive relief to establish that they are "likely to suffer future injury").

Having concluded that Plaintiffs' economic injuries are sufficiently pleaded for them to seek damages, the court is also satisfied that Plaintiffs have standing to seek injunctive relief. *See, e.g.*, *McNair*, 672 F.3d at 223 (citation omitted) ("[T]he plaintiff must show that he is 'likely to suffer future injury' from the defendant's conduct."); *see also O'Shea*, 414 U.S. at 495–96 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Here, all Plaintiffs allege that they have maintained ownership of their Class Vehicles, and that, to the extent that they have sought repairs, those repairs have not resolved manifestations of the alleged defect. *See, e.g.*, Complaint ¶¶ 29, 61–66. Thus, the likelihood of future injury from the allegedly unlawful conduct—the sale of, and failure to adequately repair, a product with a latent defect—is apparent, since Plaintiffs did not buy products for one-time use, but rather, for ongoing use. Unlike the plaintiffs in *Johnson & Johnson* and *McNair*, who "were already aware of the allegedly deceptive business practices from which they sought future protection," and were thus unlikely to contract with or purchase from the defendants again, Plaintiffs here are not insulated against future harms flowing from FCA's conduct, which has allegedly damaged them already. *Johnson & Johnson*, 903 F.3d at 293 (discussing *McNair*, 672 F.3d at 225). Their continued ownership of Class Vehicles that allegedly do not perform as intended and are likely to require repeated repairs constitute "continuing, present adverse effects" permitting Plaintiffs to seek injunctive relief. *O'Shea*, 414 U.S. at 496.

Because the standard for standing to seek declaratory relief requires plaintiffs to "possess constitutional standing but . . . not [to] have suffered 'the full harm expected,'" the court determines that this standard is satisfied where Plaintiffs have established their standing to seek

damages and injunctive relief. *Khodara*, 376 F.3d at 193 (quoting *St. Thomas–St. John Hotel*, 218 F.3d at 240).

Thus, named Plaintiffs have established Article III standing to seek damages, injunctive relief, and declaratory relief against FCA.[20]

> **b.   Plaintiffs Lack Standing to Seek Restitution and/or Disgorgement Because Their Allegations Regarding FCA's Unlawful Profits Are Conclusory**

Plaintiffs also seek restitution and "non-restitutionary disgorgement of [FCA's unlawful] financial profits" as to several of their claims.[21]  For Counts I and II, which are common law counts that Plaintiffs seek to bring on behalf of themselves and either all members of the putative Class or all Sub-Class members, Plaintiffs claim to have suffered damages.  Complaint ¶¶ 256, 267.  Under Count I (fraudulent concealment), Plaintiffs "reserve their right to . . . rescind their purchase or lease of the Defective Vehicles and obtain restitution. . . . ."  *Id.* ¶ 257.  Plaintiffs do not seek restitution under Count II (unjust enrichment), but rather, "non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct."  *Id.* ¶ 268.

In addition, Plaintiffs Diaz and Santos bring Count VII on behalf of themselves and the California Sub-Class, seeking restitution "pursuant to §§ 17203 and 17204 of the [California] Business & Professions Code [UCL]."  *Id.* ¶ 355.

---

[20]    Since the court concludes that named Plaintiffs have established Article III standing to bring all counts in the Complaint except those that the court limits or dismisses, there is no need to establish individual standing for each unnamed, putative Class member. *Neale*, 794 F.3d at 362 ("We now squarely hold that unnamed, putative class members need not establish Article III standing. Instead, the 'cases or controversies' requirement is satisfied so long as a class representative has standing, whether in the context of a settlement or litigation class.").

[21]    The Third Circuit has treated restitution as a separate type of relief from damages or injunctive relief, for which plaintiffs must establish Article III standing. *See, e.g.*, *Johnson & Johnson*, 903 F.3d at 291; *Thorne*, 980 F.3d at 895.

The court determines that Plaintiffs have failed to establish standing to seek restitution or disgorgement of the allegedly unlawful profits retained by FCA because their allegations are too conclusory to satisfy the pleading standard.

"[A]ll aspects of a complaint must rest on 'well-pleaded factual allegations' and not 'mere conclusory statements.'"  *Finkelman*, 810 F.3d at 194 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Plaintiffs devote a brief section of the Complaint specifically to FCA's allegedly unjust retention of a substantial benefit.  *See* Complaint ¶¶ 221–23 ("Defendant unlawfully failed to disclose the alleged Defect to induce [Plaintiffs] and other putative Class Members to purchase or lease the Class Vehicles. . . . Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles. . . . Defendant unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and . . . Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.").  For Plaintiffs, therefore, "Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged."  *Id.* ¶ 224.

Likewise, in their recitation of the elements of Count II (their common law claim for unjust enrichment), Plaintiffs allege that "FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the Differential Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs."

*Id.* ¶ 261; *see also id.* ¶¶ 262–64 (contending, without more, that FCA "charged higher prices" to Plaintiffs and Class members, and wrongfully retained the profits it obtained).

As a threshold matter, these allegations cannot suffice to establish standing because they are rife with legal conclusions intending to show the unlawfulness of FCA's conduct rather than to describe the conduct itself.  That is, mere assertions that FCA wrongfully or inequitably charged high prices cannot replace plainly stated factual content showing *what* excess profits Defendant obtained from Plaintiffs that could possibly be restituted or otherwise disgorged.  "While the complaint 'does not need detailed factual allegations . . . a formulaic recitation of the elements of a cause of action will not do.'"  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Plaintiffs also seek restitution and/or disgorgement by alleging (1) that FCA sold more vehicles than it otherwise would have, were it not for its unlawful conduct, and (2) that FCA wrongfully transferred repair costs to Plaintiffs and Class members.  Specifically, Plaintiffs allege that

> FCA knowingly, actively and affirmative [sic] omitted and/or concealed the existence of the Defect to increase profits by selling additional Class Vehicles and by unlawfully transferring the cost of repair and replacement of the rear differential and other damaged associated parts to Plaintiffs and members of the Classes.

*Id.* ¶ 17.

Again, however, Plaintiffs have failed to establish an injury in fact redressable by restitution or disgorgement because their allegations are too threadbare to support such a conclusion. First, to the extent that Plaintiffs claim that FCA sold more Class Vehicles than it would have had it disclosed the Differential Defect, they do not actually allege any facts to show how FCA "increase[d] profits by selling additional Class Vehicles."  *Id.*  Instead, Plaintiffs ask the court to speculate that FCA obtained "benefits accrued in the form of increased sales and profits

31

resulting from the material concealment and omissions that deceive customers[.]"  *Id.* ¶ 224.

Absent additional factual content, however, the court cannot make such a leap.  *See Johnson & Johnson*, 903 F.3d at 291–92 ("[The plaintiff] cannot invoke the federal judicial power simply by asserting that [the defendant] has earned unlawful profits. . . . [Her] restitution claims are based on nothing more than mere conjecture. She pleads no facts upon which a factfinder could conclude that Johnson & Johnson has been able to sell more Baby Powder than it could have had it informed consumers of the alleged health risks. We therefore conclude that [she] lacks standing to seek relief in the form of restitution."); *see also Thorne*, 980 F.3d at 895 ("[T]he allegations supporting [the plaintiff's] request for restitution are conclusory and hinge on mere conjecture.  She alleges that [the defendant] ignores its tire registration obligations to spend more time selling tires and is unjustly enriched by sales made during 'the time it would have taken to register Class Members' tires.' . . . But standing doesn't flow from mere suspicion that a defendant made more money by allegedly shirking a legal obligation.").

Nor can the court credit as a statement of fact, without more, the legal conclusion that FCA "unlawfully transferr[ed] the cost of repair and replacement of the rear differential and other damaged associated parts."  Complaint ¶ 17.  Named Plaintiffs did not pay for the repairs they sought or obtained—and Plaintiffs Gibson and Scorziello do not allege that they even sought repairs at all.  *See id.* ¶¶ 80–83; 136–139; *see also id.* ¶ 21 (alleging only generally that "Plaintiffs and Class members . . . have and/or must expend significant money to have their Vehicles (inadequately) repaired").  As such, the court has no factual basis on which to conclude that FCA has retained payments for repairs such that Plaintiffs have standing to seek restitution or disgorgement of those payments.

Accordingly, the court dismisses without prejudice Counts I and II of Plaintiffs' Complaint to the extent that they seek restitution and/or non-restitutionary disgorgement as a remedy under these Counts.  Further, Count II is dismissed as to California Plaintiffs Diaz and Santos, and to the extent it is brought on behalf of the California Sub-Class, because California law treats unjust enrichment not as its own cause of action, but as "synonymous with restitution."[22]  Finally, the court dismisses without prejudice Count VII, brought by Plaintiffs Diaz and Santos on behalf of themselves and the California Sub-Class, since Plaintiffs only seek restitution pursuant to that claim.

---

[22]      In *Levine v. Blue Shield of California*, a California Court of Appeal case, the Court held that "[t]here is no cause of action in California for unjust enrichment"—rather, it is "synonymous with restitution." 117 Cal. Rptr. 3d 262, 278–79 (Ct. App. 2010) (citation omitted). In *Rose v. Abraham*, a federal case from the Eastern District of California, the Court examined *Levine* and prior cases that had recited unjust enrichment elements—but concluded that, "[t]o the extent there is a 'cause of action' for unjust enrichment, Plaintiff has shown *he is entitled to restitution of the funds*. . . ." No. 1:08–cv–00606 AWI JLT, 2012 WL 78204, at *5 (E.D. Cal. Jan. 9, 2012); *see also Foremost Ins. Co. v. Enriquez*, No. 13-CV-1604-H (BGS), 2014 WL 12488498, at *2 (S.D. Cal. May 21, 2014) (citation omitted) ("The distinction between a cause of action for 'unjust enrichment' and for 'restitution' is essentially semantic . . . ."); *Nordberg v. Trielegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006) (citation omitted) ("Although [Plaintiffs'] cause of action is entitled 'unjust enrichment' it is clear [from the complaint] that plaintiffs are seeking restitution."). Because the court has concluded that Plaintiffs do not have standing to seek restitution, the apparent entanglement of unjust enrichment and restitution under California law leads the court to determine that dismissal of Count II as to California Plaintiffs and the California Sub-Class is most appropriate in the context of standing.  The court notes, however, that even if this claim were to proceed to the merits, it would be dismissed for failure to state a claim, as will be discussed *infra* with respect to the Florida and New York Plaintiffs.

**B.     Plaintiffs Lack Standing to Bring Claims Under the Laws of States in Which They Do Not Reside**

**1.     Legal Standard**

When a federal court sits in diversity, it applies "state substantive law and federal procedural law."[23] *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d. Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).

Which state's substantive law applies, however, is dependent on the choice-of-law rules of the forum state. *See, e.g.*, *Homa v. Am. Express Co.*, 558 F.3d 225, 227 (3d Cir. 2009). Delaware uses the Restatement (Second) Conflict of Laws approach, which directs that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties . . . ." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1) (AM. L. INST. 1971); *see also, e.g.*, *Erwin v. Ford Motor Co.*, 309 F. Supp. 3d 229, 234 (D. Del. 2018) (discussing Delaware's choice of law rules). Thus, where so-called "nationwide" common law tort claims are brought on behalf of plaintiffs (or proposed class members), based on defects that arose in the plaintiffs' (or proposed class members') respective states of residence and concerning products purchased in those states, it follows that the law of each state in which a plaintiff (or proposed class member) resides will govern such claims.

The Third Circuit has held that, "once Article III standing 'is determined vis-a-vis the named parties . . . there remains no further separate class standing requirement in the constitutional sense.'" *Neale*, 794 F.3d at 361 (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 306–07 (3d Cir. 1998)). This well-established principle, however, does not

---

[23]     Statutes of limitations are substantive for purposes of the *Erie* rule. *See, e.g.*, *Jaworowski v. Ciasulli*, 490 F.3d 331, 333 (3d Cir. 2007)

resolve the question of the *named* plaintiffs' standing to bring common law claims on behalf of residents of states in which the named plaintiffs do not themselves reside, when those common law claims will be governed by state substantive law.[24]  In other words, when named plaintiffs attempt to bring common law claims on behalf of a nationwide class, they are essentially bringing claims under the laws of states in which they do not reside.  This presents the court with an issue of the named plaintiffs' standing, which must be resolved before the claims can proceed.

Whether such a determination should be made before a motion for class certification is decided is a subject of dispute among the district courts of this Circuit.  *See, e.g.*, *Xi Chen Lauren v. PNC Bank, N.A.*, 296 F.R.D. 389, 390 (W.D. Pa. 2014) ("[Defendant] contends that a putative class representative does not have standing to assert unjust enrichment claims from a state in which she was not injured. [Defendant] further contends that standing is a threshold issue that should be decided immediately. Plaintiff contends, in essence, that because she clearly has standing to assert a claim under Ohio law, her fitness to assert claims on behalf of a national class should be deferred until the class certification stage in accordance with the [Rule] 23 factors (e.g., adequacy, commonality, predominance). There is a fairly even split of authority among the cases that have previously been confronted with this issue. There is no binding Third Circuit precedent directly on point."); *McGuire v. BMW of N. Am., LLC*, No. 13–7356 (JLL), 2014 WL 2566132, at *5 (D.N.J. June 6, 2014) (citation omitted) ("The question of 'whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will

---

[24]     As this court and other district courts within this Circuit have acknowledged, which state's law governs a common law claim—such as one of unjust enrichment, as Plaintiffs bring here—can be outcome-determinative. *See, e.g.*, *Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 740 (D. Del. 2012) ("[S]tates analyze unjust enrichment claims differently."); *In re Flonase Antitrust Litig.*, 610 F. Supp. 2d 409, 419 (E.D. Pa. 2009).

determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to [Rule] 23,' has caused disagreement among district courts.").

This Court has recently reached opposite conclusions on the question of nationwide (or multistate) standing. *In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litigation* held that named plaintiffs "cannot premise Article III standing for claims outside of [the states in which they suffered injuries] on the injuries allegedly suffered by putative, unnamed class members in other states." MDL No. 2895, 2022 WL 736250, at *17 (D. Del. Mar. 11, 2022). In *Garner v. Global Plasma Solutions Inc.*, however, this Court held that "[a]ny problem with raising claims under several states' laws goes to the propriety of class certification, not standing." No. 1:21-cv-00665-SB, 2022 WL 742488, at *2 (D. Del. Mar. 10, 2022) (citing *Twardzik v. HP Inc.*, No. 1:21-cv-00396-SB, 2022 WL 606092, at *3–4 (D. Del. Jan. 25, 2022)). "[A] plaintiff's injury is not pegged to the laws of different states: an injury is an injury even if no law allows recovery. . . . If [the defendant] worries about applying different states' laws down the road, it should oppose class certification." *Id.*

Although the court agrees with the reasoning in *Sensipar*, in the interest of examining the varying approaches to this issue, the court also looks to the analyses set forth by other districts in this Circuit. *See, e.g.*, *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 157 (E.D. Pa. 2009) ("[The plaintiffs'] allegations present no facts that would connect injuries specific to the plaintiffs, as opposed to injuries against competitors and purchasers nationwide, to any cause arising in states where no named plaintiff is located and where no member of a named plaintiff [employee benefit plan] purchased Wellbutrin XL. The amended complaint, therefore, provides no facts on which to find a connection between an alleged injury and some wrongful conduct that would implicate the

laws of those states in which no plaintiff, or any of their reimbursed members, resides."); *In re Ductile Iron Pipe Fittings ("DIPF") Indirect Purchaser Antitrust Litig.*, No. 12-169, 2013 WL 5503308, at *11 (D.N.J. Oct. 2, 2013) ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury."). *But see In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, 537 F. Supp. 3d 679, 753–54 (D.N.J. 2021) (citation omitted) ("[P]rior to the class certification stage, it is premature to examine the named plaintiffs' 'standing to pursue claims on behalf of absent class members of the nationwide class . . . in states other than those in which they were injured,' because such an inquiry 'is one of predominance' and 'only arises if the Court certifies the nationwide class.'").

## 2. Counts I, II, and III Are Dismissed Without Prejudice as to the Proposed Nationwide Class

Defendants summarily argue that "Plaintiffs lack standing to assert claims under the laws of states where they do not reside and did not purchase their vehicles." Motion to Dismiss 19. In their Opposition to Defendant's Motion to Dismiss, Plaintiffs urge the court to leave this issue for resolution at the class certification stage, contending that their own standing is not in question: "Whether Plaintiffs can represent a nationwide class is a Rule 23 matter unrelated to Article III standing. Accordingly, 'once the named parties have demonstrated they are properly before the court, "the issue [becomes] one of compliance with the provisions of Rule 23, not one of Article III standing."'" Opposition to Motion to Dismiss (D.I. 18) 19 (quoting *Prudential Ins. Co.*, 148 F.3d at 307).

As the court has observed, however, it is in fact the standing of the named parties—Plaintiffs Diaz, Santos, Gibson, Sinclair, Veal, and Scorziello—that is in question here. Plaintiffs do not allege or argue that they have suffered injuries in states other than those in which they reside—*i.e.*, California, Florida, and New York. It stands to reason, therefore, that Plaintiff Diaz,

a resident of California, would not have standing to bring a claim for unjust enrichment under the laws of Oklahoma or Virginia.  Yet, by bringing common law claims "on behalf of all persons in the United States . . . who purchased or leased [Class Vehicles]," Plaintiffs necessarily ask the court to permit such claims to proceed.  Complaint ¶ 1.  Plaintiffs could have joined, as named plaintiffs, individuals residing in all fifty states, but they chose to limit themselves to three states.

Plaintiffs' insistence that this issue await a yet-to-be-filed motion for class certification is unfounded on any binding rule.  Though some courts, including this one, have delayed their consideration of the issue of standing until a motion for class certification is made, this order of decision-making is not rigid.  *See Daubert v. NRA Group, LLC*, 861 F.3d 382, 395 (3d Cir. 2017) (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case.").  Rather, as this Court determined in *Sensipar*, "[h]ere, since the Court is only confronted with a challenge to Article III standing, and has not yet reached the stage of considering class certification, there would be no practical benefit to waiting to decide standing until after a decision on class certification."  2022 WL 736250, at *17.  This is in accord with the well-reasoned analysis of *Wellbutrin*, decided in the Eastern District of Pennsylvania, in which the Court explained that

> [a] ruling as to the named plaintiffs' standing depends in no way upon the standing of proposed class members. . . . The alternative proposed by the plaintiffs would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union. At the conclusion of that discovery, the plaintiffs would apply for class certification, proposing to represent the claims of parties whose injuries and modes of redress they would not share. That would present the precise problem that the limitations of standing seek to avoid. *The Court will not indulge in the prolonged and expensive implications of the plaintiffs' position only to be faced with the same problem months down the road.*

260 F.R.D. at 155 (emphasis added).

It is true that decisions issued by this Court have recently reached the opposite conclusion of *Sensipar*, notably in *Twardzik*, and the subsequently decided *Garner*.  *See* 2022 WL 606092, at *3; 2022 WL 742488, at *2.  In those cases, this Court held that the "standing doctrine requires only that plaintiffs show that 'they have been injured, [that] the defendants caused that injury, and [that] the injury can be redressed by a judicial decision.'"  *Twardzik*, 2022 WL 606092, at *3 (quoting *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011)).  "[B]ecause [Twardzik] has standing," this Court concluded, "the proposed class does too."  *Twardzik*, 2022 WL 606092, at *3 (citing *Neale*, 794 F.3d at 364); *see also Garner*, 2022 WL 742488, at *2 (citation omitted) ("Any problem with raising claims under several states' laws goes to the propriety of class certification, not standing.").

While recognizing the validity of the principle that a named plaintiff's standing, rather than a putative class member's, is what is required, the court cannot read *Neale* so broadly as to dispense with determinations of the named plaintiffs' standing.  *Neale* clearly held that "a plaintiff who lacks the personalized, redressable injury required for standing to assert claims on his own behalf would also lack standing to assert similar claims on behalf of a class."  794 F.3d at 366 (quoting *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000)).  While *Neale* did not address the precise issue before the court here—the standing of plaintiffs to bring common law claims that will be governed under the laws of states in which they do not reside—the Court nevertheless clearly stated that, *"[b]efore even getting to the point of class certification*, . . . class representatives need to present a justiciable claim."  794 F.3d at 366 (emphasis added); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added) ("While the proof required to establish standing increases as the suit proceeds, . . . the standing inquiry remains

focused on whether *the party invoking jurisdiction* had the requisite stake in the outcome when the suit was filed."). Thus, the reasoning of *Sensipar* and other district court decisions in this Circuit such as *Wellbutrin* seem most consistent with this overarching rule: named plaintiffs cannot bring claims on behalf of putative class members unless they have standing to bring those claims themselves. When applied to the "nationwide" claims here, where adjudication under state substantive law would necessitate recognition of claims as specifically arising out of states other than California, Florida, or New York, the court concludes that the issue of standing is most expediently and properly decided at the outset of litigation here.

Accordingly, the court dismisses, without prejudice, Counts I, II, and III[25] of the Complaint, to the extent that they are brought on behalf of a proposed nationwide Class of individuals residing in states other than those in which named Plaintiffs reside.

## II.   Motion to Dismiss for Failure to State a Claim as to All Counts

Rule 12(b)(6) permits a defendant to move to dismiss a complaint that fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). As already stated, when deciding such a motion, the court "must 'accept as true all factual allegations in the complaint and draw all

---

[25]      Although Count III is a federal claim under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, its adjudication is dependent on state law. That is, Plaintiffs' Magnuson–Moss Warranty Act claims hinge on their state law claims because they plead no violation of the Act other than the breach of their express and implied warranties as governed by state law. Complaint ¶¶ 276–80; *see, e.g.*, *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 n.3 (9th Cir. 2008) (citation omitted) ("Clemens alleges a violation of the [Magnuson–Moss Warranty] Act only insofar as DaimlerChrysler may have breached its warranties under state law; there is no allegation that DaimlerChrysler otherwise failed to comply with the Magnuson–Moss Act. Therefore, the federal claims hinge on the state law warranty claims."); *see also, e.g.*, *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x. 250, 254 (3d Cir. 2010) (affirming dismissal of Magnuson–Moss Warranty Act claims because there were no viable underlying state warranty claims). Thus, to the extent Count III is brought on behalf of the proposed nationwide Class, it would require the court to examine potential violations of warranty laws of states in which named Plaintiffs do not reside.

inferences from the facts alleged in the light most favorable to [the plaintiff].'" *Kedra*, 876 F.3d at 434 (quoting *Phillips*, 515 F.3d at 228).

Here, FCA moves to dismiss all of Plaintiffs' claims under Rule 12(b)(6).  Motion to Dismiss 1–2.  As a threshold matter, the court distinguishes between the applicable pleading standards that govern Plaintiffs' claims.  Plaintiffs' surviving claims can be divided into two categories: those that are grounded in fraud, and those that are grounded in contract.  As to the fraud-based claims, Counts I, II, VI, X, XIII, and XIV, the court dismisses all on the basis that Plaintiffs have failed to allege any actionable omission, concealment, or misrepresentation by FCA as to the Differential Defect.  As to the contract-based claims, the court dismisses Counts IV, VIII, and XI for failure to allege a breach of FCA's Basic Limited Warranty, dismisses Count V as time-barred, and dismisses Counts IX and XII for lack of privity.  Because Count III depends on the viability of Plaintiffs' state law warranty claims, all of which are dismissed, Count III is likewise dismissed.

## A.   Fraud-Based Claims (Counts I, II, VI, X, XIII, XIV)

### 1.   Legal Standard

The pleading standard governing Plaintiffs' claims grounded in fraud is set forth in Rule 9(b), which provides that, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).[26]

---

[26]   Rule 9 was non-substantively amended in 2007 "as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." FED. R. CIV. P. 9 advisory committee's note to 2007 amendment ("These changes are intended to be stylistic only.").  Previously, and as quoted in some of this Circuit's authority as cited below, the Rule stated "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity . . . ." FED. R. CIV. P. 9(b) (2006).

It is well-established in this Circuit[27] that Rule 9(b) applies when the "factual allegations

that support a particular legal claim" make clear that the claim—regardless of how it is

---

[27]     The Federal Rules of Civil Procedure apply because federal procedural law governs in diversity cases. *Chamberlain*, 210 F.3d at 158–59; *Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006) (quoting *Christidis v. First Pa. Mortg. Tr.*, 717 F.2d 96, 99 (3d Cir. 1983)) ("[T]he pleading requirements of Rule 9(b) 'appl[y] not only to fraud actions under federal statutes, but to fraud claims based on state law.'"). Accordingly, the issue of whether Rule 9(b) should apply to Plaintiffs' state law claims here is a question to be determined by Third Circuit precedent, since Plaintiffs have brought their case in Delaware District Court. *See, e.g.*, *Shaw v. Andritz*, No. 15–725–LPS–SRF, 2016 WL 7491809, at *2 (D. Del. Dec. 29, 2016) (citations omitted) ("[A] question of federal law . . . is governed by the law of the circuit in which the district court sits.").

As a source of persuasive authority, however, the court notes that both the Ninth Circuit (addressing California law) and the Eleventh Circuit (addressing Florida law), have hewed closely to the same underlying principle: that whether Rule 9(b) governs the sufficiency of a plaintiff's allegations depends on whether the claim is "grounded" in allegations of fraud, even if the claim itself is for something other than fraud. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (citation omitted) ("We [have] held . . . that if 'the claim is said to be "grounded in fraud" . . . the pleading of that claim as a *whole* must satisfy the particularity requirement of Rule 9(b).'"); *id.* at 1125 (applying Rule 9(b) to the CLRA, the same California statute at issue in this case); *see also Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307–08 (11th Cir. 2022) (applying Rule 9(b) to "state law claims for fraud, civil theft, and unjust enrichment, each of which, when stripped to their essentials, is based on the defendants' allegedly fraudulent promise").

The Second Circuit has disagreed as to the applicability of Rule 9(b) to NYGBL § 349 (and might extend the same analysis to § 350), pursuant to which Plaintiff Scorziello brings claims on behalf of himself and the New York Sub-Class. *See Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (citation omitted) ("[B]ecause § 349 extends well beyond common-law fraud to cover a broad range of deceptive practices, . . . and because a private action under § 349 does not require proof of the same essential elements (such as reliance) as common-law fraud, an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b) . . . ."). Regardless, because the Third Circuit's interpretation of the Rules governs, the court need not defer to this holding. *See, e.g.*, *Christidis*, 717 F.2d at 99 (distinguishing the Third Circuit's interpretation of Rule 9(b) from the Second Circuit's interpretation); *see also, e.g.*, *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 90 (2d Cir. 2006) (citation omitted) ("[Our prior precedent] instructed us to defer conclusively to another circuit's judgment only when that court of appeals' decision addressed questions of *state* law from a state within that circuit. It asserted no obligation to defer to a foreign circuit's views on *federal* law. As to issues of federal law, we are permitted—indeed, required—to reach our own conclusions.").

denominated—is grounded in fraud. *See, e.g.*, *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992) ("Rule 9(b) refers to 'averments' of fraud, and thus requires us to examine the factual allegations that support a particular legal claim. . . . As we have noted, the complaint is devoid of allegations that defendants acted negligently in violating [the applicable statute]. Instead, it brims with references to defendants' intentional and reckless misrepresentation of material facts. We see no way to construct a negligence cause of action here."); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir. 2004) ("*CALPERS*")) ("[A]n examination of the factual allegations that support Plaintiffs' . . . claims establishes that the claims are indisputably immersed in unparticularized allegations of fraud."), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007); *CALPERS*, 394 F.3d at 160 ("[A] core theory of fraud permeates the entire Second Amended Complaint and underlies all of Plaintiffs' claims. The

---

Moreover, the court notes that the Second Circuit's rule for applying Rule 9(b) would likely support a similar result on these facts, even in the context of Plaintiffs' NYGBL claims. In *Rombach v. Chang*, the Second Circuit determined that Rule 9(b) should apply when "the wording and imputations of the complaint are classically associated with fraud." 355 F.3d 164, 172 (2d Cir. 2004). This assessment "necessarily requires a case-by-case analysis," and the standard looks to "conduct alleged" rather than "constituent elements of a fraud cause of action." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007); *see Rombach*, 355 F.3d at 171. In other words, "[a] claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." *Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004); *see also Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 443 (S.D.N.Y. 2015) ("Courts have found non-fraud claims to sound in fraud where the underlying conduct alleged has been fraud or closely linked with fraudulent behavior, such as claims for which fraud is a necessary element or claims that the other party has attempted to induce action through misrepresentations or material omissions."). As the court goes on to discuss here, the allegations underlying Plaintiffs' NYGBL claims are inextricably linked with the theory of fraud that permeates the majority of their claims in this action. Accordingly, though mindful of the distinction to be made between the Second and Third Circuits' interpretations of Rule 9(b), the court considers its approach consistent with the precedents of each.

linchpin of Plaintiffs' action is their allegations that Defendants knowingly and intentionally committed accounting violations . . . .") (applying Rule 9(b)'s heightened standard).

In other words, plaintiffs may subject even non-fraud claims to the heightened pleading standard of Rule 9(b) when they substantiate a cause of action with allegations of the defendant's fraudulent conduct. *See CALPERS*, 394 F.3d at 161 ("Rule 9(b) does not discriminate between various allegations of fraud.").

A "plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.' . . . To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (citation omitted). This standard is a "lenient" interpretation of Rule 9(b), in that it does not strictly require the "date, time and place" to be alleged in all circumstances. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 198 (D. Del. 2000) (citations omitted) ("The Court should apply Rule 9(b) with some flexibility and should not require plaintiffs to plead issues that may have been concealed by defendants."). That is, "courts should be 'sensitive' to the fact that application of [Rule 9(b)] prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Shapiro*, 964 F.2d at 284–85 (citation omitted).

The Supreme Court has addressed the significance of Rule 9(b)'s directive that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Court specifically cautioned that "'generally' is a relative term." *Iqbal*, 556 U.S. at 686. "In the context of Rule 9," the Court explained "generally" "is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent

under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Id.* at 686–87.  Rule 8, as will be discussed *infra*, requires a "short and plain statement" of the facts, but "does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Id.* at 687.

### 2.   Rule 9(b) Applies to Counts I, II, VI, X, XIII, and XIV

The primary thrust of Defendant's Motion to Dismiss is to challenge what it groups together as the "Fraud-Based Claims" in Plaintiffs' Complaint: Count I, which is a common law fraudulent concealment claim, and Counts VI, X, XIII, and XIV, which are "claims under the consumer fraud statutes of the states where [Plaintiffs] purchased their vehicles (California, Florida, and New York)."[28]  Motion to Dismiss 9.

The court agrees that the above-referenced claims are grounded in fraud, and further determines that Count II (a common law unjust enrichment claim) is grounded in fraud.  Beginning with Count II, the court explains its reasoning for the application of Rule 9(b).[29]

### a.   Count II (Unjust Enrichment) Is Grounded in Fraud

Count II of Plaintiffs' Complaint is a common law claim for unjust enrichment, pursuant to which Plaintiffs allege that "FCA has received and retained a benefit from Plaintiffs and all Class Members and inequity has resulted."  Complaint ¶ 260.  Plaintiffs refer to the "artificially inflated" value of Plaintiffs' Class Vehicles, and specifically state that their cause of action arises "[a]s a result of [FCA's] wrongful acts, *concealments*, and *omissions* of the defect in its Class

---

[28]     FCA's argument also extends to Count VII, brought on behalf of California Plaintiffs and the California Sub-Class, but the court does not discuss that claim here, having already dismissed it for lack of standing.

[29]     Because Count I is a fraud claim on its face and in substance, the court does not discuss whether it is grounded in fraud.

Vehicles . . . ." *Id.* ¶¶ 261–62 (emphasis added).  Further, Plaintiffs contend that "Plaintiffs and

all Class members were not aware of the true facts about the Class Vehicles and did not benefit

from FCA's conduct," while "FCA knowingly accepted the benefits of its unjust conduct." *Id.*

¶¶ 265–66.

The court determines that this claim is clearly grounded in fraud.  While the elements[30] of

unjust enrichment do not per se require deception—such as by concealment or omission—

Plaintiffs here have based their theory of unjust enrichment on FCA's allegedly fraudulent

conduct.  As in *CALPERS*, "[t]he linchpin of Plaintiffs' action is their allegations that [FCA]

knowingly and intentionally" deceived them as to the real value of the Class Vehicles.  394 F.3d

at 160; *see also, e.g., Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th

Cir. 2022) ("[T]he [Florida] District Court concluded that all of the state law claims arose out of

---

[30]       The court previously dismissed Count II as to Plaintiffs Diaz and Santos, and to the extent that it is brought on behalf of the putative California Sub-Class, because unjust enrichment is considered "synonymous with restitution" in California. *Levine*, 117 Cal. Rptr. 3d at 278–79. The court has already concluded that Plaintiffs lack standing to seek restitution.  Because unjust enrichment is a cause of action in Florida and New York, however, and because Plaintiffs also seek injunctive relief pursuant to this cause of action, the court addresses Count II on the merits as to the remaining Plaintiffs.

In Florida, the elements of unjust enrichment are as follows: "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Hillman Const. Corp. v. Wainer*, 636 So. 2d 576, 577 (Fla. Dist. Ct. App. 1994) (citation omitted).

In New York, unjust enrichment is described as "a quasi-contract theory of recovery." *Georgia Malone & Co. v. Ralph Rieder*, 926 N.Y.S.2d 494, 497 (App. Div. 2011).  To prevail, a "plaintiff must show that the other party was enriched, at plaintiff's expense, and that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *Id.* (quoting *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011)). Instructively, the *Georgia Malone* Court observed that privity is not required, but "a claim will not be supported unless there is a connection or relationship between the parties that could have caused reliance or inducement on the plaintiff's part."  926 N.Y.S.2d at 497 (citing *Mandarin*, 944 N.E.2d at 1111).

the alleged fraudulent scheme outlined therein. It was right to do so. Counts I through III are composed of state law claims for fraud, civil theft, and unjust enrichment, each of which, when stripped to their essentials, is based on the defendants' allegedly fraudulent promise . . . .").

But for the alleged fraud FCA perpetrated on Plaintiffs by selling them Class Vehicles without disclosing the defects that Plaintiffs claim rendered the Vehicles overpriced, they would have no theory of unjust enrichment.  Accordingly, because Plaintiffs have represented that the circumstances leading to FCA's unjustly obtained profits are fraudulent in nature, their allegations showing those circumstances must be pleaded with particularity.[31]

### b. The Consumer Protection Statutes Are Governed by Rule 9(b) (Counts VI, X, XIII, XIV)

The state consumer protection statutes at issue here must be likewise evaluated under the precedents of this Circuit interpreting the applicability of Rule 9(b).  For the following reasons, the court concludes that, for Plaintiffs' CLRA, FDUTPA, and NYGBL claims to succeed, they must satisfy the heightened pleading standard of Rule 9(b) because they are grounded in fraud. That is, the allegations of the fraudulent circumstances underlying Plaintiffs' state consumer protection claims must be stated with "particularity."  Because the elements of each state law claim differ, the court notes them in turn before analyzing the basis of Plaintiffs' particular claims.

First, California's consumer protection statute, the CLRA, "prohibits 'unfair methods of competition and unfair or deceptive acts or practices,'" adjudged "from the vantage of a reasonable consumer."  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (first quoting CAL.

---

[31]     It is the factual content concerning the fraud underlying each claim that must be pleaded with particularity—elements of a claim not implicating fraud are assessed under the "short and plain statement" standard of Rule 8(a).  *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 792 n.7 (3d Cir. 1984) ("Rule 9(b) requires that fraud be pleaded particularly; it does not require that every element of an offense that includes fraud also be pleaded particularly."), *abrogated on other grounds by Twombly*, 550 U.S. 544.

CIV. CODE § 1770(a) (West 2022), then quoting *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)).  "Under the reasonable consumer standard, [plaintiffs] must 'show that "members of the public are likely to be deceived."'"  *Williams*, 552 F.3d at 938 (quoting *Freeman,* 68 F.3d at 289). Where the unfair acts involve advertising, the advertisements in question need not be false, since "actually misleading [advertisements or those] which ha[ve] a capacity, likelihood or tendency to deceive or confuse the public" will suffice.  *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002) (citation omitted).

When a CLRA claim is based on omission, the omission must be "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose."  *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 996 (N.D. Cal. 2013) (citation omitted).  A defendant's duty to disclose arises:

> (1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed.

*Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1112–13 (N.D. Cal. 2016) (quoting *Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 588, 593 (Ct. App. 2011)).  "[I]n order for non-disclosed information to be material, a plaintiff must show [based on the reasonable consumer standard] that 'had the omitted information been disclosed, one would have been aware of it and behaved differently.'"  *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 940 (C.D. Cal. 2012) (citations omitted).

Under Florida's consumer protection statute FDUTPA, plaintiffs must show "(1) a deceptive act or unfair practice;  (2)  causation; and (3) actual damages."  *Washington v. LaSalle Bank Nat'l Ass'n*, 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011) (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)) ("Under FDUTPA, a deceptive practice

is one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."); *see also* FLA. STAT. ANN. § 501.201 *et seq.* (2022). "In determining whether a representation is likely to mislead consumers acting reasonably, courts consider the net impression created." *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010) (citation omitted). "If the statements are 'likely to mislead reasonable consumers,' then it makes no difference if the statements are 'technically or literally true.'" *Coleman v. CubeSmart*, 328 F. Supp. 3d 1349, 1361 (S.D. Fla. 2018) (citation omitted).

Finally, the relevant provisions of New York's consumer protection statute NYGBL—§§ 349 and 350—are notable for their lack of elements relating to either (1) reliance on the part of plaintiffs or (2) scienter. *See Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012); *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744–45 (N.Y. 1995); *see also* N.Y. GEN. BUS. LAW §§ 349, 350 (McKinney 2022). "To establish a prima facie case under Section 349, plaintiffs must demonstrate that '(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result.'" *In re Scotts EZ Seed Litig.*, No. 12 CV 4727(VB), 2013 WL 2303727, at *10 (S.D.N.Y. 2013) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)). Under § 350, the standard is "identical" except that it is "specific to false advertising." *Goshen v. Mut. Life Ins. Co.*, 774 N.E.2d 1190, 1195 n.1 (N.Y. 2002). The deceptive acts referenced in the statute are defined according to the same "reasonable consumer" standard applicable under the CLRA and FDUTPA. *Maurizio,* 230 F.3d at 522 (citation omitted) ("[Deceptive acts are those] likely to mislead a reasonable consumer acting reasonably under the circumstances."); *Loc. 214 Pension Fund*, 647 N.E.2d at 745 (setting forth "an objective definition

of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances").

Plaintiffs uniformly allege fraudulent conduct by FCA as the basis of all of their consumer protection claims: specifically, that FCA "fail[ed] to disclose and conceal[ed]" the Differential Defect, falsely represented characteristics of the Class Vehicles while knowing of the Defect, and induced Plaintiffs' reliance on these misrepresentations and omissions.  Complaint ¶¶ 327, 329, 330–32, 395, 396, 398–400, 402, 446, 448, 449, 452–55, 464–66, 468–71, 473.[32]  Therefore, the Rule 9(b) applies to the allegations of fraud underlying each of these claims.

### 3.    All of Plaintiffs' Fraud-Based Claims Are Dismissed

At all times, Plaintiffs have emphasized that FCA acted intentionally—*knowingly*—when it engaged in the wrongful, deceptive conduct[33] that is the basis for Plaintiffs' common law and statutory claims.  *See, e.g.*, Complaint ¶ 18 ("FCA has exclusive knowledge of, and has been in

---

[32]    Again, although New York courts and the Second Circuit, in interpreting NYGBL §§ 349 and 350, decline to apply Rule 9(b)'s heightened pleading requirement, the court determines that the "linchpin" of Plaintiffs' NYGBL claims here is that FCA "knowingly and intentionally" made misrepresentations and omissions, such "that the claims are indisputably immersed in unparticularized allegations of fraud." *CALPERS*, 394 F.3d at 160; Complaint ¶ 449 (emphasis added) (supporting § 349 claim) ("FCA . . . engaged in unlawful trade practices by employing deception, deceptive acts or practices, *fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment*, suppression or omission, in connection with the sale of the Class Vehicles."), ¶¶ 468–70 (supporting § 350 claim with similar allegations).  *But see Pelman*, 396 F.3d at 511 (ruling that Rule 9(b) does not apply to NYGBL § 349).  Accordingly, the court applies Rule 9(b) as the appropriate pleading standard to the allegations of fraud underlying the NYGBL claims.

[33]    The central theory of fraud advanced by Plaintiffs is primarily one of "omission" or "active concealment" rather than of affirmative misrepresentation, but Plaintiffs also intermittently claim that, by its advertisements, "FCA represented that the rear differential installed in the Class Vehicles was sufficient to withstand the intended use of the vehicle – both ordinary and high-performance driving."  Complaint ¶ 9 ("Despite knowing that the Class Vehicles contain a defect in design, manufacturing, materials, and/or workmanship that causes the rear differential and/or axle to suddenly and prematurely fail well before its useful life, FCA failed to disclose such information about the Differential Defect to the public or remedy the Defect."); *see also id.* ¶ 231 (referring to "misrepresentations" as well as "omissions" and "active concealment").

exclusive possession of, information pertaining to the Differential Defect, which was material to Plaintiffs and Class Members, who could not reasonably know of the Defect. FCA has not disclosed the Differential Defect to the purchasers or lessees like Plaintiffs at the point of purchase or through advertisements or marketing materials."), ¶ 395 (supporting FDUTPA claim) ("FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business."), ¶ 448 (supporting NYGBL § 349 claim with similar allegations).

FCA moves to dismiss all of the fraud-based claims on the basis that Plaintiffs have failed to "plead *facts* showing [FCA] knew about the alleged defect" prior to the sale of the Class Vehicles, which is a requisite to stating "any claim based on an alleged omission."  Motion to Dismiss 11.  The court agrees with FCA that Plaintiffs have failed to establish that FCA had pre-sale knowledge[34] of the Differential Defect, such that their theory of fraud by omission could

---

[34]     "Pre-sale" knowledge, as discussed by the parties in their briefing, and Plaintiffs in the Complaint, refers to the requirement, in the context of omission/concealment-based fraud claims, that FCA "had knowledge of the alleged defect at the time of sale or lease." *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 8:19-cv-01298-JLS-KES, 2021 WL 62502, at *5 (C.D. Cal. Jan. 4, 2021).  The need to establish pre-sale knowledge is directly connected to the issue of whether a defendant has a duty to disclose based on superior knowledge of material facts. *See, e.g.*, *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 126 (E.D.N.Y. 2011) (citation omitted) ("[I]n order to premise a duty to disclose on superior knowledge, the knowledge must be of the type 'not readily available to others.'").

The court need not reach the issue of whether, and to what extent, Plaintiffs must allege a duty to disclose here, because all of Plaintiffs' fraud-based claims—including those brought under the FDUTPA and NYGBL—are premised on their assertion that "FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business." Complaint ¶¶ 395, 448.  In other words, Plaintiffs have identified *no other* deceptive or unlawful "act," but *knowing* omission, concealment, and/or misrepresentation with respect to the Differential Defect.  Because

succeed.  Further, the court concludes that Plaintiffs have not sufficiently alleged that FCA knew

of the Defect at *any* time, such that Plaintiffs' claims based on active concealment or affirmative

misrepresentation could succeed.[35]  Therefore, all of Plaintiffs' remaining fraud-based claims—

Counts I, II, VI, X, XIII, and XIV—are dismissed.

### a.   Legal Standard

Each relevant jurisdiction includes in its definition of fraud an element of knowledge—or

at least reckless disregard of the truth.[36]  *See Perlas v. GMAC Mortg., LLC*, 113 Cal. Rptr. 3d 790,

---

the court concludes that Plaintiffs have not established FCA's knowledge of the Defect prior to sale or at any time thereafter, the court dismisses the fraud-based claims in their entirety on this ground.  Put another way, Plaintiffs' claims must stand or fall on their ability to plausibly allege facts to support a conclusion that FCA knowingly omitted, concealed, or misrepresented material facts.

[35]   The only counts of Plaintiffs' Complaint that appear to incorporate affirmative misrepresentation as a theory of fraud are Counts X (under the FDUTPA) and Counts XIII and XIV (under the NYGBL).  The court notes that the portion of the Complaint devoted to Count VI, a California state law claim under the CLRA, only makes reference to misrepresentations created by omissions, not *affirmative* misrepresentations.  *See, e.g.*, Complaint ¶ 333 ("By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.").  Count VII, a claim under California's UCL consumer protection statute that makes reference to false advertising, is dismissed for lack of standing and thus is not considered on its merits.

[36]   California, Florida, and New York law permit affirmative misrepresentation claims to proceed where the defendant is reckless as to the truthfulness of its misrepresentation.  *See Perlas v. GMAC Mortg., LLC*, 113 Cal. Rptr. 3d 790, 794 (Ct. App. 2010); *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. Dist. Ct. App. 2011); *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*, 379 N.Y.S. 2d 873, 879 (App. Div. 1976).  However, Plaintiffs only sparsely allege recklessness on the part of FCA and do so in purely conclusory terms without supporting facts.  *See* Complaint ¶ 183 ("Defendant fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Classes the Defect in the Class Vehicles even though Defendant knew or should have known of design and/or manufacturing defects in Class Vehicles."), ¶ 284 ("At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions.").  Accordingly, the court does not further discuss allegations that could support a determination that FCA recklessly disregarded the truth, as none can be found in the Complaint.

794 (Ct. App. 2010) (emphasis added) (citation omitted) ("To establish a claim for fraudulent misrepresentation, the plaintiff must prove '. . . *the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth . . . .*'"); *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. Dist. Ct. App. 2011) (emphasis added) (citation omitted) ("[Fraudulent misrepresentation requires] *the representer's knowledge that the representation is false . . . .*"); *Oxford Health Plans (N.Y.), Inc. v. Biomed Pharms., Inc.*, 122 N.Y.S.3d 47, 52 (App. Div. 2020) (emphasis added) (citations omitted) ("To recover damages for fraudulent misrepresentation, a plaintiff must prove . . . a misrepresentation or an omission of material fact which was false and *known to be false by the defendant. . . .*").

Where the fraudulent act alleged is a failure to disclose a material fact, California, Florida, and New York set forth substantially similar elements, including that the defendant must be under a duty to disclose:

> The required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact.

*Hambrick v. Healthcare Partners Med. Grp., Inc.*, 189 Cal. Rptr. 3d 31, 60 (Ct. App. 2015) (citation omitted); *see Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015) (establishing essentially the same elements, but varying the "intent to defraud" element to require that the defendant "knew or should have known the material fact should be disclosed . . . [and] knew [its] concealment of or failure to disclose the material fact would induce the plaintiffs to act"); *see also P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245, 250 (App. Div.

2003) (citation omitted) (reciting the elements of fraud to include misrepresentation, intent to defraud, reasonable reliance by the plaintiff, and damage suffered as a result, and stating that "fraudulent concealment requires, in addition to the four foregoing elements, an allegation that the defendant had a duty to disclose material information and that it failed to do so").

<blockquote>

**b.   Plaintiffs Fail to Establish that FCA Knew of the Differential Defect Before Selling Plaintiffs Their Class Vehicles**
</blockquote>

Simply put, there is a mismatch between the Differential Defect as described by Plaintiffs,[37] and the allegations of FCA's knowledge thereof (*i.e.*, FCA's "presale" knowledge).

---

[37]   The court notes that the question of whether Plaintiffs have in fact adequately identified a material defect by their description of the "Differential Defect" is a close call. *Cf.*, *e.g.*, *Apodaca v. Whirlpool Corp.*, No. SACV 13–00725 JVS (ANx), 2013 WL 6477821, at *3, *9 (C.D. Cal. Nov. 8, 2013) (permitting a number of fraud-based claims to survive based on allegations describing a design defect in a dishwasher that allowed moisture to contaminate the control panel, resulting in "the dishwasher becom[ing] unresponsive, lights blink[ing], or the dishwasher conduct[ing] incomplete cycles"); *Philips v. Ford Motor Co.*, No. 14–CV–02989–LHK, 2015 WL 4111448, at *7 (N.D. Cal. July 7, 2015) (fraudulent omission claims were plausibly pleaded on the basis of a "steering defect [that] manifested in similar manners across different models of vehicles").

Here, Plaintiffs uniformly allege that "[n]one of the information provided to Plaintiff[s] . . . disclosed any defects in the rear differential or drivetrain system or that the Class Vehicles were not capable of safe driving on public roadways and track use." *See, e.g.*, Complaint ¶ 35. Yet, as noted *infra*, Plaintiffs' description of the Differential Defect is so broad as to encompass numerous symptoms and manifestations (ranging from noise/vibration to explosion and total power loss), without providing much explanation of how the Defect causes these symptoms. *See, e.g.*, Complaint ¶¶ 168, 169, 171–73, 175, 176. Plaintiffs primarily assert, without more, that the rear differential in Class Vehicles "prematurely" degrades due to "substandard design, materials, manufacturing, and workmanship." *Id.* ¶¶ 170–72 (emphasis added) (discussing how "substandard, inconsistent and improper procedures" in materials *or* manufacturing "*and/or* poor quality-control procedures" lead to the Defect itself, and that the rear differentials will accordingly "degrade at a much faster rate than normal"). The most concrete allegation of the Defect's occurrence is that it results in metal particulate buildup in the gear oil filling the differential. *Id.* ¶ 169. Moreover, Plaintiffs' allegations of their own experiences with the Defect are not particularly similar, especially since not all Plaintiffs even experienced manifestation of the Defect. *See generally id.* ¶¶ 26–144.

Nevertheless, the court notes that district courts—including those districts in which Plaintiffs reside—have reiterated the leniency of the motion to dismiss standard in the context of

While knowledge elements of fraud claims may be alleged generally, the term "generally" "is to be compared to the particularity requirement applicable to fraud or mistake," and "does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 686–87.

Here, Plaintiffs allege that "the rear differential is not adequately designed and/or manufactured for the torque loads of the engines and transmissions exerted during acceleration," which causes "high torque loads [to] degrade the differential, causing the rear differential and its internal components including, but not limited to, the ring gear, pinion gear[,] differential housing and/or axles to fail." Complaint ¶ 4. "Failure" allegedly includes "a noisy differential, such as whining, howling or whirling sounds, and vibrations in the rear of the vehicle," degradation of "the differential and entire driveline system," "metal shavings and other metal particulates . . .

---

fraud-by-omission claims, especially when assessing whether plaintiffs have adequately described defective products that involve technical components or potentially present a safety risk. *See, e.g.*, *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 220 n.9 (S.D.N.Y. 2015) ("Although plaintiffs do not allege with consistent particularity that all of their vehicle-related issues were caused by TIPM-related defects, the Court construes the Amended Complaint as alleging a causal connection as to each vehicle-related loss incurred by plaintiffs."); *see also Philips*, 2015 WL 4111448, at *7 (citation omitted) ("Plaintiff[s] have only limited technical information available in the pre-discovery stage."); *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016) (fraud-based claims were not defeated by allegations of an unmanifested defect in vehicle airbags where "the propellant used by Takata—but rejected by every other major airbag manufacturer in the industry—is prone to instability and explosions").

Mindful of this standard, the court does not dismiss Plaintiffs' fraud-based claims for failure to adequately allege a defect, but rather, premises dismissal of the fraud-based claims on the clear inadequacy of Plaintiffs' allegations attempting to establish FCA's knowledge of the Defect.

contaminat[ing] the differential oil," axle failure, loss of control of the vehicle, possible explosion of the differential, and "a complete loss of power." *Id.* ¶¶ 168–69, 171–73, 175–76.[38]

Plaintiffs next allege several sources of FCA's "superior and exclusive knowledge of the Differential Defect." Complaint at 39 (capitalization normalized); *see also id.* ¶ 184 ("Based on pre-production testing, pre-production design failure mode analysis, production design failure

---

[38]    Of the Plaintiffs who allegedly experienced manifestation of the Defect in their Class Vehicles, the symptoms they describe vary. California Plaintiff Diaz experienced "the driveshaft rattling and would feel the differential click while driving" but was told by the dealership that "nothing was wrong with the vehicle." *Id.* ¶¶ 36–37. California Plaintiff Santos heard a "loud clunking noise" in the rear of his vehicle, and when he shifted, "it made a loud noise that sounded like metal was grinding." *Id.* ¶ 55. After the dealership technician installed a new differential, "Santos noticed excessive gear lube / oil on [his Vehicle's] exhaust and rear end," which the technician found was leaking from the "rear drive axle boot." *Id.* ¶ 57. Numerous further issues for which Santos sought repairs included misaligned "exhaust tips," "metal to metal noises coming from [the] rear end" of the vehicle, clicking noises "from the right rear wheel area," leaking or otherwise damaged "axle boot," and "banging noises when he shift[ed]." *Id.* ¶¶ 58–65. The dealership technician replaced the rear differential in Plaintiff Santos's car three times and found metal shavings in the oil on at least two occasions. *Id.* ¶¶ 56, 59, 62. Florida Plaintiff Sinclair's Class Vehicle had a "noisy" rear end, and the vehicle itself "would not move," leading the dealership technician to find that the rear right and left axles were damaged, and the rear differential was "damaged inside" due to "metal contamination." *Id.* ¶ 99. The technician replaced the rear differential, but Sinclair continued to hear "a clicking noise coming from the rear differential," though no further diagnoses or repairs were made. *Id.* ¶ 101. Florida Plaintiff Veal heard a "loud noise" in the rear of his Class Vehicle, leading to the dealership "discover[ing] an internal failure in the rear differential" and replacing it. *Id.* ¶¶ 118–119. Subsequently, the dealership replaced the rear differential again due to a whining noise, but when the noise continued, "[t]he dealership explained the noise was the result of the gear mesh." *Id.* ¶ 120. Finally, Plaintiff Veal heard a "loud roaring noise" yet again, which led the dealership to "replace[] the rear axle in the differential system and add[] fluid to the differential." *Id.* ¶ 121. Plaintiffs Diaz, Santos, and Veal allege that their Class Vehicles continue to exhibit the Defect without specifying if they are experiencing the same symptoms as before. *Id.* ¶¶ 38, 66, 122. Plaintiff Sinclair does not repeat this form allegation himself, but does allege that he "has received no notification from FCA about any potential repair or aftermarket modification that would repair the Drivetrain and render the Class Vehicle safe to drive on public roadways, or during occasional track use, that would also be compliant with FCA's express warranties." *Id.* ¶ 102.

As already discussed, Plaintiffs Gibson (Florida) and Scorziello (New York) do not allege that they experienced any actual issues driving their Class Vehicles, and do not allege that they sought or obtained any repairs on account of the alleged Defect. *See id.* ¶¶ 80–83; 136–139.

mode analysis, knowledge of alternative designs for rear differentials, quality control audits of the rear differential and related components, early consumer complaints made to Defendant's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, auto parts stores, and/or consumers, consumer complaints to dealers and NHTSA and testing performed in response to consumer complaints, *inter alia*, Defendant was aware (or should have been aware) of the Differential Defect in the Class Vehicles and fraudulently concealed the defect and safety risk from Plaintiffs and members of the Classes.").

Plaintiffs only provide further factual allegations concerning three categories of information: service bulletins, consumer complaints, and pre-production testing. The court addresses each category of information in turn, and determines that Plaintiffs' allegations fall short of establishing that FCA was on notice of the Defect at the time of sale.

### i.    Service Bulletins

Plaintiffs allege that FCA "released several service bulletins describing the issues related to the Defect to their exclusive network of dealerships beginning in or around May 2015," but that these bulletins "all attempted to address symptoms related to the Differential Defect and not the underlying Defect." Complaint ¶ 187. The five bulletins that Plaintiffs cite and append were issued on May 30, 2015, July 18, 2015, June 24, 2016, December 23, 2016, and March 15, 2017. *Id.* ¶¶ 188–92. Plaintiffs do not allege that any of the bulletins identify a problem with the rear differential, or that any of the bulletins recommend replacing or repairing the rear differential itself. Indeed, Plaintiffs state that, rather than identifying the Defect, "the service bulletins do not acknowledge the Differential Defect, but instead attempt to provide instructions to dealerships on what repairs to perform to Class Vehicles to merely alleviate the symptoms of the Defect." *Id.* ¶ 187.

Again, Plaintiffs defined what a rear differential *is* as follows:

[A] component on the rear axle in all vehicles designed to compensate for the difference in distance between the inner and outer rear wheels when the vehicle is turning. Specifically, the rear differential allows the rear tires to move in the same direction while rotating at different speeds. The rear differential is a critical driveline component that transfers the vehicle's engine's power (horsepower and torque) to the rear wheels. This transfer of engine power to the rear differential enables the Class Vehicles to operate in a forward or reverse direction. The power of the engine in the Class Vehicles is routed through the transmission, then transferred to the rear differential by the driveshaft. Once the engine's power is transmitted to the rear differential, the engine's power (horsepower and torque) is subsequently transferred to the drive tires through axle shafts.

*Id.* ¶ 162.

Plaintiffs have, as previously addressed, attempted to define the Differential Defect much more broadly, but the most factually based description of the Defect suggests that it is a flaw leading to premature deterioration of the rear differential *itself*, which in turn may affect connected parts of the Class Vehicles.

No matter how broad their definition of the Defect, Plaintiffs must establish a plausible factual link between the Defect and the directives in the service bulletins. Courts frequently consider "[technical service bulletins] that only generally address the problem at hand [to be] rarely . . . persuasive." *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1222–23 (S.D. Fla. 2021); *see also Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998, at *7 (N.D. Cal. Aug. 1, 2017) ("The [technical service bulletin] d[id] not suggest that GM knew that all of the engines were inherently defective; indeed, the [allegedly defective product was] not even mentioned."); *cf. Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 546–47, 559 (S.D.N.Y. 2016) (the plaintiff "adequately pleaded BMW's knowledge of the Class Vehicles' alleged defects" where the amended complaint alleged "that the Class Vehicles were 'designed or manufactured so that certain vital electrical components are often located in the lowest part of the

vehicles and are made with or housed in materials that fail to prevent water or moisture intrusion,'" and the bulletin "instructed authorized service technicians to replace water damaged modules, relocate electronics to another less vulnerable location of the vehicle's trunk, and to place a permanent placard in the trunk warning owners to avoid allowing liquids into this area of the vehicle").

Here, none of the service bulletins (which address a variety of Class Vehicle models) cited by Plaintiffs address the Differential Defect.  They describe issues arising in the rear section of the Class Vehicles in a general sense, and direct dealership technicians to replace or repair components—never the rear differential—apparently causing the issues: *e.g.*, "a slight noise of vibration from the rear of the vehicle" with a recommendation of "replacing both rear halfshafts," (May 30, 2015 bulletin); "a slight shake/vibration felt in the seat and/or floor, generated from the rear of the vehicle . . . most noticeable on very smooth roads, at steady-state cruising speeds 50–80 mph" with a recommendation of "replacing both rear halfshafts," (July 18, 2015 bulletin); "a whining noise coming from the [rear] axle area at high speeds" with a recommendation of "inspecting and replacing the propeller shaft" (June 24, 2016 bulletin); "rear axle noise" with a recommendation of "replacing the axle oil on limited slip differentials" (December 23, 2016 bulletin);  and "noise from rear axle while the vehicle is performing tight turning maneuvers" with a recommendation of "draining and refilling the oil" (March 15, 2017 bulletin).  Complaint ¶¶ 188–92.

These alleged facts, even when taken in the light most favorable to Plaintiffs, do not establish FCA's knowledge of the Differential Defect prior to sale.  Plaintiffs must allege more to connect the symptoms that the service bulletins address to the Defect that they allege caused similar—though not identical—symptoms in their own Class Vehicles.  *See, e.g.*, *Browning v. Am.*

*Honda Motor Co.*, No. 20-cv-05417-BLF, 2022 WL 824106, at *16–17 (N.D. Cal. Mar. 18, 2022) ("While at least some of these [technical service bulletins] describe symptoms that some Plaintiffs have experienced, Plaintiffs have failed to connect these [bulletins] to the *specific* defect asserted here . . . . Plaintiffs must connect the issues described in the [bulletins]—*i.e.*, incorrect battery current, malfunctioning indicator lights, independent shifting, or 'loss-of-communication' issues—to Honda's failure to properly calibrate the control modules interacting with the Transmission during manufacturing.").

On the facts alleged here, the court cannot conclude that the service bulletins relied upon by Plaintiffs suffice to establish knowledge on the part of FCA as to the Differential Defect prior to sale.

### ii.        Consumer Complaints

Plaintiffs next cite four complaints submitted by FCA customers to the NHTSA's website. *See* Complaint ¶¶ 196–200.  They allege that

> [c]onsumers who purchased or leased Class Vehicles have filed numerous complaints with NHTSA reporting the Differential Defect, reporting the need to pay exorbitant amounts to repair or replace the rear differential and associated damaged parts and detailing their experiences of catastrophic differential failure, which put the safety of drivers and their passengers at risk.

*Id.* ¶¶ 197, 199 ("FCA knew or should have known of the many complaints about the Differential Defect logged by [the NHTSA], and the content, consistency, and large number of those complaints alerted, or should have alerted, FCA to the [Differential] Defect.").

Plaintiffs' description and identification of consumer complaints ostensibly regarding the Differential Defect, however, are insufficient to establish the pre-sale knowledge they allege as a crucial element of FCA's purported fraud.

First, two of the four complaints that Plaintiffs have chosen to identify were dated in 2019, after all named Plaintiffs purchased their Class Vehicles, undercutting the reliability of those two

complaints as a source of pre-sale knowledge generally.  *See* Complaint ¶¶ 27, 46, 74, 90, 109, 130 (Plaintiffs purchased their Class Vehicles from 2015–18), ¶ 200 (listing consumer complaints filed on the NHTSA website); *see, e.g.*, *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1148 (9th Cir. 2012) ("The two complaints that are dated were made over two years after Plaintiffs purchased the Laptops. Thus, as the District Court concluded, the complaints do not support an inference that HP was aware of the defect at the time it sold the Laptops to Plaintiffs."); *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 308 (N.D.N.Y. 2019).

Second, the two consumer complaints submitted to the NHTSA before at least some named Plaintiffs purchased their Class Vehicles do not identify the Differential Defect sufficiently, since they only describe various noises coming from the rear differential and the rear of the vehicle.  *See id.* ¶ 200 (2017) ("NOISE FROM THE REAR DIFFERENTIAL AREA. WHEN GOING SPEEDS OF 65+ MPH THERE IS A HOWLING/WHINING NOISE THAT IS CONSTANT. WHEN I LET OFF THE GAS IT GOES AWAY. WHEN I GET BACK ON THE GAS IT COMES BACK. I HAVE HAD THE REAR DIFF REPLACED AND HAVE HAD IT IN MULTIPLE TIMES FOR DIAGNOSTICS/FLUID CHANGES WITH NO FIX IN SITE [sic]."); *id.* (2016) ("DRIVELINE CLUNK NOISE IN REAR OF VEHICLE WHEN COMING TO A STOP BETWEEN 3 TO 6 MPH DOWNSHIFTING.").

These complaints, standing alone, are insufficient to establish FCA's knowledge of the Differential Defect.  Where courts have viewed consumer complaints as sufficient to establish pre-sale knowledge, the complaints must identify or describe the defect alleged, not merely identify some symptoms.  *See, e.g.*, *Sloan*, 2017 WL 3283998, at *7 ("Even if the complaints notified GM about the general excessive oil consumption problems, these complaints would not establish that GM knew that the Low-Tension Oil Rings caused the excessive consumption."); *cf., e.g.*, *Wilson*

61

*v. Volkswagen Grp. of Am., Inc.*, No. 17-23033-Civ-Scola, 2018 WL 4623539, at *9 (S.D. Fla. Sept. 26, 2018) (emphasis added) (citations omitted) (determining that consumer complaints supported a finding of pre-sale knowledge on the part of the defendant because the plaintiffs had alleged that "'as early as 2010, [VW] knew of the [d]efect through comments and postings . . . on NHTSA webpages [and] on webpages belonging to, or actively monitored by, [VW].' . . . *These complaints all refer to abnormal tire wear and many describe the problem as being the result of a defect in the car*"); *Catalano*, 167 F. Supp. 3d at 559 (emphasis added) (concluding that the *combined* strength of alleged complaints, repair invoices, warranty claims, and "*most significantly, Technical Service Bulletins . . . describing the defects in question*" were "sufficient to support an inference of BMW's knowledge of the alleged defects" at the pleading stage).  Moreover, it is worth noting that the number of complaints here—only two—stands in stark contrast to those cases that relied on dozens of detailed, consistently descriptive complaints as the basis of pre-sale knowledge.  *See, e.g.*, *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1026 (9th Cir. 2017) ("[T]he complaints from owners regarding the dry exhaust corrosion in the First Generation Outboards were so frequent that individual Customer Relations supervisors personally handled as many as 40 or 50 different consumer complaints, or more, regarding the issue . . . ."); *Wilson*, 2018 WL 4623539, at *9 (noting thirty-seven NHTSA complaints).

Therefore, the court holds that Plaintiffs have not established that FCA knew of the Differential Defect prior to sale based on the consumer complaints.

### iii.    Pre-Sale Testing

Finally, Plaintiffs' allegations of pre-sale testing data fail to factually demonstrate a plausible claim because they are conclusory.  Specifically, Plaintiffs allege that "FCA knew or should have known that the rear differential was defective and poses a significant safety risk due

to the inherent risk of the Differential Defect" because it "conducts tests," "[a]s an experienced manufacturer," for purposes of testing durability of "incoming components, including differentials, to verify the parts are free from defect and align with FCA's specifications." Complaint ¶¶ 201, 205. Further, "[v]ehicles bearing the SRT badge, like the Class Vehicles, undergo the standard durability testing as well as additional track evaluations that simulate actual driving conditions." *Id.* ¶¶ 203, 204 ("The SRT testing includes a simulated road course or dragstrip, which pushes the engine to peak torque and peak power and tests different types of driveline loads."). In footnotes to their Complaint, Plaintiffs append several weblinks to news articles regarding safety testing conducted by car manufacturers generally, and FCA specifically. *See* Complaint at 45 nn.15–17.

Nothing in the Complaint, however, explains how the tests FCA conducted on Class Vehicles revealed the Differential Defect, such that FCA could be said to have known of its existence prior to sale. Rather, the allegation that FCA "knew or should have known" because it was an "experienced manufacturer" who conducted testing as a matter of course is impermissibly conclusory under Rule 8(a), and thus, Plaintiffs cannot establish pre-sale knowledge based on testing or any other undetailed basis where they have alleged no facts to support their claims. *Id.* ¶¶ 201, 205; *see, e.g.*, *Hewlett-Packard*, 668 F.3d at 1147 (citations omitted) (holding that "[t]he allegation that HP, as the manufacturer, had 'access to the aggregate information and data regarding the risk of overheating' is speculative and does not suggest how any tests or information could have alerted HP to the defect"); *Burdt v. Whirlpool Corp.*, No. C 15–01563 JSW, 2015 WL 4647929, at *4 (N.D. Cal. Aug. 5, 2015) ("Plaintiff must allege more than an undetailed assertion that the testing must have revealed the alleged defect. Otherwise, any consumer could bring a CLRA claim merely by asserting that a manufacturer had knowledge of an alleged defect from its

prerelease testing."); *Lewis*, 530 F. Supp. 3d at 1220 ("[T]he assertions regarding testing, reports, data, and analyses do not elaborate whatsoever as to what that information actually showed, which means such allegations do not make it more plausible that Defendants knew the . . . defect existed in hundreds of thousands of vehicles."); *Cummings*, 401 F. Supp. 3d at 308–09 (citation omitted) ("Although Plaintiff is certainly not required to present evidence related to this testing at this stage, she must make more than generalized allegations to plausibly suggest that the testing actually supports her claims; the mere existence of testing, without any allegations as to what that testing revealed, does not plausibly suggest that Defendant was aware of the alleged defect.")

Accordingly, Plaintiffs have not established any basis on which the court can decide that FCA had knowledge of the Differential Defect prior to sale, and Plaintiffs' fraud-based claims must be dismissed to the extent that they are premised on a theory of omission.

### c. Plaintiffs Fail to Allege Any Other Basis on Which FCA Had the Requisite Knowledge to Actively Conceal or Affirmatively Misrepresent the Differential Defect

It follows that, having failed to establish that FCA knew of the Differential Defect prior to sale, the only way that Plaintiffs could succeed in showing that FCA *knowingly* concealed or misrepresented facts about the Class Vehicles would require them to plead additional facts showing FCA's knowledge—either of what it was concealing, or the truth of what it was affirmatively misrepresenting.  Plaintiffs have not done so.

As to their active concealment theory, Plaintiffs have only alleged that "FCA conducted an internal investigation into the failure of rear differentials after two such failures were recorded on video at a private event at the Houston Raceway Park in 2019."  Complaint ¶¶ 207–09 ("[O]f the 42 stock Demons that raced [at the event], four suffered catastrophic rear-end failures at launch. Another Demon vehicle, containing modifications, also suffered a rear-end failure").  Plaintiffs claim that "it is reported that FCA conducted an investigation" thereafter, but "provided a

response[] ignoring the Defect and instead, focused on warranty concerns and modifications." *Id.* ¶ 210.

This is insufficient to establish that FCA knew of the Defect based on an investigation into "rear-end failures" that Plaintiffs merely assume were caused by the Defect. *See id.* ¶ 206 ("Defendant failed to disclose to or actively concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair, and thereafter . . . any and all known material defects or material nonconformities of the Class Vehicles, including the Differential Defect; . . . that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and . . . that the Class Vehicles were defective, even though FCA learned of the Differential Defect before it placed the Class Vehicles in the stream of commerce."). Once again, Plaintiffs have not pointed the court to *facts* showing that FCA had knowledge of the Defect at *any* time, prior to sale or thereafter. It also bears noting that at no point have Plaintiffs pleaded facts to show *how* FCA concealed the Defect, distinct from their allegations of fraud by omission, which the court has already determined to be insufficient. *See, e.g.*, *Browning*, 2022 WL 824106, at *17 (citations omitted) ("To plead active concealment, Plaintiffs must point to specific affirmative acts Honda took 'in hiding, concealing or covering up the matters complained of.' . . . '[C]oncealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent injury.'").

Finally, as to the alleged "misrepresentations" made by FCA with respect to the Class Vehicles, Plaintiffs have again failed to plausibly allege facts showing that any representation made by FCA with respect to the Class Vehicles was knowingly false. As noted, Plaintiffs rely on marketing materials and other indicators, including the SRT badges, showing that the Class Vehicles are "high-performance" vehicles intended for racing as well as ordinary driving. *See*

*generally* Complaint ¶¶ 155–61; *see also id.* ¶ 11 ("The Class Vehicles all bear FCA's Street & Racing Technology ('SRT') badge, indicating these are high-performance vehicles designed to be driven on both ordinary public roads and for speedways, dragstrips, and other track use.").

Plaintiffs provide no facts, however, to show what is false about these representations, other than that they run counter to the reality of the Class Vehicles, which, according to Plaintiffs, are defective.  In other words, Plaintiffs generally assume, and allege in a conclusory fashion, that the Class Vehicles are not, in fact, capable of providing them with the promised high performance because of the Differential Defect. *See, e.g., id.* ¶ 395 ("As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.").

As previously discussed at length, Plaintiffs have *not* alleged facts sufficient to show that FCA knew of the Differential Defect.  Accordingly, Plaintiffs cannot show, based on their Complaint, that FCA *knowingly* made any misrepresentation concerning the defectiveness of the Class Vehicles.  Because Plaintiffs have asserted their claims in such a way that they must show that FCA knowingly made affirmative misrepresentations regarding the Differential Defect, the court cannot credit this theory of fraud.

Accordingly, the court dismisses Counts I, II, VI, X, XIII, and XIV without prejudice.

### B.    Warranty-Based Claims

Plaintiffs bring claims for breach of express and implied warranties under the laws of each of their home states (Counts IV, V, VIII, IX, XI, XII), and also bring a claim for breach of warranty

under the federal Magnuson–Moss Warranty Act (Count III).  Because the court dismisses all the state law warranty claims in their entirety, it must dismiss Count III as well, since Plaintiffs' claims under the Magnuson–Moss Warranty Act hinge on the viability of their state law claims.  *See, e.g.*, *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x. 250, 254 (3d Cir. 2010); *Robinson v. Gen. Motors, LLC*, No. 20-663-RGA-SRF, 2021 WL 3036353, at *19 (D. Del. July 19, 2021).

### 1.    Legal Standard

Contract claims, such as claims for breach of warranty, need only meet the general pleading standard of Rule 8 as governed by the Supreme Court's holdings in *Twombly* and *Iqbal*.  Rule 8(a)(2) provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2). Claims brought in "all civil suits in the federal courts" must be facially plausible—"conclusory or 'bare-bones' allegations will [not] survive a motion to dismiss."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Iqbal*, 556 U.S. at 678); *see also Twombly*, 550 U.S. at 555. Pleadings that offer mere "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *Phillips*, 515 F.3d at 232; *see also Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678) ("[A]ll civil complaints must contain 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'").

> [W]hen presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. . . . Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." . . . In other words, a complaint must do more than allege the plaintiff's entitlement to relief. . . . This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

*Fowler*, 578 F.3d at 210–11 (citations omitted).

## 2.    Express Warranty Claims (Counts IV, VIII, XI)

### a.    Legal Standard

Plaintiffs bring Counts IV, VIII, and XI for breach of FCA's Basic Limited Warranty under the relevant laws of each jurisdiction in which they reside—California, Florida, and New York—all of which govern express warranties during the sale or lease of goods through their collective adoption of the Uniform Commercial Code ("U.C.C."). *See* CAL. COM. CODE §§ 2313 & 10210 (West 2022), FLA. STAT. ANN. §§ 672.313 & 680.21, N.Y. U.C.C. LAW §§ 2-313 & 2A-210 (McKinney 2022).

Whether a plaintiff can state a claim for breach of an express warranty depends on the scope of the warranty in question. *See, e.g.*, *Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108, 1117 (C.D. Cal. 2021) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992)) ("A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty."); *Ocana v. Ford Motor Co.*, 992 So. 2d 319, 324 (Fla. Dist. Ct. App. 2008) (citations omitted) ("Under this state's law, there can be no cause of action for breach of an express limited warranty unless the consumer can allege and prove that the manufacturer did not comply with the limited express warranty's terms."); *Warren W. Fane, Inc. v. Tri-State Diesel, Inc.*, No. 1:12–cv–1903, 2014 WL 1806773, at *9 (N.D.N.Y. May 7, 2014) (citation omitted) ("[A] breach of express warranty claim in New York requires a showing that Defendant actually breached its obligations under the warranty.").

Relevant to the issue of scope here is the question of when a warranty can be held to cover "design defects" and/or "manufacturing defects." Courts deciding warranty coverage questions have recognized essentially the same distinction between the two: a design defect is one that will be reflected across all products in the same line, since they were manufactured uniformly based on

a faulty plan; a manufacturing defect is one where the *process* of manufacturing created a flaw inconsistent with the original design.  *See, e.g.*, *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1085–86 (N.D. Cal. 2021) (citation omitted) ("'[A] design defect "cannot be identified simply by comparing the injury-producing product with the manufacturer's plans or with other units of the same product line, since by definition the plans and all such units will reflect the same design."' . . . A manufacturing defect, in contrast, 'exists if the product differs from the manufacturer's intended result or if the product differs from apparently identical products from the same manufacturer.'"); *Husky Indus., Inc. v. Black*, 434 So. 2d 988, 991 n.4 (Fla. Dist. Ct. App. 1983) (noting that design flaws were alleged "[a]s distinguished from a manufacturing flaw where the defect lies in an alleged departure from a correctly designed product"); *McCarthy v. Olin Corp.*, 119 F.3d 148, 154–55 (2d Cir. 1997) (citations omitted) ("[Under New York law,] a manufacturing defect . . . results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm . . . [and] a design defect . . . results when the product as designed is unreasonably dangerous for its intended use.").

California and New York are squarely in agreement that "a warranty that protects against defects in materials or workmanship covers manufacturing defects, but not design defects." *Catalano*, 167 F. Supp. 3d at 554 (citing *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 226–27 (S.D.N.Y. 2015)); *see also Hindsman v. Gen. Motors LLC*, No. 17-cv-05337-JSC, 2018 WL 2463113, at *7 (N.D. Cal. June 1, 2018) (quoting *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015) ("'Material and workmanship' defects are synonymous with manufacturing defects.").  Florida state courts have not spoken authoritatively on this subject, but federal district

courts in the state have looked to other jurisdictions when concluding the same.[39]  *See, e.g.*, *Vazquez v. Gen. Motors, LLC*, No. 17-22209-CIV-GAYLES, 2018 WL 447644, at *3 n.4 (S.D. Fla. Jan. 16, 2018) (citation omitted) ("Although Florida courts have not directly defined the terms, numerous authorities outside of Florida recognize[ ]that 'materials and workmanship' is a specialized warranty term meaning manufacturing defects.").

### b.     Plaintiffs' Express Warranty Claims Are Dismissed

The court dismisses Counts IV, VIII, and XI of the Complaint—the express warranty claims brought under each relevant state's law—for two reasons.  First, the court determines that the warranty at issue—the Basic Limited Warranty issued by FCA to each Plaintiff—covers only manufacturing defects.  Second, the court concludes that Plaintiffs have failed to plausibly allege a manufacturing defect in the alternative to their design defect argument.

It is undisputed that FCA's Basic Limited Warranty—which was issued in identical form to all named Plaintiffs—states that FCA will cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."  Motion to Dismiss Ex. A at 5, Ex. B at 5, Ex. C at 5, Ex.

---

[39]     It is worth noting that Plaintiffs emphasize the additional phrase "factory preparation" in FCA's express warranty, seeming to imply that this favors a reading of the warranty as covering design defects and/or as ambiguous.  Opposition to Motion to Dismiss 15.  The court is unpersuaded that "factory preparation" changes the analysis; indeed, California and New York district courts have viewed it as part of the standard "materials and workmanship" language.  *See, e.g.*, *Garlough v. FCA US LLC*, No. 2:20-cv-01879-JAM-AC, 2021 WL 1534205, at *8 (E.D. Cal Apr. 19, 2021) (an express warranty covering "the cost of all parts and labor needed to repair any item on [a] vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" only covered manufacturing defects); *Cali v. Chrysler Grp. LLC*, No. 10 Civ. 7606(JSR), 2011 WL 383952, at *2 (S.D.N.Y. Jan. 18, 2011) ("[T]he process of selecting and arranging the component parts of the Vehicle clearly implicates the Vehicle's design. The terms 'material,' 'workmanship,' or 'factory preparation,' on the other hand, refer to the mechanical process of implementing that design."), *aff'd*, 426 F. App'x 38 (2d Cir. 2011).  Florida courts have not addressed the issue.

D. at 5.  This language precisely mirrors the kind of language that courts in Plaintiffs' home jurisdictions have read as signaling coverage of manufacturing defects *only*, excluding design defects.  *See, e.g.*, *Garlough v. FCA US LLC*, No. 2:20-cv-01879-JAM-AC, 2021 WL 1534205, at *8 (E.D. Cal Apr. 19, 2021); *Garcia*, 127 F. Supp. 3d at 226–27; *see also Vazquez*, 2018 WL 447644, at *3 n.4.

Plaintiffs point to no language in the warranty indicating FCA's intention to cover design defects.  Nor do Plaintiffs identify an ambiguity in the language that calls for the court to defer the question of interpretation to a later stage of litigation.  *Cf., e.g.*, *Daniel*, 806 F.3d at 1224–25 (emphasis added) ("Ford's express warranty is *not* simply a 'materials and workmanship' warranty, *as it references defects that are introduced during the 'design' process*. Ford's express warranty is ambiguous.").  Because the court agrees that warranty language referencing "material, workmanship or factory preparation" is synonymous with manufacturing defects, and because there is no warranty language incorporating design or other defects here, the court determines that FCA's Basic Limited Warranty unambiguously provides coverage exclusively for manufacturing defects.

Indeed, Plaintiffs' primary challenge to FCA's arguments with respect to their express warranty claims is that they have successfully alternatively pleaded breach on the basis of a manufacturing defect.  In their Opposition, Plaintiffs identify numerous paragraphs of their Complaint in which they claim to allege a manufacturing defect:

> Plaintiffs' [sic] expressly allege a manufacturing defect and that FCA breached its express warranties to them and the Class by, *inter alia*, (1) having "sub-standard, inconsistent and improper procedures in *manufacturing* the rear differential"; (2) failing to "repair and correct *manufacturing* defects[,]"; (3) equipping the subject vehicles with "a rear differential that contains the Differential Defect, which is the result of . . . *manufacturing* . . . [making it] unsafe for their intended use and purpose[,]"; (4) being "*manufactured* in a manner that causes the differential to prematurely fail[,]"; (5) *manufacturing* the rear differentials improperly for

> "handl[ing] the horsepower and torque loads produced by the Class Vehicle's [sic] engines during acceleration or high-performance use"; and[] (6) using "substandard, inconsistent and improper procedures in the . . . *manufacturing* of the rear differential and its components[.]" . . . At this stage, Plaintiffs' allegations must be accepted as true.

Opposition to Motion to Dismiss 14–15 (quoting Complaint ¶¶ 5, 23, 167–71, 289–305, 356–72, 408–24).

The court is unpersuaded by Plaintiffs' argument. Upon review of each of the cited allegations, and more broadly, the Complaint in its entirety, the court determines that the factual allegations underlying Plaintiffs' assertions of a defect all point to a design defect, not a manufacturing defect. That is, while Plaintiffs incorporate the term "manufacturing" in their conclusions that the Class Vehicles were defective, they repeatedly allege that the Defect is *common to all Class Vehicles*, present in multiple models built over a span of multiple years regardless of where, when, or under what conditions each individual vehicle was assembled. *See, e.g.*, Complaint ¶¶ 1, 4, 6, 7 ("The Differential Defect is inherent in each Class Vehicle[.]").

"While a plaintiff may, as a general matter, plead manufacturing and design defects in the alternative," the alternatively pleaded manufacturing defect claim "is subject to dismissal at the motion to dismiss stage where the complaint makes only 'offhand references to manufacturing defects' and the purported class includes '*all* purchasers or lessees' of the vehicles at issue." *Garcia*, 127 F. Supp. 3d at 226–27 (quoting *Sater v. Chrysler Grp. LLC*, No. EDCV 14–00700–VAP (DTBx), 2015 WL 736273, at *4 (C.D. Cal. Feb. 20, 2015)). The court dismisses Plaintiffs' express warranty claims for the same reasons identified by the courts in *Garcia* and *Sater*. *See also, e.g.*, *Woo v. Am. Honda Motor Co.*, 462 F. Supp. 3d 1009, 1017 (N.D. Cal. 2020) (allegations of a uniform defect in "all" class vehicles "evidence[es] a design rather than manufacturing defect").

A well-pleaded manufacturing defect claim would require Plaintiffs to assert sufficient facts demonstrating how the rear differentials in their individual Class Vehicles differ from the intended design. *Cf. Garcia*, 127 F. Supp. 3d at 226–27. Here, despite Plaintiffs' repeated references to "manufacturing" issues, they do not assert any facts to show a flaw within FCA's manufacturing *process*. *See* Complaint ¶¶ 5, 23, 167–72, 289–305, 356–72, 408–24. Plaintiffs' allegations along the lines that "[d]iscovery will further show the Differential Defect is the result of substandard, inconsistent and improper procedures in the materials used or the manufacturing of the rear differential and its components, and/or poor quality-control procedures to ensure such defective rear differentials do not reach consumers," are simply too vague and conclusory to establish the factual basis of a manufacturing defect theory. Complaint ¶ 170; *see, e.g.*, *Garcia*, 127 F. Supp. 3d at 227 ("[P]laintiffs allege that every single vehicle . . . regardless of where it was manufactured and on what machines . . . is defective. That allegation strongly suggests a defect in the design of the [allegedly faulty part], rather than a mistake in the manufacturing process itself.").

Similarly, when describing the faulty rear differentials present in their Class Vehicles, Plaintiffs here tie design and manufacturing issues together in their claims with no distinction between the separate kinds of circumstances that would necessarily lead to distinct, plausible claims for design and manufacturing defects. *See, e.g.*, Complaint ¶¶ 4, 9, 167. At all times, as discussed, Plaintiffs emphasize the uniform occurrence of the Differential Defect, even alleging that repair through replacement is impossible, because, "when vehicles are brought to Defendant's dealers for repair . . . Class Members are provided with ineffective repairs in which one defective differential is replaced with another defective differential, as experienced by Plaintiffs." *Id.* ¶ 213. As in *Garcia*, this is indicative of an underlying issue with the design of the vehicle, not of an error that occurred during the manufacturing process.

73

Accordingly, since Plaintiffs have failed to allege a manufacturing defect that falls within the scope of FCA's Basic Limited Warranty, the court dismisses Counts IV, VIII, and XI without prejudice.

### 3.        Implied Warranty Claims (Counts V, IX, XII)

#### a.        Legal Standard

Plaintiffs bring Counts V, IX, and XII for breach of implied warranty of merchantability. Plaintiffs Diaz and Santos bring Count V for breach of implied warranty of merchantability under the Song-Beverly Consumer Warranty Act on behalf of themselves and the California Sub-Class. Complaint ¶¶ 307, 311.   Plaintiffs Gibson, Sinclair, and Veal bring Count IX on behalf of themselves and the Florida Sub-Class.  *Id.* ¶¶ 374, 378.  Plaintiff Scorziello brings Count XII on behalf of himself and the New York Sub-Class.  *Id.* ¶¶ 426, 430.

All three jurisdictions have adopted the U.C.C.'s requirement that goods in a contract for sale be "fit for the ordinary purposes for which such goods are used."  CAL. CIV. CODE § 1791.1;[40] FLA. STAT. ANN. § 672.314(2)(c); N.Y. U.C.C. LAW § 2-314(2)(c).

---

[40]        Counts IX and XII are brought under Florida's and New York's enactments of the U.C.C., respectively.  Complaint ¶¶ 378, 430; FLA. STAT. ANN. § 672.314; N.Y. U.C.C. § 2-314. Count V, brought on behalf of the California Sub-Class, does not allege a violation of California's enactment of the U.C.C. directly, but instead alleges a violation of the Song-Beverly Consumer Warranty Act.  *See* Complaint ¶ 311.  The Song-Beverly Act sets forth the same definition of "merchantability" as California's U.C.C., requiring that goods be "fit for the ordinary purposes for which such goods are used," and "'supplements, rather than supersedes, the provisions of the California Uniform Commercial Code' by broadening a consumer's remedies to include costs, attorney's fees, and civil penalties." *See* CAL. COM. CODE § 2314; CAL. CIV. CODE § 1791.1(a)(2); *Am. Suzuki Motor Corp. v. Super. Ct.*, 44 Cal. Rptr. 2d 526, 528 n.2 (Ct. App. 1995) (citation omitted).

To successfully allege a breach of this implied warranty, a plaintiff must plead a defect: that is, that the product in question is *unfit* for its ordinary purpose.[41] *See, e.g.*, *Banh v. Am. Honda Motor Co.*, No. 2:19-cv-05984-RGK-AS, 2020 WL 4390371, at *8 (C.D. Cal. July 28, 2020) (counting California as among the states where plaintiffs must prove that "the product was unmerchantable or unfit for its ordinary use at the time the product left defendant's possession"); *Jovine v. Abbott Laboratories, Inc.*, 795 F. Supp. 2d 1331, 1340 (S.D. Fla. 2011) (citing *Amoroso v. Samuel Friedland Fam. Enters.*, 604 So. 2d 827, 833 (Fla. Dist. Ct. App. 1992)) ("A cause of action for breach of implied warranty of merchantability requires allegations that . . . the product was defective when transferred from the warrantor . . . ."); *Cummings*, 401 F. Supp. 3d at 309 (citing *Wojcik v. Empire Forklift, Inc.*, 783 N.Y.S.2d 698, 701 (App. Div. 2004)) ("[The inquiry of merchantability] focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners."); *see also* U.C.C. § 2-314(2)(c) (AM. L. INST. & UNIF. L. COMM'N 1951).

Florida and New York require vertical privity for implied warranty of merchantability breach claims when the only harm alleged is economic.[42] *See, e.g.*, *Mesa v. BMW of N. Am., LLC*,

---

[41] A product is not necessarily merchantable simply because it is capable of the most basic elements of fulfilling its ordinary purpose. *See, e.g.*, *Isip v. Mercedes-Benz USA, LLC*, 65 Cal. Rptr. 3d 695, 700 (Ct. App. 2007) ("We reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability."); *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1183–84 (S.D. Fla. 2019) (allegations of safety and drivability concerns were enough to show unmerchantability even though the plaintiff continued to drive the vehicle); *Kail v. Wolf Appliance, Inc.*, No. 15-CV-3513(JS)(GRB), 2017 WL 3608242, at *6 (E.D.N.Y. Aug. 21, 2017) ("[E]ven if the car is fit for a daily commute or a cross-country road trip, it may still violate the implied warranty of merchantability . . . [S]aid another way, cosmetic damages may affect the functionality of the good.").

[42] Defendants do not challenge Count V (California Plaintiffs' implied warranty of merchantability claim) on the basis of lack of privity, likely because the Song-Beverly Act does

904 So. 2d 450, 458 (Fla. Dist. Ct. App. 2005) (citations omitted) ("[A] plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity."); *Catalano*, 167 F. Supp. 3d at 556 (citing *Arthur Jaffee Assocs. v. Bilsco Auto Serv., Inc.*, 448 N.E.2d 792, 792 (N.Y. 1983)) ("New York courts continue to require privity between a plaintiff and defendant with respect to claims for breach of the implied warrant[y] of merchantability . . . where the only loss alleged is economic."). Because exceptions to this rule vary between the two states, the court addresses the applicability of potential exceptions in the context of each respective claim.

### b.    Count V: California (Song-Beverly Act)

The court first dismisses Count V, brought under the Song-Beverly Act by California Plaintiffs Diaz and Santos on behalf of themselves and the California Sub-Class, because it is time-barred by the applicable statute of limitations.

California's enactment of the U.C.C. specifically governs actions for breach of warranty in a sales context. The section gives a four-year limitation for a breach of warranty cause of action that starts from the date the goods are delivered regardless of the date the buyer discovers the breach unless the "warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance." *See* CAL. COM. CODE § 2725(2). If the future performance exception applies, "the cause of action accrues when the breach is or should have been discovered." *Id.*; *see also Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 87 Cal. Rptr. 3d 5, 15–16 (Ct. App. 2008).

---

not require the same showing of vertical privity as the California U.C.C. *See, e.g.*, *Keegan*, 838 F. Supp. 2d at 947 (citations omitted) ("[T]he plain language of section 1792 of the Song–Beverly Act does not impose a . . . vertical privity requirement[.]"). Accordingly, the court does not address privity under California law.

The Song-Beverly Act—under which California Plaintiffs bring their claims here—does not contain its own statute of limitations.  Therefore, "California courts have held that the [four-year] statute of limitations for an action for breach of warranty under the Song–Beverly Act is governed by the same statute that governs the statute of limitations for warranties arising under . . . section 2725 of the Uniform Commercial Code."  *Mexia v. Rinker Boat Co.*, 95 Cal. Rptr. 3d 285, 291 (Ct. App. 2009) (citations omitted).[43]

California Plaintiffs allege generally in their Complaint that any applicable statutes of limitations that would bar any of their claims must be tolled based on the "delayed discovery" rule that applies to warranties covering future performance, and on the basis of FCA's fraudulent concealment.  In their Opposition, Plaintiffs additionally argue that the Basic Limited Warranty/express warranty tolls the statute of limitations for their implied warranty of merchantability claims.  The court addresses each of these arguments in turn.

### i.        Delayed Discovery Rule/Future Performance Exception

The "delayed discovery" rule or "future performance" exception relies on the language of § 2725 providing that "where a warranty explicitly extends to the future performance of goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."  CAL. COM. CODE § 2725(2).  *Mexia* set forth the prerequisite conditions for application of the doctrine:

---

[43]        The pro-consumer Song-Beverly Act provides a more generous duration period than California's U.C.C., directing that breach may occur for a period not to exceed one year after purchase.  *See Mexia*, 95 Cal. Rptr. 3d at 295 (citing CAL. CIV. CODE § 1791.1(c)) ("The duration provision provides, in essence, that the duration of the implied warranty of merchantability shall be the same as the duration of any reasonable express warranty that accompanies the product, but in no event shorter than 60 days or longer than one year.").  Further, "[t]here is nothing that suggests a requirement that the purchaser discover and report to the seller a latent defect within that time period."  *Mexia*, 95 Cal. Rptr. 3d at 295.

> First, there must be a latent defect in the product that the buyer could not reasonably discover at sale. . . . Second, there must be a warranty which "extends to the future performance of . . . goods." . . . The delayed discovery exception cannot apply to claims based on a warranty that can only be breached at the time of delivery. . . . On the other hand, when a "warranty has a . . . prospective existence beyond the time of delivery," California courts have held it may be breached after delivery and so the delayed discovery exception may apply.

*Smith v. Ford Motor Co.*, No. 19-cv-05170-CRB, 2020 WL 609864, at *3 (N.D. Cal. Feb. 4, 2020)

(quoting *Mexia*, 95 Cal. Rptr. 3d at 290–95).

Once these conditions have been met, "[i]n order to invoke [the delayed discovery exception] to [toll] the statute of limitations, the plaintiff must specifically plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *In re Conseco Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, No. C–05–04726 RMW, 2008 WL 4544441, at *8 (N.D. Cal. Sept. 30, 2008) (quoting *Saliter v. Pierce Bros. Mortuaries*, 146 Cal. Rptr. 271, 274 (Ct. App. 1978)).

Even if the delayed discovery rule applies to claims brought under the Song-Beverly Act,[44] California Plaintiffs' conclusory allegations would still fall short of invoking it here.

---

[44]     Under California's enactment of the U.C.C., implied warranties do not guarantee future performance. *See Cardinal Health*, 87 Cal. Rptr. 3d at 19–20 (citation omitted) ("Because an implied warranty is one that arises by operation of law rather than by an express agreement of the parties, courts have consistently held it is not a warranty that 'explicitly extends to future performance of the goods . . . .'").

There is some debate among California district courts, however, as to whether the implied warranty of merchantability guaranteed by the Song-Beverly Act covers future performance, such that the statute of limitations for a Song-Beverly Act claim could be tolled based on the delayed discovery/future performance exception. These courts interpret *Mexia*—the most apposite state authority—differently. *See, e.g.*, *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2016 WL 1745948, at *13 (N.D. Cal. May 3, 2016) ("California Plaintiffs state that when the future performance exception applies, tolling accrual begins when the latent defect is discovered, not on the date of purchase. . . . [Yet,] even though Mexia did not discover the defect in his boat until two years after purchase, the California Court of Appeal did not read the four year statute of limitations as applying at the moment of discovery of the defect. This reading contradicts Plaintiffs' position

Plaintiff Diaz claims he first experienced the Defect "[o]n or around April 26, 2016" (when he brought his Class Vehicle to an FCA-authorized dealership for repair), due to "the driveshaft rattling and . . . the differential click[ing] while [he was] driving." Complaint ¶¶ 36–37.  Assuming the facts alleged in the light most favorable to Plaintiff Diaz, this is the date of discovery—yet even applying the delayed discovery rule, the statute of limitations would have run on April 26, 2020, more than a year before the Complaint was filed on June 24, 2021.  *See id.* ¶¶ 26-44.

Plaintiff Santos alleges that he first experienced the defect "[i]n or around August 2017," when "the vehicle made a loud clunking noise," which would bring his claim within the statute of

---

that tolling accrual begins when the defect is discovered.").  *But see Smith*, 2020 WL 609864, at *3 (discussing *Mexia*) ("Ultimately it appears that California law does not bar the theory that the Song-Beverly Act's implied warranty of merchantability extends to the future performance of goods.").

*Mexia*, which addressed the Song-Beverly Act's duration period, explained the effect of the Song-Beverly's one-year durational period as follows:

> To say that a warranty exists is to say that a cause of action can arise for its breach. Defining the time period during which the implied warranty exists, therefore, also defines the time period during which the warranty can be breached. *Thus, by giving the implied warranty a limited prospective existence beyond the time of delivery, the Legislature created the possibility that the implied warranty could be breached after delivery.*

95 Cal. Rptr. 3d at 294 (emphasis added).  In other words, *Mexia* could be read to interpret the implied warranty of merchantability granted by the Song-Beverly Act as one that guarantees future performance.  Yet *Mexia* also stated that, in the case of a *latent defect*—the other precondition for application of the delayed discovery rule—"a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery."  *Id.* at 291.  Accordingly, whether the *Mexia* Court intended to permit tolling of Song-Beverly Act implied warranty claims on the basis of the delayed discovery rule remains unclear.

Mindful of the pro-consumer policy underlying the Song-Beverly Act, the court makes no definitive ruling on whether *Mexia* permits or bars the application of the delayed discovery rule to Song-Beverly Act claims.  In any event, it need not do so at this time, because, as addressed *infra*, Plaintiffs' allegations fail to carry their burden under the rule.

limitations. *Id.* ¶ 55. This cannot suffice, however, because Plaintiff Santos must specifically allege facts to show his "inability to have made earlier discovery despite reasonable diligence." *See Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920–21 (Cal. 2005) (citation omitted); *Herremans v. BMW of N. Am., LLC*, No. CV 14–02363 MMM (PJWx), 2014 WL 5017843, at *5 (C.D. Cal. Oct. 3, 2014) (footnote omitted) (citations omitted) ("[Plaintiff's] complaint, however[,] contains no specific allegations concerning how or when she first discovered the defect. Nor does it plead why, in the exercise of reasonable diligence, she could not have discovered the defect earlier. Consequently, [the] allegations are not adequate to invoke the delayed discovery rule."). Here, Plaintiff Santos's individual allegations provide no specific facts as to his own diligence. *See* Complaint ¶¶ 45–72. Rather, to the extent that California Plaintiffs attempt to invoke the delayed discovery rule with respect to their Song-Beverly Act claims, they rely solely on generalized, conclusory allegations set forth to support "tolling of the statute of limitations." *Id.* at 53 (capitalization normalized); *see also id.* ¶¶ 231–32 ("Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect. . . . Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Defect and the associated safety risk. . . . Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the Defect or that Defendant was concealing the Defect.").

Accordingly, California Plaintiffs cannot toll the statute of limitations as to their Song-Beverly Act implied warranty of merchantability claims based on the delayed discovery rule.

### ii.      Fraudulent Concealment

"The doctrine of fraudulent concealment tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale."[45] *Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 875 (Cal. 2013) (citation omitted).  California federal district courts have recognized the applicability of the doctrine to claims brought under the Song-Beverly Act, consistent with California state court rulings "noting that Song-Beverly Act claims are 'subject to tolling or estoppel.'" *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2016 WL 1745948, at *14 (N.D. Cal. May 3, 2016) (quoting *Mills v. Forestex Co.*, 134 Cal. Rptr. 2d 273, 288 (Ct. App. 2003)). Federal courts in California apply Rule 9(b) to "claim[s] that fraudulent concealment tolls an applicable state statute of limitations." *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1132– 33 (C.D. Cal. 2010) (citing *389 Orange Street Partners v. Arnold,* 179 F.3d 656, 662 (9th Cir. 1999)).  That pleading standard is applied to this analysis.

Here, as discussed *supra*, Plaintiffs Diaz and Santos (along with all other named Plaintiffs) have failed to plausibly allege any fraudulent concealment by FCA.  They cannot toll the statute of limitations as to their Song-Beverly Act implied warranty claims based on this doctrine.

---

[45]      Under California law, "the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." *Sanchez v. S. Hoover Hosp.*, 553 P.2d 1129, 1133–34 (1976).  A plaintiff seeking application of the doctrine "must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Baker v. Beech Aircraft Corp.*, 114 Cal. Rptr. 171, 175 (Ct. App. 1974).  Importantly, "[n]otwithstanding a defendant's continuing efforts to conceal, if [a] plaintiff discovers the claim independently, the limitations period commences." *Sanchez*, 553 P.2d at 1134 (citation omitted) ("This rule has been applied even in those cases in which there was imposed on a defendant a fiduciary duty of disclosure.").

### iii.     Express Warranty Tolling Implied Warranty

Finally, Plaintiffs argue that, as a matter of law, the existence of the express warranty—FCA's Basic Limited Warranty—tolls the running of the statute of limitations as to their implied warranty claims under the Song-Beverly Act.  Opposition to Motion to Dismiss 5–6.  To support this argument, Plaintiffs rely on several cases from the Central District of California, which in turn relied upon a California Court of Appeals case, *Krieger v. Nick Alexander Imports, Inc.*, 285 Cal. Rptr. 717 (Ct. App. 1991).  *See, e.g.*, *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 924–25 (C.D. Cal. 2010) (citing *Krieger*, 285 Cal. Rptr. at 723–24) ("[The express warranty explicitly extending to future performance of the goods] tolled the statute of limitations until Plaintiff reasonably knew that his [vehicle] would not perform as it should, which did not occur until his windshield cracked and BMW would not replace it. . . . The statute of limitations for Plaintiff's breach of implied warranty claim thus began running in March 2008, when he first discovered that BMW would not repair his defective windshield."); Opposition to Motion to Dismiss 5–6 (citing cases that rely on *Ehrlich*'s interpretation of *Krieger*).

The authority relied on by Plaintiff reads *Krieger* too broadly, and cannot support tolling here.  Specifically, *Krieger* does not stand for the proposition that an express warranty guaranteeing future performance can serve to toll a parallel *implied* warranty.  *See* 285 Cal. Rptr. at 723–24 (quoting Cal. Com. Code § 2725) (stating that where an *express warranty* "explicitly extend[ed] to future performance," a breach of warranty action *concerning that warranty* accrued on discovery of the defect, not at the time of tender of delivery).  Nonetheless, it is the only California state authority on which the Central District cases cited by Plaintiffs rely.

The reasoning of several Northern District cases, disagreeing with *Ehrlich* and its progeny, is a more persuasive interpretation of *Krieger*.  Specifically, in *MacDonald v. Ford Motor Co.*, the

Court determined that "nowhere does [*Krieger*] suggest that the implied warranty's statute of limitations can be extended for the duration of an express warranty."  37 F. Supp. 3d 1087, 1101 (N.D. Cal. 2014).  *MacDonald* further relied on the applicable statutory language when rejecting the same argument Plaintiffs make here:

> Parsing the language of section 2725, it appears that at all times, the statute refers to the warranty that forms the basis for the cause of action. This is evident from the statute's final reference to "the breach," suggesting that the antecedent "warranty" relates to the claim being asserted and not to an altogether separate claim.

*Id.* ("The purpose section of the Comments on the statute provides further clarification. Subsection (2) provides 'that the cause of action accrues when the breach occurs,' but 'states an exception where the warranty extends to future performance.' The use of the definite article to describe 'the warranty' indicates that it refers to only one warranty. The natural reading of this comment is that the warranty referred to is the same as that which forms the basis for the cause of action."). Likewise, in *Baranco v. Ford Motor Co.*, the Court stated that "[t]he contrary interpretation would produce absurd results. For example, a product may provide for several express warranties covering varying durations of time; if any of these sufficed to extend the limitations period for all the other warranties . . . then the purpose of the shorter limitations would be defeated."  294 F. Supp. 3d 950, 976 (N.D. Cal. 2018) ("The express warranty's representations regarding future performance therefore do not cross-toll the statute of limitations for the implied warranty.").

California Plaintiffs cannot evade the applicable four-year statute of limitations as to their implied warranty of merchantability claims under the Song-Beverly Act.  Therefore, Count V is dismissed without prejudice.

### c.    Count VIII: Florida

Without regard to the sufficiency of the named Florida Plaintiffs' (Gibson, Sinclair, and Veal) defect allegations, their implied warranty claims must be dismissed for lack of privity.

Plaintiffs attempt to take advantage of three possible exceptions to the vertical privity rule in Florida: primarily, through "direct contact" with FCA by way of the issuance of the Basic Limited Warranty, on the basis of an agency relationship between FCA and its "authorized" dealerships, and/or through Plaintiffs' status as third-party beneficiaries of agreements between FCA and the dealerships.  To the extent that such exceptions are recognized under Florida law,[46] Plaintiffs have failed to establish that they apply here.

### i.     Direct Contact

First, Plaintiffs allege that they have had direct contacts with FCA through the Basic Limited Warranty, which FCA provided "directly" to Plaintiffs.[47]  Complaint ¶¶ 148, 225, 228;

---

[46]     The status of the three privity exceptions has been unclear in Florida since the Florida Supreme Court's explicit distinction in *West v. Caterpillar Tractor Co.* between the *tort* action of strict liability, which does not require privity, and the *contract* action of implied warranty of merchantability, which does.  *See* 336 So. 2d 80, 88, 91 (Fla. 1976).  Previously, there was a conflation of an action for breach of implied warranty on the basis of personal injury, and the usual contract action.  *See, e.g.*, *Affiliates for Evaluation & Therapy, Inc. v. Viasyn Corp.*, 500 So. 2d 688, 692 (Fla. Dist. Ct. App. 1987) ("The *West* court fundamentally altered products liability law in Florida by creating a new products liability tort action—strict liability in tort—out of the prior breach of implied warranty cases which had done away with privity of contract. In so doing, *West* necessarily swept away such no-privity, breach of implied warranty cases in favor of the new action of strict liability in tort. Stated differently, the doctrine of strict liability in tort supplants all no-privity, breach of implied warranty cases, because it was, in effect, created out of these cases. This ground-breaking holding, however, did not result in the demise of the contract action of breach of implied warranty, as that action remains, said the *West* court, where privity of contract is shown.").

[47]     Plaintiffs further allege that

FCA notifies Plaintiffs and class members in the warranty booklet that "*Warranty service must be done by an authorized Chrysler, Dodge, Jeep or Ram dealer*" and that "*They know you and your vehicle best, and are most concerned that you get prompt and high quality service.*" Further, the booklet states that "warranty problems came [sic] be resolved by your dealer's sales or service departments." The booklets direct Plaintiffs and class members, should they have a problem or concern, to "always talk to your dealer's service manager or sales manager first." FCA than [sic] directs Plaintiffs and class members to first, "[d]iscuss your problem

*see also* Opposition to Motion to Dismiss 17 (citing *Razen v. FCA US LLC*, No: 6:19-cv-831-Orl-40LRH, 2019 WL 7482214, at *4 (M.D. Fla. Oct. 23, 2019)) ("Plaintiffs have pled facts regarding the direct contacts Plaintiffs had with FCA, through its agency relationship with the dealerships at which Plaintiffs purchased and serviced their vehicles, as well as pleading that the warranties on their vehicles were provided by FCA directly. . . . Courts have found that Florida law provides that privity is established when a manufacturer provides a direct written warranty.").

It is undisputed by FCA that Plaintiffs are in privity of contract with FCA for purposes of their express warranty claims.  The mere existence, however, of a standard express warranty issued by the manufacturer to all purchasers for purposes of defining what repairs purchasers may obtain does not create privity for purposes of Plaintiffs' implied warranty of merchantability claims.  The caselaw cited by Plaintiffs supports this conclusion.

In *Razen*, a Middle District of Florida case in which FCA was also the defendant, the Court determined that the plaintiff's "allegation that Defendant directly provided Plaintiff with these [express] warranties satisfies Plaintiff's burden at this stage" with respect to the privity needed for the plaintiff's *implied* warranty claim.  2019 WL 7482214, at *4 (citation omitted).  The state law precedents, however, on which Plaintiffs and *Razen* implicitly rely,[48] do not stand for the proposition that a manufacture's issuance of an express warranty, as a matter of course, can

---

with the owner or general manager of the dealership," and if that is unsatisfactory,
to second, "contact the FCA US Customer Assistance Center."

Complaint ¶ 229.

[48]      *Razen* cites *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022 (11th Cir. 2017) and *Ohio State Troopers Association, Inc. v. Point Blank Enterprises, Inc.*, No. 17-cv-62051-UU, 2018 WL 3109632 (S.D. Fla. Apr. 5, 2018), which in turn rely on *ISK Biotech Corp. v. Douberly*, 640 So. 2d 85 (Fla. Dist. Ct. App. 1994) and *Cedars of Lebanon Hospital Corp. v. European X-Ray Distributors of America, Inc.*, 444 So. 2d 1068 (Fla. Dist. Ct. App. 1984).  *See Razen*, 2019 WL 7482214, at *4.

establish a "direct contacts" exception to the privity requirement. *See ISK Biotech Corp. v. Douberly*, 640 So. 2d 85, 88 n.1 (Fla. Dist. Ct. App. 1994) (emphasis added) (citations omitted) ("We do not reach the issue of whether the Douberlys proved that ISK breached an *express* warranty in the absence of privity, or under section 672.313, Florida Statutes (1989), because, by failing to raise the issue by motion for directed verdict at the close of all the evidence, ISK Biotech failed to preserve this issue for appellate review."); *Cedars of Lebanon Hosp. Corp. v. Eur. X-Ray Distribs. of Am., Inc.*, 444 So. 2d 1068, 1072 (Fla. Dist. Ct. App. 1984) (determining that an express and implied warranty were created, thus making resolution of the absence-of-privity issue unnecessary, where "sales representatives from appellee manufacturer called upon appellant and made *direct representations* that the equipment was very advanced and 'state of the art'" and that the manufacturer could not "hide behind the doctrine of privity" where "*it induced the purchaser to buy*" the defective product).

Other than *Razen*, Florida District Courts have generally interpreted the "direct contact" exception as requiring "*direct* contact by means of actual one-on-one communication" between the purchaser-plaintiff and the manufacturer that rises to a level of "direct representations" and "negotiations" between the parties. *See e.g.*, *Toca v. Tutco, LLC*, 430 F. Supp. 3d 1313, 1326 (S.D. Fla. 2020); *Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1118–19 (S.D. Fla. 2019) ("Plaintiffs do not allege any factual matter that Porsche was 'directly involved in the negotiation of the purchase and limited warranty' of the used vehicles, *Glob. Quest, LLC*, 849 F.3d at 1032; that Porsche 'made direct representations' to Plaintiffs concerning the used vehicles, *Cedars of Lebanon Hosp. Corp.*, 444 So.2d at 1072; or that Porsche made direct representations to The Collection or Carmax that were in turn 'assure[d]' to Plaintiffs about the

used vehicles, *ISK Biotech Corp.*, 640 So.2d at 88."); *Lady Di Fishing Team, LLC v. Brunswick Corp.*, No. 3:07-cv-402-J-33TEM, 2007 WL 3202715, at *6 (M.D. Fla. Oct. 29, 2007).

Plaintiffs' allegations here are insufficient to create privity between themselves and FCA to support their implied warranty of merchantability claims. They primarily rely on the conclusory contention that they "have had sufficient direct dealing with either [FCA] or its agent dealerships to establish privity . . . with respect to the . . . implied warranty[.]" Complaint ¶ 230. While Plaintiffs Gibson and Veal allege that they "spoke with [a] FCA sales representative concerning the vehicle's features" before purchasing their Class Vehicles, they do not describe the representations made by that alleged contact, much less suggest that they negotiated a warranty with FCA's sales representatives. *Id.* ¶¶ 80, 115. Plaintiff Sinclair alleges only that he "viewed FCA marketing materials" on which he relied "in part" when making his purchase. *Id.* ¶ 96.

These allegations are insufficient to circumvent the privity requirement.

### ii.     Agency

Under Florida law, "actual" agency requires a plaintiff to allege 1) acknowledgement by the principal that the "authorized" dealership was acting as its agent; 2) acceptance of the undertaking by the dealership(s); and 3) control by FCA over each dealership's day-to-day activities. *Ocana*, 992 So. 2d at 326 (citing *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990)). "Apparent agency" is established by allegations showing "1) a representation by the purported principal; 2) reliance on that representation by a third party; and 3) a change in position by the third party in reliance on the representation." *Ocana*, 992 So. 2d at 326 (citing *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995)).

Florida Plaintiffs have not alleged facts sufficient to show that either type of agency exists.

Rather, Plaintiffs allege that FCA "enters into agreements with its nationwide network of authorized dealerships to engage in retail sales [of vehicles] with consumers such as Plaintiffs," and because those agreements permit the authorized dealerships "to service and repair these vehicles under the warranties Defendant provides directly to consumers who purchased new vehicles from the authorized dealerships," the dealerships are FCA's agents.  Complaint ¶ 225. Plaintiffs itemize a list of allegations intending to demonstrate that the agency relationship, which include statements that the "dealerships complete all service and repair according to Defendant's instructions," which are communicated "through service manuals, service bulletins, . . . and other documents"; that the agreements between FCA and its dealerships "provide [FCA] with a significant amount of control over" its dealerships; that the warranties direct purchasers to seek repairs and services at the dealerships; that FCA "dictates the nature and terms of [consumer] purchase contracts"; and that FCA "controls the way in which" dealerships "respond to complaints and inquiries," including making warranty repairs.  *Id.* ¶ 228.

These allegations, however, cannot establish apparent agency as an exception to the privity requirement.  The *Ocana* Court addressed very similar allegations when concluding that an "authorized dealer" could not automatically be shoehorned into the definition of agency for purposes of an implied warranty claim under Florida law.  *Ocana*, 992 So. 2d at 326 ("[W]e conclude Ocana cannot execute an end-run around Florida's historic privity requirement by employing principal-agent theory in this case.").  Specifically, *Ocana* concluded that an agency relationship could not be established by

> [allegations] that Ford, as the manufacturer, exercises control over: 1) dealer location, size, and number of dealer logos on dealer's premises; 2) prizes given to dealer's employees; 3) number of bathrooms dealer must make available to the public; 4) training and certification of sales and service personnel; and also requires that its dealers 5) use manufacturer-supplied computer software; 6) report vehicle sales and sale details, including name and address of purchaser and related

> information, to manufacturer; 7) provide warranty service paid for by Ford Motor
> Company; and 8) afford Ford the right to enter the dealer's business premises to
> audit the records and operations of the dealership as to sales and service.

*Id.* ("The complaint is devoid of any allegation of some of the tell-tale signs of a principal-agent relationship, such as the ability of the principal to hire, fire, or supervise dealership employees or dealer ownership.").

Plaintiffs' allegations here necessarily fail, since they amount to nothing more than "the subjective understanding of the person dealing with the purported agent," rather than "from appearances created by the purported agent himself." *Id.* (quoting *Izquierdo v. Hialeah Hosp. Inc.*, 709 So. 2d 187, 188 (Fla. Dist. Ct. App. 1998)). That FCA, like Ford in the *Ocana* case, "permitted" its dealerships to "hold [themselves] out as . . . 'authorized dealer[ships],'" to "display . . . logos and other . . . prepared advertising materials," "provided them with technical bulletins," and "required automobile purchasers to seek redress of warranty issues in the first instance from the dealer," is not enough to establish the dealerships as FCA's agents. 992 So. 2d at 327. Accordingly, Florida Plaintiffs have not established their entitlement to the agency-based exception to the requirement of privity for their implied warranty of merchantability claims under Florida law.

### iii.    Third-Party Beneficiary

Florida Plaintiffs also allege that they need not establish privity for their implied warranty of merchantability claims because they are "the third-party beneficiaries of [the] dealership agreements" between FCA and its authorized dealerships, "which allow [Plaintiffs] to purchase and service their [Class] vehicles locally." Complaint ¶ 225.

Florida law recognizes the existence of third-party beneficiary status as an exception to contractual privity, as set forth in the Restatement (Second) of Contracts. *See, e.g.*, *Warren v.*

*Monahan Beaches Jewelry Ctr., Inc.*, 548 So. 2d 870, 872 (Fla. Dist. Ct. App. 1989) (citing RESTATEMENT (SECOND) OF CONTRACTS § 302(1)(b) (AM. L. INST. 1979)) ("As to breach of contract, the law is that a person not party to a contract may sue for breach of contract where the parties' dealings clearly express the parties' intent to create a right primarily and directly benefiting a third party.").   "The real test is said to be whether the contracting parties *intended* that a third person should receive a benefit which might be enforced in the courts." *Jenne v. Church & Tower, Inc.*, 814 So. 2d 522, 525–26 (Fla. Dist. Ct. App. 2002) (citation omitted); *cf. also Goodell v. K. T. Enters., Ltd.*, 394 So. 2d 1087, 1089 (Fla. Dist. Ct. App. 1981) ("We also find that appellee is liable to Better Baked as a third party beneficiary. As shown in the facts above, the precontract dealings of the parties, the contract itself, and the subsequent dealings between the parties show that the clear intent and purpose of the contract was to directly and substantially benefit Better Baked.").

Even if Florida state courts would apply the third-party beneficiary exception in the instant context—that is, where consumer plaintiffs allege that they are third-party beneficiaries of contracts between a manufacturer and an intermediate seller—Plaintiffs' conclusory allegations regarding the "dealership agreements" cannot satisfy the governing rule.[49]

---

[49]    Florida state courts have not addressed this exception in the context of an implied warranty based on a relationship between a manufacturer and a dealership, but federal district courts in Florida are split about the availability of this exception to privity when consumers attempt to bring claims against a vehicle manufacturer. *Sanchez-Knutson v. Ford Motor Co.*, a 2014 case from the Southern District of Florida, held that the plaintiff sufficiently alleged third-party beneficiary status by stating that he and each class-member were "the intended beneficiaries of [the defendant manufacturer's] express and implied warranties." 52 F. Supp. 3d 1223, 1234 (S.D. Fla. 2014). Thereafter, Southern District decisions have repeatedly declined to follow *Sanchez-Knutson*, holding that privity cannot exist between a consumer plaintiff and an automotive manufacturer and/or distributor that did not make consumer sales. *See In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1346 (S.D. Fla. 2016) (declining to follow *Sanchez-Knutson* on the basis that the plaintiff "could not have purchased his vehicle from [the defendant

Florida law requires that the *contracting* parties must "clearly express," through their dealings, their "intent to create a right primarily and directly benefiting a third party." *Warren*, 548 So. 2d at 872 (citation omitted). Here, Plaintiffs supply no actual facts as to the nature and content of the alleged agreements between FCA and its dealerships—much less to show evidence of the contracting parties' intent. Complaint ¶ 225. Plaintiffs cannot merely assume, without any

---

distributor]" and thus, his implied warranty claim failed for lack of privity); *see also Padilla*, 391 F. Supp. 3d at 1117 (same); *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV-MORENO, 2018 WL 3405245, at *10 (S.D. Fla. July 12, 2018) (same).

In *Weiss v. General Motors LLC*, however, a 2019 case from the Southern District, the Court declined to follow *Takata*'s rejection of *Sanchez-Knutson*, concluding that "the [*Takata*] court did not consider or analyze a fully briefed and contested third-party beneficiary argument." 418 F. Supp. 3d at 1183 (citation omitted). *Weiss* relied instead on *Sanchez-Knutson* for the proposition that a consumer plaintiff "can establish privity with [a manufacturer/distributor defendant] if he alleges that he purchased a vehicle from an authorized dealer who was an agent of [the defendant], he was the intended consumer of the vehicle, the dealership was not the intended consumer, and the warranty was intended to benefit the consumer, not the dealership." *Id.* (first citing *Sanchez-Knutson*, 52 F. Supp. 3d. at 1234, then citing *Feldman v. BRP US, Inc.*, No. 17-CIV-61150, 2018 WL 8300534, at *8 (S.D. Fla. Mar. 28, 2018)).

The court disagrees with the reasoning of *Sanchez-Knutson*, to the extent that it would apply the third-party beneficiary doctrine because FCA issued express warranties to Plaintiffs. As discussed in the context of the "direct contacts" exception to privity, the mere existence of FCA's Basic Limited Warranty is insufficient for purposes of Plaintiffs' *implied* warranty claims (and, as noted *supra*, Plaintiffs have failed to establish that the dealerships were agents of FCA, which is also a basis for distinguishing the instant case from *Weiss*). Further, Plaintiffs cannot claim to be third-party beneficiaries of warranties accompanying purchase agreements to which they were parties. *See, e.g., Fuller v. Marinemax E., Inc.*, No. 18-CIV-61389-RAR, 2020 WL 3266195, at *4 (S.D. Fla. Mar. 10, 2020) ("The question is not whether Plaintiff should benefit from the warranties in his Purchase Agreement, but whether privity of contract exists between Plaintiff and [the manufacturer who issued the warranties but did not sign the Purchase Agreement]. Where, as here, the agreement at issue was specifically signed by the party seeking to benefit from the third-party beneficiary status, there is no function for the third-party beneficiary doctrine.").

 Plaintiffs further allege that the dealerships have "no rights under the warranty agreements provided by [FCA]," but this has no bearing on the issue of whether Plaintiffs are beneficiaries of the agreements between FCA and its dealerships. Moreover, FCA's Basic Limited Warranty merely serves to define the parameters of the repairs that FCA will and will not cover post-purchase; it does not warrant that the Class Vehicles are defect-free. *See* Complaint ¶¶ 226, 281, 366; *see also, e.g.*, Motion to Dismiss Ex. A at 5.

facts to support their assumption, that they are the "intended beneficiaries" of those agreements. Complaint ¶ 226. They point to no binding authority that would support such a broad reading of the third-party beneficiary exception under Florida law. *See* Opposition to Motion to Dismiss 17.

Because the court can find no facts in the Complaint to support application of Florida's third-party beneficiary exception, Florida Plaintiffs have failed to successfully allege any exception to the vertical privity requirement, and their claims for breach of the implied warranty of merchantability must fail. Accordingly, Count VIII is dismissed without prejudice.

### d.    Count XI: New York

Plaintiff Scorziello of New York makes substantially the same arguments as Florida Plaintiffs with respect to the privity requirement, which would otherwise bar his New York law claim for breach of the implied warranty of merchantability. However, Plaintiff Scorziello does not attempt to make a "direct contacts" argument under New York law, based on the existence of the express warranty.[50] Opposition to Motion to Dismiss 17. Rather, he relies on the agency and third-party beneficiary exceptions. For reasons similar to those for which the court dismissed Florida Plaintiffs' arguments on this subject, Plaintiff Scorziello's arguments are unavailing and Count XI is dismissed.

---

[50]      *See Cummings*, 401 F. Supp. 3d at 311 (citations omitted) ("Plaintiff has cited no legal authority for her contention that a manufacturer's provision of a limited warranty on a new vehicle automatically creates privity between the manufacturer and a purchaser who obtained the vehicle from a third-party dealer."). "Rather, New York law does not automatically create an implied warranty against a remote manufacturer." *Id.* (quoting *Pronti v. DML of Elmira, Inc.*, 478 N.Y.S.2d 156, 157 (App. Div. 1984)) ("There is no implied warranty of merchantability from a manufacturer to a remote purchaser not in privity with that manufacturer where only property damage, and not personal injury, is alleged.").

### i.      Agency

Like Florida, New York recognizes both actual and apparent agency.  To show express or implied actual agency under New York law, Plaintiffs must allege (1) consent; (2) fiduciary duty; (3) absence of gain or risk to the dealership; and (4) control by FCA.  *Paul T. Freund Corp. v. Commonwealth Packing Co.*, 288 F. Supp. 2d 357, 373 (W.D.N.Y. 2003) (quoting RESTATEMENT (SECOND) OF AGENCY § 1 cmt. b (AM. L. INST. 1958)) (requiring a showing of "[1] the manifestation by the principal that the agent shall act for him, [2] the agent's acceptance of the undertaking and [3] the understanding of the parties that the principal is to be in control of the undertaking.").  A theory of agency based on apparent authority would require a showing of conduct by FCA which led to reasonable belief by Plaintiffs that the dealerships were FCA's agents.  *See Flame Cut Steel Prod. Co. v. Performance Foams & Coatings, Inc.*, 46 F. Supp. 2d 222, 228 (E.D.N.Y. 1999) (quoting *Hallock v. State*, 474 N.E.2d 1178, 1181 (N.Y. 1984)) ("Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority.").

New York courts have been unconvinced by allegations attempting to establish agency based on the connection between a vehicle manufacturer and its authorized dealerships.  *See, e.g.*, *Cummings*, 401 F. Supp. 3d at 310 (citation omitted) ("[Plaintiff] admits in the Complaint that she did not purchase the vehicle directly from Defendant, but rather through a third-party dealer. In this respect, Plaintiff argues that the third-party dealer was Defendant's 'authorized agent' . . . However, Plaintiff offers no factual allegations plausibly suggesting that the specific dealership from which she purchased her vehicle was Defendant's agent; rather, she simply alleges that it was

an 'authorized dealer.'"); *see also L.S. & Sons Farms, LLC v. Agway, Inc.*, 837 N.Y.S.2d 448, 449 (App. Div. 2007) (distinguishing between an "authorized dealer" and an "agent").

All of the allegations here—which the court has already recited in the context of agency under Florida law—are either too conclusory to be plausible, or only serve reemphasize the dealerships' "authorized" status. *See, e.g.*, Complaint ¶ 228. Plaintiff Scorziello has not pointed to any binding authority in New York that would require the court to equate "authorization" to "agency" in this context, nor do the facts alleged satisfy the requirements of agency as defined under New York law.

Accordingly, Plaintiff Scorziello has failed to demonstrate that the agency exception to privity can save his implied warranty of merchantability claim.

### ii.        Third-Party Beneficiary

New York law requires third-party beneficiaries to show:

> (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.

*State of Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*, 741 N.E.2d 101, 104 (N.Y. 2000).

The allegations at issue here are the same set forth in support of Florida Plaintiffs' argument regarding this exception. Plaintiff Scorziello has failed to allege plausible facts, as opposed to mere conclusory statements, tending to show that he was the intended beneficiary of the agreements apparently existing between FCA and its authorized dealerships. *See, e.g.*, Complaint ¶¶ 225–26. Even taking as true the allegation that agreements exist between FCA and its dealerships, there are simply no facts alleged to establish (1) that they were intended to confer a benefit on Plaintiff Scorziello, or (2) what that benefit was. This conclusion is consistent with New York state and federal court rulings. *See, e.g.*, *Artwear, Inc. v. Hughes*, 615 N.Y.S.2d 689,

692–93 (App. Div. 1994) (concluding a sublicensee had failed to adequately allege that it was a third-party beneficiary because it could not show that the original license was clearly for its benefit); *Catalano*, 167 F. Supp. 3d at 557 (dismissing allegations that class member vehicle buyers were third-party beneficiaries based solely on the supposition that the defendants knew that consumers were the end users of their vehicles); *Dixon v. Ford Motor Co.*, No. 14-CV-6135 (JMA)(ARL), 2015 WL 6437612, at *6 (E.D.N.Y. Sept. 30, 2015) (determining that allegations that the plaintiff was a third-party beneficiary of the defendant vehicle manufacturer were insufficient because they only alleged in a conclusory fashion that the plaintiff was the third-party beneficiary of the defendant's express warranties and contracts with dealerships); *Cummings*, 401 F. Supp. 3d at 313 (citation omitted) (rejecting a third-party beneficiary argument because the plaintiff had "not included any factual allegations regarding the contract between Defendant and the authorized dealer, much less any factual allegations plausibly suggesting that the contract was intended to provide a sufficiently immediate benefit to her").

Accordingly, since the privity requirement applies to Scorziello's claim for breach of implied warranty of merchantability, the court dismisses Count XI without prejudice.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Complaint (D.I. 1) is dismissed in its entirety without prejudice. Because no claims presently survive on which relief could be granted, the court does not reach Defendant's additional arguments regarding the applicability of the doctrine of economic loss, the adequacy of remedies at law obviating the need for remedies at equity, or the potential federal preemption of a court-ordered recall of the Class Vehicles. *See* Motion to Dismiss 1–2.

95

Plaintiffs have thirty (30) days from the date of this Memorandum Opinion to file a motion for leave to amend their Complaint.  In the absence of such a motion, this dismissal without prejudice shall convert to a dismissal with prejudice.

**SO ORDERED.**