## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| GUSTAVO DIAZ, *et al.*, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| FCA US LLC, | ) ) ) |
| Defendant. | ) ) ) |

Civil Action No.  21-cv-00906-EJW

**JURY TRIAL DEMANDED**

Kelly A. Green, SMITH, KATZENSTEIN & JENKINS, LLP, Wilmington, DE; Russell D. Paul, Amey J. Park, Abigail J. Gertner, Natalie Lesser, BERGER MONTAGUE PC, Philadelphia, PA; Tarek H. Zohdy, Cody R. Padgett, Laura E. Goolsby, CAPSTONE LAW APC, Los Angeles, CA; Steven Calamusa, Geoffrey Stahl, Rachel Bentley, GORDON & PARTNERS, P.A., Palm Beach Gardens, FL.

> *Counsel for Plaintiffs*

Patrick M. Brannigan, Jessica L. Reno, ECKERT SEAMANS CHERIN & MELLOTT LLC, Wilmington, DE; Stephen A. D'Aunoy, Thomas L. Azar, Scott H. Morgan, THOMPSON COBURN LLP, St. Louis, MO.

> *Counsel for Defendant*

## <u>MEMORANDUM OPINION AND ORDER</u>

September 21, 2023
Wilmington, Delaware

**WALLACH, *Circuit Judge*, sitting by designation.**

Gustavo Diaz, Joseph Santos, Christian A. Gibson, Gerald Sinclair, Marvin Leon Veal, Brian Stone, and Michael Kissler (collectively "Plaintiffs")[1] with the Court's leave filed their First Amended and Supplemental Class Action Complaint ("FASC") (D.I. 59) against FCA US LLC ("FCA" or "Defendant"), as buyers of new or used rear-wheel-drive "Class Vehicles"[2] from FCA-authorized dealerships, and "on behalf of all persons in the United States, and in the alternative, on behalf of all persons in the states of California, Florida, New Jersey, and Texas who purchased or leased" Class Vehicles, which allegedly have a "Differential Defect."[3]  D.I. 59 ¶¶ 1, 39–40, 60–61, 92–93, 111–112, 130–131, 159–161, 181–182, 221–241, 340.  Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), FCA moves to dismiss ("Motion to Dismiss" or "Motion")

---

[1]    Plaintiffs maintain California (Diaz and Santos) and Florida (Gibson, Sinclair, and Veal) citizens from their initial Complaint, add New Jersey (Stone) and Oklahoma (Kissler) citizens, and remove a New York citizen (Domenick Scorziello).  *See generally* D.I. 59-1 (redline between FASC and Complaint).

[2]    "Class Vehicles" now includes:
   Model Year ("MY") 2015-2022 Dodge Charger Hellcats and Dodge Challenger Hellcats equipped with the 6.2L Supercharged V8 (including Super Stocks, RedEyes, and Jailbreaks), all 2015-2022 Dodge Challengers and Chargers equipped with the 6.4L V8 engine (including Scat Packs and 1320's), 2018 Dodge Demons, and any variants of the aforementioned vehicles equipped with the 6.4L or 6.2L V8 engine . . . .
D.I. 59 ¶ 1; *see also* D.I. 48 at 1 (acknowledging "three additional model-years of vehicles").

[3]    According to Plaintiffs' FASC:
   Class Vehicles contain a rear differential that is defective in design, materials, and/or workmanship.  The rear differential in the Class Vehicles all have a common defect, which was latent, but existed at the time that the Class Vehicles left FCA's possession and control and was present at the time of sale or lease of the Class Vehicles.  The rear differential in the Class Vehicles is defective in its design, workmanship, and/or materials in that, among other problems, the rear differential is not adequately designed for the torque loads of the engines and transmissions exerted during acceleration.  Accordingly, the high torque loads degrade the differential, causing the rear differential and its internal components including, but not limited to, the ring gear, pinion gear and differential housing to fail (the "Differential Defect" or "Defect").
D.I. 59 ¶ 4.

(D.I. 47) the FASC for failure to state a claim upon which relief can be granted.  *See* Def.'s Mot. to Dismiss (D.I. 47); Def.'s Br. in Supp. of Mot. to Dismiss (D.I. 48); Def.'s Reply (D.I. 50); Def.'s Suppl. Br. (D.I. 61); Def.'s Suppl. Reply (D.I. 63); *see also* Pls.' Opp'n to Def.'s Mot. to Dismiss (D.I. 49); Pls.' Response in Opp'n to Def.'s Suppl. Br. (D.I. 62).  For the below reasons, the Court grants-in-part and denies-in-part FCA's Motion to Dismiss.

## I.    BACKGROUND

In its prior Memorandum Opinion and Order (D.I. 34), the Court dismissed Plaintiffs' Complaint (D.I. 1) "in its entirety without prejudice."  *Diaz v. FCA US LLC*, No. 21-cv-00906-EJW, 2022 WL 4016744, at *47 (D. Del. Sept. 2, 2022).  The Court addressed at length the facts of this case, *see generally id.*, which are not recounted here because the Parties are familiar with them, but are amended or supplemented where needed like the FASC that largely reincorporates them.  The Parties fully briefed Defendant's Motion to Dismiss a proposed first amended complaint, *see generally* D.I. 39, D.I. 40, D.I. 47, D.I. 48, D.I. 49, D.I. 50, but prior to the Court's disposition of the Motion, Plaintiffs requested leave to file another "to supplement their allegations based on newly discovered information" "obtained from attending Dodge's reveal of the 2023 Demon 170 [('MY2023 Demon')] on March 20, 2023, in Las Vegas, Nevada."  D.I. 52 at 1–2; *see also* D.I. 53, D.I. 54.  After holding a status conference with the Parties, the Court accepted the additional pleading under Rule 15(d)[4] as the denominated FASC.  D.I. 58.  Defendant's Motion to

---

[4]    *See* Fed. R. Civ. P. 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.").

Dismiss the FASC is now ripe for review[5] and fully briefed after the Parties' supplemental briefing. *See* D.I. 48, D.I. 49, D.I. 50, D.I. 61, D.I. 62, D.I. 63.

## II.   LEGAL STANDARD

Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  On the other hand, the heightened pleading requirements of Rule 9(b) apply to "fraud claims based on state law." *Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006) (quoting *Christidis v. First Pa. Mortg. Tr.*, 717 F.2d 96, 99 (3d Cir. 1983)).  When Plaintiffs allege fraud, they "must state with particularity the circumstances constituting fraud . . . .  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Under Third Circuit precedent, "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (cleaned up).  "[T]he complaint must describe the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023); *see also Langston v. Ethicon Inc.*, No. 3:20-CV-3712-S, 2021 WL 6198218, at *2 (N.D. Tex. Dec. 31, 2021) ("Rule 9(b) requires the who, what, when, where, and how of the fraud." (cleaned up)).

When reviewing a 12(b)(6) motion, the Court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable" to Plaintiffs. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).  A

---

[5]   The Court observes that the Parties did not request oral argument and concludes that oral argument is unnecessary here to decide the Motion.  *See* D. Del. LR 7.1.4 ("An application for oral argument shall be in writing and shall be made no later than 7 days after service of a reply brief.").

complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Plaintiffs' claims have facial plausibility when Plaintiffs "plead[] factual content that allows the [C]ourt to draw the reasonable inference that the [D]efendant is liable for the misconduct alleged." *Id.* The Court may not dismiss a complaint under Rule 12(b)(6) unless it finds Plaintiffs "can prove no set of facts that would entitle [them] to relief." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

## III.   DISCUSSION

In light of the pleading standards, as well as the claim-specific standards described below, the Court dismisses with prejudice Plaintiffs' claims grounded in fraud (Counts I, II, V, VI, VIII, X, & XII), as Plaintiffs fail to plausibly plead FCA's pre-sale knowledge to allege a required element of fraud. The Court denies Defendant's Motion to Dismiss as to Plaintiffs' implied warranty of merchantability claims under New Jersey and Texas law (Counts IX & XI); however, it grants the Motion as to Plaintiffs' implied warranty of merchantability claims under California and Florida law (Counts IV & VII), which are dismissed with prejudice. In turn, the Magnuson–Moss Warranty Act claim (Count III) is dismissed without prejudice when based on New Jersey and Texas law, but it is dismissed with prejudice when based on California and Florida law. The Court also dismisses with prejudice Plaintiffs' requested relief to compel FCA to perform a voluntary recall according to National Highway Traffic Safety Administration ("NHTSA") regulations. The Court addresses these claims below.

**A. The Fraud-Based Claims (Counts I, II, V, VI, VIII, X, & XII) are Dismissed with Prejudice Because Plaintiffs Fail to Plausibly Plead FCA's Pre-Sale Knowledge.**

In the FASC, Plaintiffs assert several claims against FCA based on allegations of underlying fraud ("Fraud-Based Claims").[6]  *See generally* D.I. 59 (Counts I, II, V, VI, VIII, X, & XII); *see also* D.I. 48 at 7 ("Plaintiffs assert nationwide[7] fraudulent omission/concealment and

---

[6]     Now, as before, the Court applies Rule 9(b) to Plaintiffs' counts relating to common law fraud by omission or fraudulent concealment (Count I), common law unjust enrichment (Count II), as well as the California Consumer Legal Remedies Act ("CLRA") (Count V) and Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count VIII), which are both "consumer fraud statutes of the states where [Plaintiffs] purchased their vehicles . . . ."  *Diaz*, 2022 WL 4016744, at *21–24.  The Court also applies Rule 9(b)'s heightened pleading requirements to the claim under California's Unfair Competition Law ("UCL") (Count VI), *see, e.g.*, *Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1020 (S.D. Cal. 2020) (applying Rule 9(b) to UCL claim sounding in fraud), as well as to the FASC's newly added consumer fraud statute claims under the New Jersey Consumer Fraud Act ("NJCFA") (Count X) and Texas Deceptive Trade Practices Act ("TDTPA") (Count XII), which are all sounded in fraud here.  *See generally* D.I. 59; *see also Frederico*, 507 F.3d at 202–03 (acknowledging NJCFA cases that apply Rule 9(b)); *Gonzalez v. State Farm Lloyds*, 326 F. Supp. 3d 346, 350 (S.D. Tex. 2017) ("[C]ourts applying Rule 9(b) to [T]DTPA claims . . . appear to universally apply [R]ule 9(b) regardless of the provision.").

[7]     The Court dismisses with prejudice Counts I, II, and III, "to the extent that they are brought on behalf of a proposed nationwide Class of individuals residing in states other than those in which named Plaintiffs reside," *Diaz*, 2022 WL 4016744, at *19, n.25, or "under the common law of states in which Plaintiffs did not suffer an alleged injury[,]" *Robinson v. Gen. Motors LLC*, No. 20-663-RGA-SRF, 2021 WL 3036353, at *20 (D. Del. July 19, 2021) (collecting cases), *report and recommendation adopted*, No. 1:20-cv-00663, 2021 WL 7209365 (D. Del. Nov. 30, 2021).

Also, at this stage in the litigation and based on the Parties' extensive briefing on New Jersey and Texas law, *see* D.I. 48, D.I. 49, D.I. 50, D.I. 61, D.I. 62, D.I. 63, and lack thereof on the "appropriateness of performing a choice-of-law analysis at the motion to dismiss stage," *Aclate, Inc v. Eclipse Mktg. LLC*, No. 20-576-RGA, 2020 WL 6158579, at *3 (D. Del. Oct. 21, 2020), the Court takes Plaintiffs' factual allegations as true here and does not issue with either Plaintiff Stone representing a New Jersey Class for "[a]ll residents of the State of New Jersey," D.I. 59 ¶ 340, where he resides but not where he bought his Class Vehicle (Florida), *see* D.I. 59 ¶¶ 159–161, or with Plaintiff Kissler, an Oklahoman who bought his Class Vehicle out-of-state (Texas), *see* D.I. 59 ¶¶ 181–182, and represents a Texas Class for "[a]ll persons who purchased or leased" a Class Vehicle "within the state of Texas," D.I. 59 ¶ 340.  Moreover, the Court acknowledges that the five returning Plaintiffs still "do not allege or argue that they have suffered injuries in states other than those in which they reside . . . ."  *Diaz*, 2022 WL 4016744, at *18.

Should discovery indicate that any Plaintiffs' (including Plaintiffs Stone's and Kissler's) claims should be evaluated under a different state's law than pleaded, the Parties will need to brief this Court on any such impacts to the law.  *See id.* at *16 (acknowledging that "Delaware uses the

unjust enrichment claims, as well as claims under the consumer fraud statutes of states where they purchased their vehicles (California, Florida, New Jersey, and Texas).").  FCA moves to dismiss the Fraud-Based Claims for, among other reasons, Plaintiffs' failure to plausibly plead that FCA knew or should have known[8] of the Differential Defect before selling Plaintiffs their Class Vehicles.  *See* D.I. 48 at 9–12; D.I. 50 at 3–4; D.I. 61 at 6–8; *see, e.g.*, D.I. 48 at 9 ("A plaintiff must plead facts showing that the defendant manufacturer knew of the alleged defect before the sale of a vehicle in order to state any claim based on an alleged omission." (collecting cases)).  The Court agrees with FCA that Plaintiffs' FASC does not sufficiently correct for their failure from the original Complaint to plausibly plead FCA's pre-sale knowledge at any time before Plaintiffs bought their respective Class Vehicles,[9] for their theories of fraud (e.g., omission, concealment, or misrepresentation).  Simply put, the mismatch between Plaintiffs' allegations of the Differential Defect and FCA's knowledge of it remains.  *See Diaz*, 2022 WL 4016744, at *26; *see also* D.I. 48 at 9.  Accordingly, the Court dismisses with prejudice Counts I, II, V, VI,[10] VIII, X, and XII.

---

Restatement (Second) Conflict of Laws approach" for conflict of laws); *see also Arçelik A.Ş. v. E. I. du Pont De Nemours & Co.*, No. 15-961-LPS, 2018 WL 1401327, at *9 (D. Del. Mar. 20, 2018) ("Virtually, no discovery has taken place, and the Court would benefit from a more-developed record.  The Court does not find it appropriate at the motion to dismiss stage of this case to undertake a choice of law analysis.").

[8]    As before, the Court acknowledges that "[e]ach relevant jurisdiction includes in its definition of fraud an element of knowledge—or at least reckless disregard of the truth."  *Diaz*, 2022 WL 4016744, at *25 (collecting cases).  Here, the Court applies these levels of knowledge for its "pre-sale knowledge" analysis.

[9]    Plaintiffs bought their Class Vehicles from FCA-authorized dealerships on October 27, 2015 (Diaz), on August 27, 2016 (Santos), on October 20, 2017 (Gibson), on July 28, 2018 (Sinclair), on October 27, 2018 (Veal), on October 14, 2019 (Stone), and on April 16, 2021 (Kissler).  D.I. 59 ¶¶ 39–40, 60–61, 92–93, 111–112, 130–131, 159–161, 181–182.

[10]    The Court also dismisses the UCL claim (Count VI) because it is time-barred.  *See* D.I. 48 at 18 (arguing that the four-year statute of limitations for the UCL claim began when the "harm is completed," i.e., the dates Plaintiffs Diaz and Santos bought their respective Class Vehicles, so their individual claims were barred as of October 28, 2019 (Diaz) and August 28, 2020 (Santos)); *Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002) ("[C]laims under California Business and Professions Code § 17200 *et seq.* are subject to a four-

Plaintiffs rely on the *same* Technical Service Bulletins ("TSBs") that this Court concluded do not even address the Differential Defect. *See* D.I. 59 ¶¶ 280–292; *see also Diaz*, 2022 WL 4016744, at *29 ("Here, none of the [TSBs] (which address a variety of Class Vehicle models) cited by Plaintiffs address the Differential Defect."). Plaintiffs appear to concede the same, yet pivot to argue that the TSBs' lack of description of a Differential Defect somehow shows that Defendant knew of the Differential Defect based on its other communications with FCA-authorized dealerships. *See, e.g.*, D.I. 59 ¶ 283 ("*[T]he TSBs do not acknowledge the Differential Defect*, but instead attempt to provide instructions to dealerships on what repairs to perform to Class Vehicles to merely alleviate the symptoms of the Differential Defect." (emphasis added)); *see also* D.I. 59 ¶ 283 ("Discovery will show, as a result of its exclusive and superior knowledge regarding the Differential Defect, Defendant released several TSBs describing the issues related to the Defect to FCA's exclusive network of dealerships beginning in or around May 2015."). Plaintiffs appear to ask the Court to draw an inference that FCA had pre-sale knowledge from its instructions to and communications with FCA-authorized dealerships. *See, e.g.*, D.I. 59 ¶ 280 ("Discovery will show that this proprietary database *describes in detail how FCA instructs technicians to inspect the rear differential* when customers complain of noises coming from the rear of the vehicle." (emphasis added)). However, this Court concludes that Plaintiffs' allegations relating to these communications do not meet plausibility standards. They do not reasonably allow for the inference that the TSBs indicate FCA's pre-sale knowledge for Fraud-Based Claims based on the absence of details[11] relating to the Differential Defect, and they speculate to reach an

---

year statute of limitations which began to run on the date the cause of action accrued, not on the date of discovery." (citing Cal. Bus. & Prof. Code § 17208)). Thus, the Court does not reach the Parties' other arguments on the UCL claim. *Compare* D.I. 48 at 16–17, *with* D.I. 49 at 15–16.

[11] The Court recognizes that Plaintiffs plead fraud by omission or fraudulent concealment, *see, e.g.*, D.I. 59 ¶¶ 351–360, but the Court agrees with FCA that Plaintiffs "fail to set forth

unsupported conclusion that this will be revealed by Defendant's other communications with FCA-authorized dealerships. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Simply put, Plaintiffs' cited TSBs still do not mention the Differential Defect.  *See generally* D.I. 59-2 (recommending replacing rear shafts and axle oil).[12]  The Court agrees with FCA that although "devoting more space in the [FASC] to the TSBs, the TSBs themselves are unchanged and the allegations Plaintiffs make about them remain ***disconnected*** from the symptoms identified in Plaintiffs' vehicles."  D.I. 48 at 11.  Despite Plaintiffs' efforts to circumvent this inconvenient disconnection by speculating that Defendant's other communications with FCA-authorized dealerships will make this inference reasonable, *see generally* D.I. 59 ¶¶ 280–292, they are unavailing.  The TSBs do not mention the Differential Defect and do not plausibly show FCA's pre-sale knowledge of the same to satisfy the pleading requirements of Rule 9(b).  *See Maugain v. FCA US LLC*, No. 22-116-GBW, 2023 WL 1796113, at *9 (D. Del. Feb. 7,

---

***precisely what*** omissions were made, when they occurred, and how the [P]laintiff[s were] misled, among other details."  D.I. 48 at 8.  The Court concludes that the FASC does not plausibly plead FCA's pre-sale knowledge relating to any alleged omission, failure to disclose, or active concealment, including among other things, "at and after the time of purchase, lease, or repair, and thereafter . . . any and all known material defects or material nonconformities of the Class Vehicles, including the Differential Defect . . . ."  D.I. 59 ¶ 307; *see also* D.I. 48 at 9 (arguing the same).

[12]    For example, Plaintiffs cite to one TSB, Service Bulletin number 03-008-16, and allege that axle oil is the same as differential oil.  *See* D.I. 59 ¶ 287 ("The oil used in the rear axle on these vehicles is the same oil which circulates in rear differentials (axle oil, differential oil, and gear oil are all terms for the same high-density oil used in axles and differentials).").  However, even looking at this TSB, it does not include language that mentions the Differential Defect; thus, it does not plausibly plead that FCA knew of the Differential Defect.  *See, e.g.*, *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998, at *7 (N.D. Cal. Aug. 1, 2017) ("The TSB does not suggest that GM knew that all of the engines were inherently defective; indeed, the Low-Tension Oil Rings are not even mentioned.").

2023) ("This Court has previously found that Plaintiffs must connect the symptoms that the service bulletins address to the defect alleged." (cleaned up)).

Plaintiffs allege that consumer complaints filed with NHTSA, as well as those posted anonymously online, show that FCA knew or should have known of the Differential Defect.[13]  *See generally* D.I. 59 ¶¶ 293–306.  Plaintiffs' FASC adds two additional NHTSA complaints,[14] *see* D.I. 59 ¶ 296, as well as eleven screenshots of complaints posted to online forums, *see* D.I. 59 ¶¶ 300–302.  FCA counters that these consumer complaints "are unavailing because, ***at best***, they still only 'merely identify some symptoms' rather than expressly 'identify or describe the defect alleged.'"  D.I. 48 at 11 (quoting *Diaz*, 2022 WL 4016744, at \*30).  The Court agrees with FCA.  Even giving the weight of factual truth to Plaintiffs' assertions,[15] the cited online forum complaints mention symptoms, such as noises or groans coming from the rear end of the car, or replacements of rear differentials, without any complaints specifically identifying or describing the Differential Defect.  *See* D.I. 59 ¶¶ 300–302.

---

[13]    Plaintiffs also allege that "[a] robust aftermarket emerged to deal with the Differential Defect in the face of FCA's refusal to correct the Defect. . . . However, as noted, in retaliation, FCA has responded to the aftermarket by requiring dealerships to void the warranty on the entire vehicle if they suspect any aftermarket parts were installed, even those that enhance the safety of the vehicle by mitigating the Differential Defect."  D.I. 59 ¶ 305.  The Court does not accept FCA's legal conclusion that FCA *retaliated* against such consumers who used aftermarket parts when it lacks plausible facts that this happened.  *See generally* D.I. 59.

[14]    The Court maintains its conclusions on the four NHTSA complaints mentioned in the original Complaint that Plaintiffs reassert in their FASC, that the NHTSA complaints did not support a finding that Plaintiffs plausibly pleaded FCA's pre-sale knowledge of the Differential Defect.  *See Diaz*, 2022 WL 4016744, at \*29–30.

[15]    The Court observes that three of these online forum complaints refer to earlier models that cannot refer to Class Vehicles based on the car's model year (e.g., "RT 2013 14K"), the post's publication date (e.g., October 24, 2011 post), or both (e.g., December 1, 2013 post relating to "my 2014 R/T w/STP").  D.I. 59 ¶¶ 301–302.  The Court need not accept Plaintiffs' conclusory allegation that "despite these early warnings, FCA did nothing to correct the [Differential] Defect before the 2014 model year and continued in subsequent years . . . ."  D.I. 59 ¶ 302; *see also Iqbal*, 556 U.S. at 678.

Although the two additional NHTSA complaints fare better, they also fall short and do not plausibly plead Defendant's pre-sale knowledge of the Differential Defect.  The July 30, 2015 consumer complaint (NHTSA ID Number: 10744923)[16] details:

> *ON DRIVE HOME FROM PURCHASING VEHICLE WE NOTICED A LOUD CLUNKING IN THE REAR END WHILE IN STOP AND GO TRAFFIC.* CALLED DEALERSHIP IMMEDIATELY. SALES MANAGER SAID IT WAS NORMAL, THEY ALL DO THAT. TOOK IT IN FOR SERVICE, TECH TEST DROVE IT AND SAID IT WAS NOT NORMAL & *SEEMED TO BE PROBLEM IN THE REAR DIFFERENTIAL.* WHEN BROUGHT IN FOR REPAIRS THEY ONLY UPDATED COMPUTER SYSTEM. PROBLEM PERSISTED WITH *LOUD CLUNK AND HARD SHIFTING AT ABOUT 1500 RPM AND SLOWING AND ENGAGING GAS AT LOWER SPEEDS, TYPICALLY BETWEEN 30-40 MPH.* TOOK BACK IN, AFTER SOME TIME INVESTIGATING AND COMING UP WITH NO DIAGNOSIS *THEY CONTACTED MANUFACTURERS "STAR CENTER" AND WERE ADVISED IT WAS A SHIFT BINDING PROBLEM IN THE REAR DIFFERENTIAL. THEY REPLACED THE VALVE BODY & RESET THE TRANSMISSION SHIFT ADAPTIVE.* PROBLEM STILL PERSIST WHILE THE DEALERSHIP & MANUFACTURER INSISTS IT MEETS MANUFACTURER SPECS. CONCERN IS WITH THE REAR DIFFERENTIAL BINDING AND LOCKING UP CAN & MAY LOCK THE REAR END UP BRINGING THE CAR TO AN IMMEDIATE & ILL TIMED STOP IN TRAFFIC.

D.I. 59 ¶ 296 (emphases added).  The FASC does not identify or describe the Differential Defect with "shift binding problem," "transmission shift adaptive," or "valve body," and these three terms only appear in the FASC within this single NHTSA consumer complaint.  *See generally* D.I. 59. Also, the FASC does not plausibly plead that a brand-new car would experience the Class Vehicles' Differential Defect that is supposed to be latent and based on degradation,[17] when there

---

[16]     The Court observes that Plaintiffs instead cite to the incident date of March 26, 2014, and appear to miscite the NHTSA ID Number as "10744*295*."  *Compare* D.I. 59 ¶ 296 (emphasis added), *with NHTSA ID Number: 10744923*, NHTSA (July 30, 2015), *available at* https://www.nhtsa.gov/vehicle/2014/DODGE/CHALLENGER/2%252520DR/RWD#complaints.

[17]     Plaintiff Kissler alleges he bought his Class Vehicle on April 16, 2021, D.I. 59 ¶ 182, and that "[s]hortly after purchase" he experienced the Differential Defect, "when the differential started to make a loud, whining noise that caused his Class Vehicle to vibrate," D.I. 59 ¶ 195.  On March 21, 2022 (i.e., nearly a year after purchase), Plaintiff Kissler brought his Class Vehicle with "approximately 33,745 miles on the odometer," into the FCA-authorized dealership to complain about the "vibration coming from the rear of the vehicle."  D.I. 59 ¶ 196.  The Court concludes

is not even, at minimum, any wear and tear yet.  *See generally* D.I. 59 ¶ 4.  Here, FCA did not

have pre-sale knowledge of Plaintiffs' Differential Defect because even if FCA knew or should

have known of a potential problem relating to the rear end's "loud clunk," on these facts it would

be associated with a "shift binding problem" where at least one FCA-authorized dealership reset

the "transmission shift adaptive" and replaced the "valve body," and not the Differential Defect.

*See* D.I. 59 ¶ 296.

> Next, the June 7, 2017 consumer complaint (NHTSA ID Number: 10993808)[18] states:
>
> *WHILE DRIVING DOWN THE ROAD THE REAR DIFFERENTIAL INTERNALLY EXPLODED* , LOSING CONTROL OF THE VEHICLE LUCKILY I DIDN'T HIT ANYTHING. IT'S BEEN AT THE DEALER FOR OVER A WEEK AND I CAN'T GET A HOLD OF ANYONE. *GOING 60MPH AND A LOUD BANG. GOT PULLED OVER AND LOOKED UNDER CAR. DIFFERENTIAL PUMP HOUSING WAS SPLIT IN TWO WITH NO SIGNS OF ANY EXTERNAL DAMAGE.* STILL AT THE DEALER. ...UPDATED 06/13/17 *BF ...UPDATED 08/29/17 *BF ....UPDATED 06/21/17 *BF *THE CONSUMER STATED AFTER THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED.* THE CONSUMER WAS PROVIDED A RENTAL VEHICLE. UPDATED 08/03/2017*JS *CN *JS

D.I. 59 ¶ 296 (emphases added) (detailing an incident on June 4, 2017).  Similarly, even if FCA

knew or should have known of some problem relating to a rear differential, it is not Plaintiffs'

Differential Defect, where "when the differential fails, *it often explodes*, *sending shrapnel into the*

*undercarriage* of the vehicle and *damaging ancillary parts* that also require repair or replacement."

D.I. 59 ¶ 7 (emphases added).  The June 7, 2017 NHTSA consumer complaint mentions the

vehicle's "rear differential *internally* exploded"[19] with "*no signs* of any *external* damage," that

---

that the July 30, 2015 NHTSA complaint, where a brand-new car right off the lot had an alleged issue with the rear differential (that does not align readily with the Differential Defect) does not plausibly plead FCA's pre-sale knowledge, as alleged by Plaintiffs (Kissler or otherwise).

[18]    *See NHTSA ID Number: 10993808*, NHTSA (June 7, 2017), *available at* https://www.nhtsa.gov/vehicle/2015/DODGE/CHALLENGER/2%252520DR/RWD.

[19]    The Court recognizes that, in part, Plaintiffs allege the Differential Defect to include circumstances where "the *high torque loads degrade the differential*, causing the rear differential

was *not accelerating* but going at a set speed of 60 miles per hour unlike the Differential Defect, D.I. 59 ¶ 296 (emphases added), where "the rear differential is not adequately designed for the torque loads of the engines and transmissions *exerted during acceleration*." D.I. 59 ¶ 4 (emphasis added). These additional consumer complaints from NHTSA and online forums do not plausibly plead FCA's knowledge of the Differential Defect, when not identifying or describing the alleged defect. *See Diaz*, 2022 WL 4016744, at *30 (collecting cases).

Moreover, the Court finds that Plaintiffs do not point to an unusual number of complaints within the span of nearly eight years relating to the alleged Differential Defect, so they are insufficient to plausibly plead FCA's pre-sale knowledge. *See, e.g.*, *Sloan*, 2017 WL 3283998, at *7 ("[C]onsumer complaints suffice to establish knowledge only where there were an *unusual* number of complaints, such that the manufacturer would be on notice of a specific problem."); *Roe v. Ford Motor Co.*, No. 2:18-cv-12528-LJM-APP, 2019 WL 3564589, at *7 (E.D. Mich. Aug. 6, 2019) (finding the plaintiffs did not plausibly plead pre-sale knowledge where they provided fourteen consumer complaints spanning three years); *Deras v. Volkswagen Grp. Of Am., Inc.*, No. 17-cv-05452-JST, 2018 WL 2267448, at *4 (N.D. Cal. May 17, 2018) (applying Ninth Circuit law and finding the plaintiff did not plausibly plead pre-sale knowledge where she provided fifty-six NHTSA complaints from over seven years).

Plaintiffs also assert that before they bought their Class Vehicles, FCA was "aware" of the Differential Defect from "pre-production testing, including failure mode analysis . . . ." D.I. 59 ¶ 275; *see generally* D.I. 59 ¶¶ 275–279. Plaintiffs allege that, "[a]s an experienced manufacturer,

---

and its internal components including, but not limited to, the ring gear, pinion gear and differential housing to fail . . . ." D.I. 59 ¶ 4 (emphasis added). The June 7, 2017 NHTSA consumer complaint, however, does not speak to a failure or degradation under high torque loads like Plaintiffs' Differential Defect. *See* D.I. 59 ¶ 296.

FCA conducts tests, including pre-sale durability testing, on incoming components, including rear differentials to verify the parts are free from defect and align with FCA's specifications," and note that, because Class Vehicles have the SRT badge, FCA was required to perform "additional track evaluations that simulate actual driving conditions, including track racing."  D.I. 59 ¶¶ 276, 279. FCA insists that "Plaintiffs' generic and conclusory averments about 'testing,' past designs, and other 'data' fail to establish the required pre-sale knowledge about the purported defect *in the subject vehicles* (or any other)."  D.I. 48 at 9–10.  The Court agrees with FCA that Plaintiffs' allegations are entirely too speculative to satisfy the plausibility requirements of Rule 9(b) because Plaintiffs do not explain *how* FCA knew of the Differential Defect from the testing, past designs, and other data here.[20]  *See Twombly*, 550 U.S. at 555; *see also Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1147 (9th Cir. 2012) ("The allegation that HP, as the manufacturer, had 'access to the aggregate information and data regarding the risk of [the alleged safety hazard]' *is speculative* and does not suggest *how* any tests or information could have alerted HP to the [design] defect." (emphases added)).

For example, Plaintiffs allege that FCA's "Arizona Proving Grounds hosts testing for noise, vibration and harshness (NVH) development and pass-by-noise development and

---

[20]     Plaintiffs' allegation that FCA had pre-sale knowledge of the Differential Defect based on industry knowledge of other high-performance vehicles' past designs of rear differentials from both FCA's predecessor as well as other Original Equipment Manufacturers ("OEMs"), *see generally* D.I. 59 ¶¶ 242–255; *see also* D.I. 49 at 5, also fails to satisfy Rule 9(b)'s pleading standard.  *See Twombly*, 550 U.S. at 555; *see also Frederico*, 507 F.3d at 200.  Even if FCA was aware of past designs for rear differentials used by its predecessor or other OEMs, Plaintiffs do not plausibly plead that FCA knew or should have known that the Class Vehicles would have the alleged Differential Defect.  Here, Plaintiffs rely on conclusory statements to build their case.  *See, e.g.*, D.I. 59 ¶ 253 (alleging that "[d]iscovery will show that FCA knew that a cast iron rear differential housing or a very robustly designed aluminum housing would not flex or distort under mechanical loads," but "to cut costs, FCA used an inferior, weak and defectively designed aluminum rear differential housing in the Class Vehicles").

certification[,]" and in turn, "[d]iscovery will show that such testing revealed the symptoms of the [Differential] Defect, including significant whining coming from the rear differential." D.I. 59 ¶ 277. Plaintiffs point this Court's attention to a set of tests, without describing how they work to alert FCA to the Differential Defect or what they would specifically show to FCA. *See Wilson*, 668 F.3d at 1147. These allegations are speculative and do not plausibly plead with specificity how FCA's pre-production testing is connected to its alleged pre-sale knowledge of the Differential Defect, because "Plaintiff[s] must allege more than an undetailed assertion that the *testing must have revealed the alleged defect.*" *Burdt v. Whirlpool Corp.*, No. C. 15-01563 JSW, 2015 WL 4647929, at *4 (N.D. Cal. Aug. 5, 2015) (emphasis added) ("[The p]laintiff merely alleges that [the d]efendant engages in extensive pre-release testing that would have shown that the racks in the Subject Ovens are prone to slipping or becoming dislodged. [The p]laintiff does not provide any details about or dates of the alleged tests or exactly what the tests would have shown." (citation and internal quotation marks omitted)).

Another example is where Plaintiffs allege that,

> FCA puts vehicles with the SRT badge[21] through the SRT Duty Cycle, including simulated road course on dynameters and on the drag strip which pushes the engine to peak torque and peak power and tests different types of driveline loads. Such testing revealed to FCA that the rear differentials in Class Vehicles was insufficient to carry the torque and power of the engines in Class Vehicles.

D.I. 59 ¶ 279; *see also* D.I. 49 at 6. Despite their allegations, *see, e.g.*, D.I. 59 ¶ 279, Plaintiffs once again fail to connect the testing to FCA's alleged pre-sale knowledge of the Differential Defect, and speculate the result they want without "elaborat[ing] whatsoever as to what that

---

[21]   Plaintiffs mention that Class Vehicles have an SRT badge, which is FCA's "sub-brand indicating that the vehicles are equipped with Street Racing Technology and have significantly improved performance compared to non-SRT vehicles." D.I. 59 ¶ 279 ("[V]ehicles bearing the SRT badge . . . undergo the standard durability testing as well as additional track evaluations that simulate actual driving conditions, including track racing.").

information actually showed . . . ." *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1220 (S.D. Fla. 2021) ("[T]he assertions regarding testing, reports, data, and analyses do not elaborate whatsoever as to what that information actually showed . . . .  These allegations are precisely the kind of conclusory allegations that *Iqbal* and *Twombly* caution courts to disregard.").

Here, the Court finds that "these general statements about the testing of cars and potential data that FCA may (perhaps likely does) possess about the Class Vehicles provide insufficient support for a plausible inference that FCA actually knew about the alleged defect." *Maugain*, 2023 WL 1796113, at *10.  Thus, Plaintiffs' allegations regarding pre-production and pre-sale testing do not plausibly plead FCA's pre-sale knowledge of the Differential Defect, and "such allegations are the type of 'mere conclusory statements' that the Court must ignore." *Id.* (quoting *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022)).

Plaintiffs assert that the MY2023 Demon—the Class Vehicles' supposed successor, the revelation of which was the impetus behind Plaintiffs' FASC—demonstrates FCA's pre-sale knowledge.  *See generally* D.I. 59 ¶¶ 258–272; *see also* D.I. 59 ¶ 37 ("FCA failed to disclose its knowledge until March of 2023, when it announced the release of the MY2023 [] Demon with its vastly improved rear differential.").  FCA disagrees.  *See generally* D.I. 61 at 6–8.  The Court concludes that Plaintiffs fail to plausibly plead FCA's pre-sale knowledge of the Differential Defect based on the MY2023 Demon.

FCA contends that Plaintiffs are only able to point to a generic timeline of how car design works and do not "plead any facts about how FCA US's design 'timeline' works."[22]  D.I. 61 at 6

---

[22]    Plaintiffs do allege that "[d]iscovery will show that the time-cycle to design, engineer, re-tool, manufacture, calibrate and durability test the subject improved rear differential prior to the release of the MY2023 [] Demon was approximately four to six years."  D.I. 59 ¶ 269.  The Court acknowledges that the four to six years range does not appear to be based on any awareness of FCA's design timeline.  *See* D.I. 59 ¶ 269 (citing *How car design works, start to finish*,

(citing D.I. 59 ¶ 36); *see also* D.I. 59 ¶¶ 36 ("The timeline from an initial vehicle design to the first public sale of the vehicle to a consumer is typically three to five years but can take longer." (citing *How car design works, start to finish*, TorqueNews.com (Apr. 16, 2012), *available at* https://www.torquenews.com/1080/how-car-design-works-start-finish)), 269 (same). Even if this were the case, the Court agrees with FCA's argument detailed below that Plaintiffs fail to show the requisite pre-sale knowledge, when not plausibly pleading any facts that "tie the release of a completely new design, for a completely new vehicle, to the rear differentials in their vehicles." D.I. 61 at 6.

As an initial matter, the Court agrees with FCA that Plaintiffs' factual allegations regarding the MY2023 Demon relate only to the MY2023 Demon and do not relate to Class Vehicles here, so "Plaintiffs fail to **connect** the release of the [MY2023 Demon] to the defect and symptoms they allege for their vehicles." D.I. 61 at 5. In response, Plaintiffs insist that the MY2023 Demon is "*virtually identical* to the MY2015 - MY2022 Challenger Class Vehicles but for a *modest increase* in power and a *vastly improved, strengthened and redesigned* rear differential which directly addresses elements of the [Differential] Defect alleged by Plaintiffs and specifically demonstrates FCA's pre-sale knowledge . . . ." D.I. 62 at 2 (emphases added). FCA contends that Plaintiffs' "FASC makes no effort to account for the differences in, for instance, the engines, horsepower production, and relevant component configurations or characteristics between [MY2023 Demon] and their" respective Class Vehicles. D.I. 61 at 5.

The Court agrees with FCA in that it appears that Plaintiffs cherry-picked these distinctions between Class Vehicles and the MY2023 Demon, when they highlight the changes between their

---

TorqueNews.com (Apr. 16, 2012), *available at* https://www.torquenews.com/1080/how-car-design-works-start-finish ("Most manufacturers have models on a 4-6 year 'remodel circuit' which means they will undergo a major remodeling in look and powertrain every 4 to 6 years.")).

rear differentials, *see, e.g.*, D.I. 59 ¶¶ 267–268, and do not detail the MY2023 Demon's other improvements, including a "*1,025-horsepower* '*brand new engine*'" with "*upgrades to almost every primary engine power component*" and "[e]ngine upgrades" throughout the vehicle.  D.I. 61 at 3–4.  Plaintiffs essentially argue that the MY2023 Demon and the Class Vehicles are the same where they look the same, and are not where they look different (e.g., rear differentials).  *See generally* D.I. 62 at 6–7, *see also* D.I. 62 at 9 (arguing that "the FASC demonstrates FCA knew of the Defect, substantially redesigned the rear differential of a MY2023 [Demon], which is nearly visually and structurally identical to Class Vehicle[s]").  The Court concludes that Plaintiffs fail to plausibly plead the relevance of the MY2023 Demon "as an admission of defects in rear differential components in their own less powerful vehicles manufactured as many as eight years earlier," D.I. 61 at 5 (listing Plaintiffs' specific Class Vehicles and suggesting that they all have somewhere between 707-horsepower to 840-horsepower), when other improvements (e.g., horsepower and engine improvements) also matter here.  *See* D.I. 61 at 3–4.

Turning back to FCA's alleged pre-sale knowledge, the Court finds that Plaintiffs do not plausibly plead pre-sale knowledge based on the MY2023 Demon.  In their FASC, Plaintiffs allege FCA's pre-sale knowledge based on, inter alia, the MY2023 Demon's "fixes" to the Class Vehicles' rear differential, "includ[ing] enlarging the ring gear and revamping the manufacturing process for the rear differential housing to, in FCA's own words, 'eliminate porosity of casting.'" D.I. 59 ¶ 258; *see also* D.I. 59 ¶ 264 (insisting that "for its MY2023 Demon, FCA purports to have allegedly remedied the [Differential] Defect plaguing the Class Vehicles").  Plaintiffs further assert that the MY2023 Demon's "revisions" that "allegedly remedy the insufficient strength of the Rear Differential, should have *and could have* been made to the Class Vehicles before they entered the stream of commerce in MY2015."  D.I. 59 ¶ 267.  FCA contends that "Plaintiffs plainly

characterize the rear differential in the special-edition [MY2023 Demon] as a 'subsequent remedial measure' (*see, e.g.*, D.I. 59, ¶¶ 31, 34, 264, 267), which Fed. R. Evid. 407 prohibits."  D.I. 61 at 7; *see also* D.I. 61 at 7–8 (collecting cases); *see generally* D.I. 62 (no apparent rebuttal from Plaintiffs with Federal Rule of Evidence 407's application to this case).

> Federal Rule of Evidence 407 relates to subsequent remedial measures and provides:
>
> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
> - negligence;
> - culpable conduct;
> - a defect in a product or its design; or
> - a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407.  Federal Rule of Evidence 407's exceptions to the general rule do not appear to apply readily to this case; for example, Parties do not currently dispute the feasibility of using the MY2023 Demon's rear differential design in the Class Vehicles, and there is no deposition witness here to impeach.  *See generally* D.I. 59, D.I. 61, D.I. 62, D.I. 63.  The Court finds that Plaintiffs plead the MY2023 Demon to support their assertions that there is both a "defect in a product or its design" and to demonstrate FCA's "culpable conduct" with respect to the Fraud-Based Claims based on pre-sale knowledge.  *See generally* D.I. 59; *see also Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415 (3d Cir. 2002) ("Courts routinely exclude evidence of subsequent remedial measures to encourage people to take such measures whether or not they are at fault." (cleaned up)).  Even if the alleged differences between the Class Vehicles' and MY2023 Demon's rear differentials were accepted as a remedial measure to plead the Differential Defect, considering this measure as plausibly pleaded facts would be impermissible here, when relating to an element of tort claims on a motion to dismiss.  *See, e.g., In re Horizon Healthcare Servs. Inc. Data Breach*

*Litig.*, 846 F.3d 625, 629, 634 n.12 (3d Cir. 2017) (concluding that, on an appeal at the motion to dismiss stage, a free credit monitoring offer "should not be used" as a "concession or recognition" of the plaintiffs having suffered injury by the health insurer because "such a rule would disincentivize companies from offering credit or other monitoring services in the wake of a breach"; then citing Fed. R. Evid. 407–08 (cleaned up)); *see also Michalesko v. Office Max*, No. 4:04-CV-2479, 2006 WL 3791344, at *3 (M.D. Pa. Dec. 22, 2006) ("[The p]laintiff has offered no authority in support of its argument that contesting of an element of a tort is grounds for admitting otherwise inadmissible subsequent remedial measures."). Accordingly, the Court concludes that Plaintiffs fail to plausibly plead that FCA was making "fixes" or "revisions" to the Class Vehicles' rear differentials and "Plaintiffs fail to connect the release of the [MY2023 Demon] to the defect and symptoms they allege for their vehicles," D.I. 61 at 5, when the circumstances surrounding the MY2023 Demon indicate instead that FCA was simply making "***a new level, a new benchmark of 'factory-crazy' production car performance***." D.I. 61 at 4.

Finally, in addition to Plaintiffs' failure to plausibly plead pre-sale knowledge of the Differential Defect, they also do not plausibly plead any *knowing* fraudulent *concealment or misrepresentation* of the Differential Defect by FCA. *Compare* D.I. 59 ¶¶ 307–322 (reasserting the same factual allegations as their Complaint and only adding one paragraph simply noting that the automotive press widely covered the 2019 private event at the Houston Raceway Park), *with* D.I. 1 ¶¶ 202–216; *see also* D.I. 49 at 3–5. The Court has also reviewed what was amended and supplemented from the original Complaint, *see, e.g.*, D.I. 59 ¶¶ 11, 26–38, 46–48, 81–84, 99–100, 104, 118, 137–142, 149–150, 161, 166–175, 179, 188–198, 258–272 (mentioning, among other things: the MY2023 Dodge Demon's public acknowledgment; Plaintiffs' experience when buying Class Vehicles, including speaking to dealership representatives or looking at window stickers;

marketing materials, including television commercials, websites, online videos or brochures on Class Vehicles; discussions with FCA-authorized dealership personnel on repairs; etc.),[23] and concludes that once again, "Plaintiffs provide no facts . . . to show what is false about these representations, other than that they run counter to the reality of the Class Vehicles, which, according to Plaintiffs, are defective." *Diaz*, 2022 WL 4016744, at *32.

In sum, Plaintiffs fail to provide any plausible facts demonstrating FCA's pre-sale knowledge of the Differential Defect and cannot satisfy the pleading requirements of Rule 9(b) for the Fraud-Based Claims relating to any actionable omissions, concealments, or misrepresentations. Thus, the Court dismisses with prejudice the FASC's Fraud-Based Claims (Counts I, II, V, VI, VIII, X, and XII).

### B. Some State Law Implied Warranty Claims Fail (Counts IV & VII) While Others Survive (Counts IX & XI).

Rule 8 applies to Plaintiffs' claims relating to breaches of implied warranty of merchantability ("Implied Warranty Claims") under four states, California, Florida, New Jersey, and Texas (Counts IV, VII, IX, and XI, respectively).  Plaintiffs' FASC must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see generally*, *supra*, Section II.

---

[23]     The Court agrees with FCA, that the "types of generalized statements Plaintiffs point to constitute nothing more than nonactionable 'puffery.'"  D.I. 48 at 8 (collecting cases); *see, e.g.*, D.I. 59 ¶ 191 ("Plaintiff Kissler recalls speaking with multiple FCA sales representatives prior to purchase who represented that the [Class Vehicle] was a 'quick car' and 'fun to drive.'"). "'Puffery' typically involves making 'generalized statements,' not making specific claims, or making claims 'so exaggerated as to preclude reliance by consumers.'"  *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV 18-1882 JGB (SHKx), 2019 WL 2619666, at *12 (C.D. Cal. May 20, 2019) (quoting *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990)).  The Court concludes that Plaintiffs do not identify or plausibly plead with particularity any misrepresentations knowingly made by FCA, even those statements made to Plaintiffs while they purchased their Class Vehicles.  *See generally* D.I. 59.

An implied warranty of merchantability under California, Florida, New Jersey, and Texas law requires merchantable goods to be "fit for the ordinary purposes for which such goods are used." Cal. Civ. Code § 1791.1(a)(2); *see also* Fla. Stat. Ann. § 672.314(2)(c) (same); Tex. Bus. & Com. Code §§ 2.314(b)(3) (same), 2A.212(b)(3) (noting the same); N.J. Stat. Ann. § 12A:2-314(2)(c) (same). To plausibly plead a breach of implied warranty, Plaintiffs must plead that their Class Vehicles are unfit for their ordinary purposes. *See, e.g.*, *Greene v. BMW of N. Am.*, No. 2:11-04220 (WJM), 2013 WL 5287314, at *2 (D.N.J. Sept. 17, 2013) ("Under an implied warranty of merchantability, a manufacturer warrants to deliver a product that is reasonably suitable for the ordinary uses it was manufactured to meet." (cleaned up)). FCA argues that Plaintiffs do not demonstrate that their Class Vehicles are unfit for their ordinary purposes because "none of the Plaintiffs allege they have stopped driving their vehicles, or cannot drive them today, and, Plaintiffs acknowledge that when they actually presented their vehicles for a repair, either a free repair was provided or the condition complained of could not be replicated." D.I. 48 at 16 (citations omitted). The Court disagrees, because "[t]he ordinary purpose of a car is not simply to provide transportation but rather, *safe and reliable transportation*." *Lessin v. Ford Motor Co.*, No. 3:19-cv-01082-AJB-AHG, 2020 WL 6544705, at *7 (S.D. Cal. Nov. 6, 2020) (emphasis added) (applying California law); *see also Greene*, 2013 WL 5287314, at *2 ( "In the context of a car, this warranty is satisfied when the vehicle provides safe and reliable transportation." (applying New Jersey law)). "Whether a defect is so severe that the cars at issue could not be said to provide safe, reliable transportation is a question of fact for the jury." *Click v. Gen. Motors LLC*, No. 2:18-CV-455, 2020 WL 3118577, at *11 (S.D. Tex. Mar. 27, 2020) (cleaned up) (applying Texas law).

Taking the FASC's factual allegations as true, Plaintiffs assert that the "Differential Defect can cause unexpected failures that significantly impair the safety, reliability, and operability of the

Class Vehicles to such an extent that they are rendered unfit for the ordinary purpose of driving on public roadways." D.I. 59 ¶¶ 56 (Diaz), 88 (Santos), 107 (Gibson), 126 (Sinclair), 155 (Veal), 177 (Stone), 200 (Kissler). Plaintiffs insist that their Class Vehicles under warranty are "unusable and unsafe even for regular driving," D.I. 59 ¶ 12, because the Differential Defect "pose[s] a safety risk on a racetrack and on public roads due the horsepower and torque loads placed upon the defective rear differential for which it is incapable of withstanding," D.I. 59 ¶ 14 ("[T]he high speeds the Class Vehicles can rapidly attain due to their high-performance engines causes the defective differential to be a much greater safety risk."). They further state that they have "lost confidence in the ability" of their respective Class Vehicles to "provide safe and reliable transportation for ordinary" purposes. D.I. 59 ¶¶ 57 (Diaz), 89 (Santos), 108 (Gibson), 127 (Sinclair), 156 (Veal), 178 (Stone), 201 (Kissler). The Court finds that Plaintiffs, at this stage, have plausibly pleaded that the Differential Defect renders Class Vehicles "unfit" for their ordinary purposes[24] by failing to provide safe and reliable transportation under New Jersey or Texas law, so Counts IX and XI survive FCA's Motion to Dismiss. Those Counts, no doubt, will be further tested after discovery.

---

[24]    Both Plaintiffs Stone and Kissler allege that they took their Class Vehicles to FCA-authorized dealerships, where they both individually complained of a "low throttle noise in the rear of the vehicle" and a "vibration coming from the rear of the vehicle" for their respective Class Vehicles, that the relevant FCA-authorized dealership replaced their Class Vehicles' rear differentials, and that the complained-of problems persisted for the Class Vehicles. *See* D.I. 59 ¶¶ 172–178, 195–201. At the pleading stage, the Court does not need to resolve a question of fact, whether Plaintiffs Stone's and Kissler's alleged experiences of the Differential Defect are "so severe that the cars at issue could not be said to provide safe, reliable transportation . . . ." *Click*, 2020 WL 3118577, at *11; *see also Arakelian v. Mercedes-Benz USA, LLC*, No. CV 17-06240 TJH (RAOx), 2018 WL 6422649, at *2 (C.D. Cal. June 4, 2018) ("A vehicle is not in safe condition or free from defects when it smells, lurches, clanks, or emits smoke over an extended period of time. On the other hand, a defect that creates a minor inconvenience does not make the product defective or unmerchantable." (cleaned up)).

On the other hand, the Court concludes that Plaintiffs fail to overcome similar hurdles that previously led to the dismissal of their claims under both California and Florida law. *See generally Diaz*, 2022 WL 4016744, at \*36–45. These are addressed in reverse order.

In Florida, implied warranties are recognized "*only when* the litigants were in privity with the manufacturer." *Talley v. Gen. Motors, LLC*, No. 1:20-cv-01137-SB, 2021 WL 7209448, at \*7 (D. Del. Nov. 26, 2021) (emphasis added) (citing *Ocana v. Ford Motor Co.*, 992 So.2d 319, 325 (Fla. D. Ct. App. 2008)), *reconsideration denied*, No. 1:20-cv-01137-SB, 2022 WL 958467 (D. Del. Mar. 30, 2022). Plaintiffs largely reassert in the FASC that the FCA-authorized dealerships are Defendant's agents based on "agreements" between Defendant and its "nationwide network of authorized dealerships," relating to servicing and repairing cars sold under warranty. D.I. 59 ¶ 328 ("[D]iscovery will show that Defendant's authorized dealerships are Defendant's agents, and the consumers who purchase or lease Defendant vehicles are the third-party beneficiaries[25] of these dealership agreements, which allow the consumers to purchase and service their Defendant vehicles locally."). FCA argues and the Court agrees that Plaintiffs Gibson, Sinclair, and Veal bought their Class Vehicles from "third party dealerships" and not from Defendant, so "the implied warranty claim under Florida law (Count VII) [is] also subject to dismissal for lack of privity." D.I. 48 at 16; *see also Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1116 (S.D. Fla. 2019) ("Consistent with the overwhelming weight of Florida law, this Court has repeatedly ruled that to establish contractual privity to state a breach of implied warranty claim, *plaintiffs must purchase the product at issue directly from the defendant*." (emphasis added)). Even when reading

---

[25]   Once more, the Court does not find any factual allegations to support the application of Florida's third-party beneficiary exception here and concludes that "Florida Plaintiffs have failed to successfully allege any exception to the vertical privity requirement, and their claims for breach of the implied warranty of merchantability must fail." *Diaz*, 2022 WL 4016744, at \*45.

the facts in the light most favorable to Plaintiffs, they are unable to plausibly plead privity through

an agency relationship[26] between Defendant and FCA-authorized dealerships.  *See, e.g.*, *Talley*,

2021 WL 7209448, at *7 (dismissing with prejudice the Florida implied warranty claim, when

applying Florida law to find no privity with the manufacturer where the purchasers bought cars

from dealerships and not from the manufacturer).  Thus, this Court dismisses Count VII with

prejudice.

Next, Plaintiffs' breach of implied warranty of merchantability claim under California's

Song-Beverly Consumer Warranty Act ("Song-Beverly Act") fails to satisfy the four-year statute

of limitation.  *See, e.g.*, *Harris v. LSP Prod. Grp., Inc.*, No. 2:18-cv-02973-TLN-KJN, 2021 WL

2682045, at *5 (E.D. Cal. June 30, 2021).  "Under § 2725, any claim for breach of contract for

sale of goods must be brought 'within four years after the cause of action has accrued.'"  *Id.*

(quoting Cal. Com. Code § 2725(1)).  "Such claim accrues at tender of delivery, with a limited

exception for future performance[.]"  *Id.*  Plaintiff Diaz alleges that he purchased his vehicle on

---

[26]     Plaintiffs assert that the authorized dealerships are FCA's agents.  *See, e.g.*, D.I. 59 ¶ 332
("FCA's warranty booklets make it abundantly clear that *FCA's authorized dealerships are FCA's
agents* for vehicle sales and service." (emphasis added)); *but see Ocana*, 992 So.2d at 326 ("The
complaint is devoid of any allegation of some of the tell-tale signs of a principal-agent relationship,
such as the ability of the principal to hire, fire, or supervise dealership employees or dealer
ownership.").  Under such an agency theory in Florida, Plaintiffs must demonstrate FCA's
acknowledgment of the agency relationship, "acceptance of the undertaking" by the authorized
dealerships, and FCA's "control" over the authorized dealerships' "day-to-day activities during
the course of the agency."  *Ocana*, 992 So.2d at 326 (concluding that, among other allegations,
that exercising control over "provid[ing] warranty service paid for by" the manufacturer "neither
individually nor collectively support the existence of an agency relationship" with the dealership).
     After amending and supplementing their pleading, Plaintiffs still fail to plausibly plead
such facts.  Rather, they express to this Court that they still do not even know what the relationship
entails but only speculate.  *See, e.g.*, D.I. 59 ¶ 328 ("*Plaintiffs will be requesting the agreements*
between FCA and its nationwide network of authorized dealerships *in discovery*.  Upon
information and belief, *the agreements* between FCA and its nationwide network of authorized
dealerships *will corroborate the agency relationship* that exists between FCA and its authorized
dealerships." (emphases added)).

October 27, 2015, bringing it to an FCA-authorized dealership once for repairs on April 26, 2016. *See* D.I. 59 ¶¶ 39–53.  Plaintiff Santos alleges that he purchased his vehicle on August 27, 2016, noticed an issue "[i]n or around August 2017," and brought the vehicle to an FCA-authorized dealership for repairs on August 28, 2017.  D.I. 59 ¶¶ 70–72.  FCA insists that the Song-Beverly Act claims here began to run from the time Plaintiffs Diaz and Santos bought their Class Vehicles "at tender of delivery," D.I. 48 at 18 (quoting *Harris*, 2021 WL 2682045, at *5), so the four-year statute of limitations renders their claims time-barred.  Plaintiffs, however, insist that the delayed discovery rule applies here,[27] *see* D.I. 49 at 18 ("A breach of warranty claim accrues when the plaintiff reasonably knows or should know that breach has occurred—that is, that the defendant either will not or cannot repair an existing defect." (quoting *Kwon Yi v. BMW of N. Am., LLC*, 805 F. App'x 459, 461 (9th Cir. 2020))).  The Ninth Circuit provides:

> [U]nder California's so-called "discovery rule," this four-year statute of limitations begins to run only "when the breach is or should have been discovered."  Cal. Com. Code. § 2725(2); *see Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 216–18, 285 Cal. Rptr. 717 (1991) (applying the discovery rule to claims for a breach of warranty and other Song-Beverly Act claims).  The California Supreme Court has explained that, under this discovery rule, "[o]nce the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights."  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111, 245 Cal. Rptr. 658, 751 P.2d 923 (1988).

*Schick v. BMW of N. Am., LLC*, 801 F. App'x 519, 520 (9th Cir. 2020) (applying discovery rule to Song-Beverly implied warranty claim).

---

[27]   Plaintiffs also assert that "[a]ny applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein."  D.I. 59 ¶ 334; *see* D.I. 59 ¶¶ 334–338; *see also* D.I. 49 at 17–18.  Because Plaintiffs fail to plausibly plead their Fraud-Based Claims, including fraudulent concealment, *see supra*, Section III.A., Plaintiffs Diaz and Santos "cannot toll the statute of limitations as to their Song-Beverly Act implied warranty claims based on this doctrine."  *Diaz*, 2022 WL 4016744, at *40; *see also id.* at *39 (collecting cases).

"In order to invoke the delayed discovery exception to the statute of limitations, the plaintiff must specifically plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Herremans v. BMW of N. Am., LLC*, No. CV 14-02363 MMM (PJWx), 2014 WL 5017843, at *4 (C.D. Cal. Oct. 3, 2014) (cleaned up); *see also E-Fab, Inc. v. Accts., Inc. Servs.*, 64 Cal. Rptr. 3d 9, 17 (Cal. Ct. App. 2007) ("A plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.").

Plaintiff Diaz relies on essentially the same set of factual allegations as before, with one applicable change from saying that the "dealership told him nothing was wrong with the vehicle," D.I. 1 ¶ 37, to now detailing that the "dealership told him the driveshaft and rear differential were normal and there was nothing wrong with the vehicle as it was operating as intended. Plaintiff's Class Vehicle was covered by warranty at this time, yet FCA failed to recommend repairs to the rear differential," D.I. 59 ¶ 52. However, Plaintiff Diaz does not plead facts relating to his time and manner of discovery of the Differential Defect. *See generally* D.I. 59 ¶¶ 39–59.

Also, this Court noted in its prior opinion that "Plaintiff Santos must specifically allege facts to show his 'inability to have made earlier discovery despite reasonable diligence.'" *Diaz*, 2022 WL 4016744, at *39. "The burden is on the plaintiff to show diligence, and conclusory allegations will not withstand demurrer." *E-Fab, Inc.*, 64 Cal. Rptr. 3d at 17. Plaintiff Santos insists that he "exercised reasonabl[e] diligence in investigating the defects by continually taking his vehicle in for repairs," D.I. 59 ¶ 81, that he relied on "FCA's authorized dealership representatives' assertions that each repair fixed the issue," when at each visit he was "reassured" by the FCA-authorized dealership's "service personnel that his vehicle was fixed," D.I. 59 ¶ 82,

26

and that "[n]o reasonable consumer would have done more than take their vehicle to an authorized dealership to fix the issues with their rear differential under warranty[,]" D.I. 59 ¶ 84.  Even accepting these factual allegations as true, Plaintiff Santos fails to point to his time and manner of discovery of the Differential Defect.  *See generally* D.I. 59 ¶¶ 60–91.

The Court concludes that Plaintiffs Diaz and Santos cannot invoke the delayed discovery rule here, where even after amending and supplementing their pleading, they fail to provide any "specific allegations concerning *how or when [they] first discovered the defect*."  *Herremans*, 2014 WL 5017843, at *5 (emphasis added); *see also Diaz*, 2022 WL 4016744, at *39 (quoting the same). Plaintiffs have been afforded the opportunity to amend and supplement their pleading, so the Court dismisses with prejudice the implied warranty claims under the Song-Beverly Act as time-barred, because Plaintiffs Diaz and Santos fail to plausibly plead that they "can invoke the delayed discovery rule . . . ."  *Herremans*, 2014 WL 5017843, at *7.

Thus, Plaintiffs' Implied Warranty Claims under New Jersey and Texas law (Counts IX and XI) survive; however, the Implied Warranty Claims under California and Florida law fail, so the Court dismisses with prejudice Counts IV and VII.

### C. The Magnuson–Moss Warranty Act Claim (Count III) Stands or Falls with the State Law Implied Warranty Claims.

The Parties agree that Plaintiffs' claim under the federal Magnuson–Moss Warranty Act ("MMWA") (Count III) stands or falls with the state law Implied Warranty Claims.  *See* D.I. 48 at 15; D.I. 49 at 14; *see also Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015) ("Claims under the Magnuson–Moss Warranty Act stand or fall with … express and implied warranty claims under state law." (cleaned up)); *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 254 (3d Cir. 2010) ("Cooper's [MMWA] claim is based upon his state law claims of breach of express and

implied warranties.  Since the [d]istrict [c]ourt correctly dismissed both of those claims, Cooper's [MMWA] claim was also properly dismissed.").

The Court observes, however, that the "MMWA requires at least 100 named plaintiffs to advance a class action claim under the Act." *Robinson v. Gen. Motors, LLC*, No. 1:20-CV-00663, 2022 WL 19384806, at *4 (D. Del. Dec. 5, 2022) (citing 15 U.S.C. § 2310(d); then citing *Talley*, 2021 WL 7209448, at *6).  There are only seven named Plaintiffs, *see generally* D.I. 59, not the 100 required to bring the MMWA claim.  *See* 15 U.S.C. § 2310(d)(3)(C) ("(3) No claim shall be cognizable in a suit . . . (C) if the action is brought as a class action, and the number of named plaintiffs is less than one hundred.").  Thus, the Court dismisses with prejudice Count III to the extent that it must fall with the Implied Warranty Claims under California and Florida law (Counts IV & VII) and dismisses without prejudice Count III to the extent that it stands with the Implied Warranty Claims under New Jersey and Texas law (Counts IX & XI).  Plaintiffs are granted leave to amend their FASC to include 100 named plaintiffs to support an MMWA claim that stands with the Implied Warranty Claims under either New Jersey or Texas law.  *See Robinson*, 2022 WL 19384806, at *4 ("Since [p]laintiffs' [a]mended [c]omplaint includes less than 100 named plaintiffs, the MMWA claim is dismissed without prejudice, and [p]laintiffs are granted leave to amend.").

**D.  The Request for a Recall is Pre-Empted by Federal Law.**

FCA contends with Plaintiffs' requested relief relating to an order that compels FCA "to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a)[.]"  D.I. 59 at 135 ("Prayer for Relief"); *see also* D.I. 48 at 19 (quoting the same).  Plaintiffs argue that "there is no actual conflict between FCA's voluntary recall and NHTSA, which has taken no action."  D.I. 49 at 20 (citing *Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d 1208, 1217–18 (N.D. Cal. 2002) ("At

most, [d]efendant has demonstrated that the relief sought by [p]laintiffs *might* conflict with some future action of NHTSA as it investigates the alleged defect at issue in this action.")).  This Court disagrees.  *See Flynn v. FCA US LLC*, No. 15-cv-0855-MJR-DGW, 2016 WL 5341749, at *5 (S.D. Ill. Sept. 23, 2016) (concluding that "a court-supervised recall would run roughshod over the recall procedures put forth in the Motor Vehicle Safety Act for an agency-coordinated recall," and that "[t]he problem is that a state law can be preempted if it interferes with the actual goal of a federal statute or if it interferes with the methods by which the federal statute set to achieve the federal goal" (collecting cases; then distinguishing as unpersuasive *Kent*, 200 F. Supp. 2d at 1217–18)). The Court concludes that "[u]sing state law, as [Plaintiffs] are trying to do here, to obtain declaratory-style recall relief would create an implied preemption problem, for court ordered recalls would interfere with the methods set up for recalls by the Safety Act."  *Id*. at *5.  Thus, Plaintiffs' requested relief is "dismissed with prejudice as an improper intrusion into federal governmental operations by state law, to the extent that Plaintiffs seek to enjoin Defendant to perform a recall of the Class Vehicles 'pursuant to applicable NHTSA guidelines.'"  *Granillo v. FCA US LLC*, No. 16-153 (FLW)(DEA), 2016 WL 9405772, at *20 (D.N.J. Aug. 29, 2016); *see also* D.I. 59 at 135 (requesting an order to compel FCA "to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a)").

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Defendant's Motion to Dismiss (D.I. 47) is **GRANTED-IN-PART** and **DENIED-IN-PART**:

1. The Motion to Dismiss is **GRANTED** with respect to Counts I, II, III, IV, V, VI, VII, VIII, X, and XII, as well as to the requested relief to compel FCA to perform a voluntary recall according to NHTSA regulations;

    a.  Counts I, II, III (as to Plaintiffs Diaz, Santos, Gibson, Sinclair, and Veal), IV, V, VI, VII, VIII, X, and XII, as well as to the requested relief to compel FCA to perform a voluntary recall according to NHTSA regulations are **DISMISSED WITH PREJUDICE**;

    b.  Count III (as to Plaintiffs Stone and Kissler) is **DISMISSED WITHOUT PREJUDICE**; and

2.  The Motion to Dismiss is **DENIED** with respect to Counts IX and XI.

The Parties are **ORDERED** to confer and file a Joint Letter to the Court proposing a schedule as to how this case should proceed, on or before **October 5, 2023**.  The Court will schedule a Status Conference with the Parties after receipt of the Joint Letter.

**SO ORDERED.**